**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**☐ ORIGINAL**

---------------------------------------------------x

UNITED STATES OF AMERICA

– against –                                                                    CR NO. 01-10384-MLW

GARY LEE SAMPSON

----------------------------------------------------x

## GARY LEE SAMPSON'S MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE, AND CORRECT CONVICTION AND DEATH SENTENCE MADE PURSUANT TO 28 U.S.C. § 2255 AND/OR RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Gary Lee Sampson, represented by counsel appointed by this Court, pursuant to 28

U.S.C. § 2255 and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and the

provisions of Rule 33 of the Federal Rules of Criminal Procedure, requests that this Court grant

him a new trial and vacate, set aside, and correct his conviction and sentence of death.

### PRELIMINARY STATEMENT

Mr. Sampson was indicted by a federal grand jury on October 24, 2001, on two counts of

violating 18 U.S.C. § 2119(3), in connection with the carjackings and murders of Philip

McCloskey and Jonathan Rizzo. The indictment was subsequently amended twice on June 5,

2002, and August 8, 2002. Mr. Sampson pleaded guilty to the controlling indictment on

September 9, 2003. After a penalty phase, a jury determined that Mr. Sampson should be

sentenced to death on both counts of the Second Superseding Indictment on December 23, 2003.

This Court formally entered a judgment on January 29, 2004, sentencing Mr. Sampson to death.

In this motion, Mr. Sampson demonstrates that his conviction and sentence were obtained in

violation of the U.S. Constitution and laws of the United States, as required by 28 U.S.C. § 2255.

- 1 -

## TABLE OF CONTENTS

I.      Introduction. .................................................................................................- 7 -

II.     Summary of Evidence Presented During the Penalty Phase. .........................- 8 -

    A.      The Government's Presentation. ..........................................................- 8 -

    B.      The Defense's Presentation. ...............................................................- 12 -

    C.      The Government's Rebuttal...................................................................- 14 -

    D.      The Defense's Sur-Rebuttal..................................................................- 14 -

    E.      The Jury's Findings. ............................................................................- 15 -

III.    Mr. Sampson Was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments To the U.S. Constitution and 18 U.S.C. § 3006A.................................................................................................- 16 -

    A.      Mr. Sampson Is Entitled to Habeas Relief because Trial Counsel Provided Ineffective Assistance During the Sentencing Proceedings...............- 16 -

    B.      Trial Counsel Has a Duty To Investigate and Present Mitigating Evidence. ................................................................................................- 18 -

    C.      Trial Counsel Was Ineffective for Failure To Conduct a Proper Investigation Into Mr. Sampson's Life and To Present a Complete Picture of Powerful Mitigating Evidence. .........................................- 23 -

        1.      Trial Counsel Failed To Conduct an Adequate Investigation of Mitigating Evidence. ...............................................................- 23 -

        2.      Trial Counsel Presented a Weak Mitigation Case to the Jury. ..............- 25 -

        3.      An Effective Investigation Would Have Uncovered Ample Mitigating Evidence. ...............................................................- 28 -

            a.      Brief Family History.................................................- 29 -

            b.      Early Evidence of Head Injury. ................................- 30 -

            c.      Early Childhood and Adolescence. ..........................- 31 -

            d.      Educational Difficulties and Early Brain Dysfunction..............- 33 -

            e.      Substance Abuse, Continuing Signs of Brain Impairment, and Petty Crimes......................................- 35 -

            f.      Prison Trauma.........................................................- 38 -

            g.      Parole and North Carolina. ......................................- 38 -

            h.      Late July 2001. ........................................................- 44 -

        4.      Trial Counsel's Failure To Investigate and Present Mitigating Evidence Was Prejudicial.................................................................- 47 -

D.   Trial Counsel Was Ineffective for Failure To Investigate and Present Evidence that Mr. Sampson Suffered from Significant Brain Damage. ........... - 49 -

  1.   Trial Counsel Had a Duty To Investigate and Develop Evidence of Significant Brain Damage. ................................................. - 49 -

  2.   Trial Counsel Failed To Thoroughly Investigate and Develop Evidence of Mr. Sampson's Significant Brain Damage........................ - 50 -

  3.   If Trial Counsel Had Been Effective, They Would Have Discovered Evidence of Significant Brain Damage. ............................ - 52 -

      a.   Trial Counsel Could Have Provided Dr. Deters Evidence To Corroborate His Testimony. ............................... - 52 -

      b.   Trial Counsel's Investigation and Presentation of Mitigation Evidence Could Have Corroborated Dr. Deters' Testimony. ................................................................. - 53 -

      c.   Dr. Ruben Gur's Test Results..................................... - 55 -

      d.   Trial Counsel's Unreasonable Conduct Prejudiced Mr. Sampson................................................................... - 58 -

E.   Trial Counsel was Ineffective for Failure To Investigate and Present Evidence Regarding Mr. Sampson's Trauma in Prison. ................................... - 59 -

  1.   Trial Counsel Has a Duty to Investigate Evidence of Institutional History and Adjustment. ..................................................... - 59 -

  2.   Trial Counsel Failed To Investigate and Present Compelling Evidence of Prison Trauma. ................................................................. - 59 -

  3.   An Adequate Investigation Would Have Revealed Relevant Mitigating Evidence of the Conditions of Mr. Sampson's Confinement in State Prison Systems................................................... - 60 -

  4.   An Adequate Investigation Would Have Revealed Relevant Mitigating Evidence of Mr. Sampson's Treatment in Prison............... - 62 -

  5.   Trial Counsel's Failure To Investigate and Present Evidence of Prison Trauma Prejudice Mr. Sampson............................................. - 64 -

F.   Trial Counsel Was Ineffective for Failure To Investigate and Present Evidence of Trauma and Neglect in Childhood and Adolescence. ................... - 65 -

  1.   Trial Counsel Has a Duty To Investigate and Present Evidence of Trauma and Neglect in Childhood and Adolescence ....................... - 66 -

  2.   Trial Counsel Failed To Thoroughly Investigate or Corroborate Evidence of Trauma......................................................................... - 67 -

  3.   A Thorough Investigation Would Have Revealed Relevant Mitigating Evidence of Trauma and Neglect in Childhood and Adolescence....................................................................................... - 69 -

4.      Trial Counsel's Failure To Investigate Mitigating Evidence of Trauma and Neglect in Childhood and Adolescence Was Prejudicial. .................................................................................. - 74 -

G.      Trial Counsel Was Ineffective by Failing To Plead Mr. Sampson Guilty prior to the Supreme Court's Decision in *Ring v. Arizona*. .................... - 75 -

H.      Trial Counsel Was Ineffective by Pleading Mr. Sampson Guilty to the Second Superseding Indictment after the Supreme Court's Decision in *Ring v. Arizona*. ............................................................................... - 81 -

I.      Trial Counsel Was Ineffective by Allowing Mr. Sampson To Proceed to Trial While Incompetent, and Mr. Sampson Was Denied His Right to a Contemporaneous Determination of Competence. ..................................... - 84 -

        1.      Trial Counsel's Failure to Raise Visible Signs of Mr. Sampson's Incompetency to This Court's Attention Was Ineffective and Prejudicial. ................................................................ - 84 -

        2.      This Court Had a Duty To *Sua Sponte* Order a Competency Hearing. ............................................................................................ - 89 -

J.      Trial Counsel Was Ineffective for Failure To Present Evidence That Mr. Sampson's Indifferent Demeanor During Court Proceedings Was Caused by His Medication. ............................................................................. - 90 -

K.      Trial counsel Was Ineffective For Failure To Properly Investigate and Impeach Government Witness John Flanagan. ................................................. - 92 -

        1.      Trial Counsel's Performance Was Deficient for Failure To Investigate Readily Available Records of Mr. Flanagan's Background. .................................................................................... - 94 -

        2.      Trial Counsel's Failure To Investigate Mr. Flanagan Prejudiced Mr. Sampson. .............................................................................. - 98 -

L.      Trial Counsel Was Ineffective for Failure To Cross-Examine the Government's Psychiatrist on the Substance of His Conclusions. .................. - 100 -

M.      Trial Counsel Was Ineffective for Failure To Move for an Immediate Mistrial When the Victims' Bloody Shirts Were Improperly Exposed to the Jury. ....................................................................................................... - 103 -

N.      Trial Counsel Was Ineffective for Failure To Frame Mr. Sampson's Confessions in the Context of His Severe Brain Damage and Mental Impairments. ................................................................................................... - 106 -

        1.      Trial Counsel Was Deficient for Failure To Explain Mr. Sampson's Confessions In Light of His Brain Damage and Mental Impairments. ................................................................... - 106 -

        2.      Trial Counsel's Failure To Mitigate the Confession Was Prejudicial. ................................................................................ - 108 -

Redacted

.

## IV.    [An Issue Relating To the Jury – FILED UNDER SEAL]

.

V.    The Government Violated Its Obligations Under *Brady v. Maryland* for Failure To Disclose to Mr. Sampson Information Material to His Ability To Prepare and Present a Defense at Sentencing. ................................................................- 120 -

    A.    Michael Hannon. ................................................................................- 121 -

    B.    Joseph Casey. ....................................................................................- 122 -

VI.    The Government's Misconduct in the Grand Jury Violated Mr. Sampson's Rights Under the Fifth and Eighth Amendments to the U.S. Constitution. ...............- 123 -

    A.    The Government Violated Mr. Sampson's Rights by Misusing the Role of the Grand Jury To Foreclose Trial Testimony from Mitigating Witnesses. .........................................................................................- 125 -

    B.    The Government Violated Mr. Sampson's Due Process Rights by Coaching Key Witnesses. ...................................................................- 130 -

VII.    The Eighth Amendment Prohibits Executing Mr. Sampson Because He Is Severely Mentally Impaired. ....................................................................................- 134 -

    A.    *Atkins v. Virginia.* .............................................................................- 135 -

    B.    *Roper v. Simmons.* ............................................................................- 137 -

    C.    Mentally Impaired Offenders. ............................................................- 137 -

        1.    Objective Indicia of Consensus. ............................................- 138 -

        2.    Deterrence. ...............................................................................- 141 -

        3.    Retribution. ...............................................................................- 141 -

VIII.    Sentencing Mr. Sampson to Death is Unconstitutional because Carjacking Is Not a Valid Federal Crime. ........................................................................................- 142 -

IX.    The Death Penalty and the Federal Death Penalty Act Violate the U.S. Constitution. ..............................................................................................................- 145 -

A.  The Federal Death Penalty is Unconstitutional as Applied in this Case because the Statute Does Not Permit Aggravating Factors Necessary for a Death Verdict to be Presented to a Grand Jury, as Required by *Ring v. Arizona*. ............................................................................................- 145 -

B.  The Federal Death Penalty Is Unconstitutional because It Is Rarely Sought or Imposed and, Therefore, Operates in a Fundamentally Arbitrary and Capricious Manner. ...................................................- 146 -

C.  The Federal Death Penalty Is Unconstitutional Because No Principled Basis Exists To Distinguish Between Cases in which the Death Penalty is Imposed and Cases in which It Is Not. ............................................- 148 -

D.  The Death Penalty Is Unconstitutional because, as a System, It Is Sought on the Invidious Basis of Race and the Irrational Basis of Geography. .....................................................................................- 149 -

E.  The Federal Death Penalty Is Unconstitutional because of the Probability that Its Continued Enforcement Will Lead to the Execution of a Meaningful Number of Innocent People. ...................................- 149 -

F.  The Death Penalty Is Unconstitutional because It Operates as a *Per Se* Denial of Due Process in All Cases. ..............................................- 150 -

X.   The Cumulative Effect of the Errors Discussed in this § 2255 Motion Demand Relief. ...............................................................................................- 150 -

XI.  Mr. Sampson Is Entitled to an Evidentiary Hearing. ..................................- 152 -

## STATEMENT OF JURISDICTION

This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. §§ 2255 and 2241.

## CLAIMS FOR RELIEF

### I.    Introduction.

The trial jury sentenced Gary Lee Sampson to death.   They made this decision without the benefit of a full and accurate account of his life-long struggle with debilitating brain damage. They were also unaware of the impact on him of the violence, degradation and humiliation spawned by the consequences of that damage.  Trial counsel failed to conduct the mandated adequate investigation into mitigation, depriving Mr. Sampson of the effective assistance of counsel guaranteed by the Constitution of the United States.  Trial counsel's strategy focused on the theme of acceptance of responsibility, emphasizing Mr. Sampson's efforts to turn himself in before and after the tragic events of the last week in July 2001, his subsequent confessions and assistance to law enforcement, and his guilty plea.  Trial counsel also focused on the argument that he would not be a future danger if incarcerated for life without parole.  Trial counsel, however, never adequately investigated available witnesses and documents that establish brain damage and mental disease far greater than that presented at trial, and childhood trauma and brutal conditions of confinement starting in his teenage years that coalesced to exacerbate this brain damage and its accompanying psychiatric impairments.  This Constitutional violation prejudiced Mr. Sampson because if that evidence had been developed as it has been below, it is reasonably probable that a unanimous verdict for death would not have been returned.

This motion raises additional issues of ineffective assistance of counsel, including the decision not to plead guilty in anticipation of the Supreme Court's decision in *Ring v. Arizona* to an indictment that, based on the *Ring* decision, could not have resulted in a death sentence.  This

motion also challenges the decision after *Ring* to plead Mr. Sampson guilty without obtaining any insulation from the imposition of the death penalty, and proceeding without seeking a determination of Mr. Sampson's competency to assist his counsel and participate in his defense.

Further, this motion advances the claims that the government's failure to comply with its obligations under *Brady v. Maryland*, to disclose to Mr. Sampson information material to his ability to prepare and present his defense at sentencing, and its misuse of the grand jury process to minimize the evidence of Mr. Sampson's mental impairment during the week of the crimes.

Finally, the motion raises an issue relating to the jury and various issues with respect to the Constitutionality of the Federal Death Penalty Act as applied to Mr. Sampson and as applied to the offense of carjacking.

Based on the facts and arguments set forth below, Mr. Sampson seeks a new trial and to vacate, set aside, or correct his death sentence and an evidentiary hearing with respect to the same.

## II.      Summary of Evidence Presented During the Penalty Phase.

### A.      The Government's Presentation.

The Government's case contained most of the same elements it would, had Mr. Sampson not pleaded guilty and instead opted for a guilt phase. In its pursuit of the death penalty, the Government introduced gruesome autopsy photos, a compelling narrative of the search for the victims' bodies, and captivating forensic techniques tying Mr. Sampson to the crimes, all despite his plea of guilty. The Government also played for the jury audio excerpts of Mr. Sampson's graphic confession, thereafter calling multiple witnesses to corroborate what Mr. Sampson already had admitted.

The Government called to the stand a variety of witnesses, including many uniformed police officers who testified concerning the investigation into Mr. Sampson's crimes. Major

Crisp detailed his search for Mr. Rizzo and discussed Mr. Sampson's confession to that death as well as the death of Mr. McCloskey. Tr., Nov. 5, 2003, at 108–124; Tr., Nov. 6, 2003, at 5–17. Trooper Berna described his investigation into the death of Mr. Rizzo, including the condition of the body when it was found. Tr., Nov. 6, 2003, at 104–117. Lieutentant Paul D'Amore also testified to what he found at the Rizzo crime scene. Tr., Nov. 13, 2003, at 61–83. Dr. William Zane catalogued his autopsy of Mr. Rizzo, including an extensive discussion of the wounds inflicted on Mr. Rizzo. Tr., Nov. 6, 2003, at 121–155; Tr., Nov. 10, 2003, at 15–28. Shawn Wood, the manager of the restaurant at which Mr. Rizzo worked, also testified about the last time he saw Mr. Rizzo. Tr., Nov. 12, 2003, at 113–120.

Dennis Macedo and Patrick Shea were called to offer sympathetic testimony about Mr. McCloskey and the search for and discovery of his body, *see* Tr., Nov. 6, 2003, at 17–25, 42–53; and Officers Davis, Taber, and Dateo described the extent of the search and the conditions of the scene where Mr. McCloskey's body was found, *see* Tr., Nov. 6, 2003, at 26–41, 53–83, 84–104. Trooper Cooke testified about the location of the McCloskey crime scene, including its proximity to the Plymouth police station, and Mr. Sampson's confessions to him. Tr., Nov. 19, 2003, at 62–69; Tr., Nov. 20, 2003, at 4–25. Dr. James Weiner offered graphic testimony of his autopsy of Mr. McCloskey. Tr., Nov. 10, 2003, at 81–112. The Government also called Anthony Onorato and Karen Lanning, FBI forensic and trace examiners, to discuss their conclusions that the DNA on a murder weapon matched Mr. Sampson's and the victims, and other trace evidence tying Mr. Sampson to his admitted victims. Tr., Nov. 13, 2003, at 6–25, 29–41.

The Government called several witnesses to describe what they viewed as Mr. Sampson's calm and controlled mental state during the week of the crimes, attempting to minimize

anticipated mental illness mitigation evidence.  Deborah Stuart testified about her brief and uneventful interaction with the "rugged-looking, well groomed" Mr. Sampson on the beach, *see* Tr., Nov. 10, 2003, at 118–130; Valerie Mullaney described her interactions with him when he purchased sodas while waiting for the bus at the Green Harbor general store, *see* Tr., Nov. 10, 2003, at 130–141.  Michael Anabel, a taxi driver, told how he gave an uneventful ride to Mr. Sampson, *see* Tr., Nov. 10, 2003, at 142–148, and Kerri DiCarlo discussed how Mr. Sampson appeared "overdressed" for the campground at which she worked, *see* Tr., Nov. 10, 2003, at 149–167.  Paul Philbrick detailed his interaction with Mr. Sampson at a laundromat in which Mr. Sampson stared at him but did nothing more.  Tr., Nov. 10, 2003, at 168–173.  Officer Robert Akin, Joseph Barrett, Park Ranger Kathleen Duguay, and Joseph Desisto described their calm and polite (though odd) interactions with Mr. Sampson in or near the Myles Standish State Forest.  *See* Tr., Nov. 10, 2003, at 174–208; Tr., Nov. 12, 2003, at 18–92, 99–113.  John Dorion, an employee of the Boston Fire Department, testified about his friendly interaction with Mr. Sampson while his family was bridge-jumping near Eastern Mountain Campground.  *See* Tr., Nov. 12, 2003, at 121–145.

The Government also called witnesses to support the aggravating factors it had alleged in the Second Superseding Indictment.  Officer John Paul Eichhorn and Sergeant William Magee discussed finding Mr. Whitney's body, *see* Tr., Nov. 13, 2003, at 56–60, 91–102, and Detective Kathleen Kimball discussed her attendance at the autopsy of Mr. Whitney, *see* Tr., Nov. 13, 2003, at 113–122.  Mary and Kenneth Boucher testified about what Mr. Whitney was doing at their home on the day of his death, and their last recollection of the condition of the home in which Mr. Whitney's body was found.  *See* Tr., Nov. 13, 2003, at 123–129; Tr., Nov. 17, 2003, at 11–13.  Thomas Andrew, the Chief Medical Examiner for the state of New Hampshire,

testified about Mr. Whitney's autopsy in graphic detail. *See* Tr., Nov. 17, 2003, at 15–27. Michael Smith, an FBI fingerprint specialist, confirmed that Mr. Sampson's fingerprints were found on broken glass at the Boucher home, which he already had admitted to burglarizing. *See* Tr., Nov. 13, 2003, at 43–55. Eugene Schlosser testified about his home, which Mr. Sampson had broken into, *see* Tr., Nov. 17, 2003, at 28–46, and Officer Ray Keefe discussed his arrest of Mr. Sampson at the Schlosser residence, *see* Tr., Nov. 17, 2003, at 72–99; Tr., Nov. 18, 2003, at 7–54. Officer John Helfant described his investigation and discovery of Mr. Sampson's duffle bag and the murder weapon following Mr. Sampson's arrest. *See* Tr., Nov. 18, 2003, at 55–62. Officer Jeffrey Cable described Mr. Sampson's confessions after his arrest. *See* Tr., Nov. 18, 2003, at 82–90.

The Government also detailed other bad acts committed by Mr. Sampson. Four bank tellers from North Carolina recounted when Mr. Sampson robbed their banks at gun point. *See* Tr., Nov. 10, 2003, at 31–77. William Gregory testified about picking up a hitchhiking Mr. Sampson, who appeared to be dressed as a stranded businessman, and running away from his car after Mr. Sampson pulled a knife on him. *See* Tr., Nov, 17, 2003, at 47–69. Correctional Officer Frederick Brousseau described Mr. Sampson's prison escape attempt in 1988, *see* Tr., Nov. 18, 2003, at 70–77, and Correctional Officers Albert Hutchins and Jose Delgado testified that they found metal shanks in Mr. Sampson's cell in 1992 and 1994, *see* Tr., Nov. 18, 2003, at 64–67, 79–82. Correctional Officers Shawn Sullivan, Antone Moniz, Edward Barrett, and Ralph Mattivello described Mr. Sampson's threats when he was placed into the Plymouth County Correctional Facility following his arrest in 2001, *see* Tr., Nov. 19, 2003, at 6–26, 39–58, and Correctional Officer Edward Bombardier described confiscating a shank (a sharpened spoon)

from Mr. Sampson at the same jail, *see* Tr., Nov. 19, 2003, at 26–38.[1] The Government closed its case with compelling, poignant, and wrenching testimony by family members of the victims about the horrendous impact on their lives from the loss of their loves ones. *See* Tr., Nov. 20, 2003 at 40–103.

In sum, the Government put on all it would have been able to during a guilt phase, and more.

### B.    The Defense's Presentation.

Jill Miller, the defense team's mitigation specialist, opened. *See* Tr., Dec. 2, 2003, at 12–180. She gave a recitation of facts from records she had gathered and relayed uncorroborated information reported to her by witnesses and Mr. Sampson. She was impeached on the basis that she was a member of the defense team rather than an unbiased expert. Scott Keller, the defense team's investigator, testified that he was unable to gain the cooperation of Mr. Sampson's family. Joan Katz, a social worker who saw Mr. Sampson twice, testified based on Mr. Sampson's self-reporting that he was abused by his family, and had a long history of substance abuse, low self-esteem, and head injuries. *See* Tr., Dec. 3, 2003, at 183–206; Tr., Dec. 4, 2003, at 9–36.

The defense case primarily consisted of expert testimony. Dr. Thomas Deters testified that Mr. Sampson had impairments in executive functioning consistent with frontal lobe brain damage. *See* Tr., Dec. 9, 2003, at 93–239. Dr. Robert Smith, a teaching expert, discussed the effect of cocaine use on an individual with Bipolar Disorder. *See* Tr., Dec. 9, 2003, at 17–93. Dr. Mark Cunningham detailed how Mr. Sampson would not be a future danger at the Supermax facility where he likely would be sent if sentenced to life in prison without the possibility of

---

[1] The Government also read into the record Exhibit 109, a stipulation that Mr. Sampson placed a call to the FBI's Boston office on July 23, 2001, prior to the murders.

parole. *See* Tr., Dec. 4, 2003, at 67–197. And Dr. Angela Hegarty, a forensic neuropsychiatrist, explained her diagnoses of Bipolar Disorder, Substance Abuse, and Psychosis (Axis I), Borderline Personality Disorder with Antisocial Features (Axis II), and Neurocognitive Deficits, Psoriasis, History of Head Trauma, and Dyslexia (Axis III). *See* Tr., Dec. 10, 2003, at 4–143; Tr., Dec. 11, 2003, at 5–209. She concluded that Mr. Sampson's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *See* 18 U.S.C. § 3592(a)(1). She also testified that Mr. Sampson was remorseful.

Trial counsel called only five corroborating life-history witnesses, three of whom knew Mr. Sampson because of his tenure in the New Hampshire State Prison. These three witnesses— Wayne Brock, Dennis Robinson, and Tina Withington—essentially gave lay testimony regarding Mr. Sampson's mental condition to corroborate Dr. Hegarty's diagnosis of Bipolar Disorder and other mental issues. *See* Tr., Dec. 3, 2003, at 4–182. They also testified that Mr. Sampson tried to receive help for drug treatment when he was in prison. The two other life-history witnesses were Karen Alexander, Mr. Sampson's ex-wife and the mother of his son Hunter, and Houston Roberts, the proprietor of a hotel in North Carolina where Mr. Sampson lived for nine months. Ms. Alexander gave testimony corroborating Mr. Sampson's mood swings, and confirmed that she would be impacted if he were executed. *See* Tr., Dec. 12, 2003, at 7–52. Mr. Roberts said that Mr. Sampson used alcohol and was around people who used drugs, but was a good worker. *See* Tr., Dec. 4, 2003, at 42–59.

Trial counsel also called Emily Schulman, an Assistant United States Attorney. Ms. Schulman testified that, prior to litigating pretrial motions, Mr. Sampson offered to plead guilty to life in prison without the possibility of parole, but the offer was rejected by the United States

Attorney. *See* Tr., Dec. 4, 2003, at 37–51. Trial counsel called Kevin Reddington, an attorney representing the McCloskey family in a civil suit alleging the FBI was at fault for failing to stop Mr. McCloskey's murder. *See* Tr., Dec. 9, 2003, at 5–16.

### C.    The Government's Rebuttal.

The Government in rebuttal presented Dr. Michael Welner, a forensic psychiatrist who testified that Mr. Sampson was not mentally ill, but was merely antisocial. *See* Tr., Dec. 12, 2003, at 62–181. Dr. Welner rebutted the defense experts' conclusions of frontal lobe brain damage, Bipolar Disorder, and remorse. Trial counsel's cross-examination did not substantively contest Dr. Welner's findings but instead was limited to his financial incentives in testifying for the Government. The Government also called John Flanagan, who lived with the Sampson family when Mr. Sampson was approximately three or four years old. *See* Tr., Dec. 15, 2003, at 6–29. Mr. Flanagan stated that for the ten months in 1963–64 that he lived in the household, he did not observe physical abuse. Finally, the Government called U.S. Marshal John Wickham, who testified that Mr. Sampson threatened him during the trial proceedings. *See* Tr., Dec. 15, 2003, at 30–52.

### D.    The Defense's Sur-Rebuttal.

Just prior to closing arguments, this Court permitted trial counsel a brief sur-rebuttal. In an attempt to bolster the defense's claim that Dr. Welner was only interested in money, trial counsel read into the record excerpts in which the firewalled Assistant United States Attorneys described the challenges they faced in "lighting a fire under Dr. Welner" prior his formal contractual retention. *See* Tr., Dec. 19, 2003, at 9–11. Closing arguments followed, and the case was submitted to the jury. *See* Tr., Dec. 19, 2003.

## E.     The Jury's Findings.

The jury unanimously found that Mr. Sampson was guilty of all gateway eligibility factors and all statutory aggravating factors, including that the murders of Mr. McCloskey and Mr. Rizzo were committed in an especially heinous, cruel, or depraved manner; Mr. McCloskey was a particularly vulnerable victim; and Mr. Sampson used substantial planning and premeditation in the murder of Jonathan Rizzo.[2] The jury also unanimously found several nonstatutory aggravating factors, including that Mr. Sampson murdered Mr. Whitney in New Hampshire; he carjacked Mr. Gregory in Vermont; he committed four armed bank robberies in North Carolina; he killed Mr. McCloskey and Mr. Rizzo over a series of criminal episodes; and Mr. Sampson's actions caused injury, harm, or loss to the McCloskey and Rizzo families. One or more jurors found neither that Mr. Sampson murdered Mr. McCloskey or Mr. Rizzo for the purpose of preventing them from reporting the theft of the car to the police, nor that Mr. Sampson was likely to commit criminal acts of the violence in the future.

In mitigation, no jurors found the following mitigating factors: that Mr. Sampson's capacity to conform his conduct to the requirements of the law was significantly impaired; he was under a severe mental or emotional disturbance at the time of the crimes; he was mentally ill at the time of the crimes or at the time of trial; he had a brain dysfunction; he was the subject of verbal, emotional, or physical abuse; or he was remorseful for his conduct. Five jurors found that Mr. Sampson had accepted responsibility for his crimes. Only eight jurors found that Mr. Sampson attempted to surrender himself to the FBI before the murders of Mr. McCloskey and Mr. Rizzo. Eleven jurors found that Mr. Sampson cooperated with every investigative agency, and that one or more people would suffer grief or loss if Mr. Sampson were executed. And all

---

[2] *See generally* D.E. 654 (McCloskey Verdict Sheet), 654-2 (Rizzo Verdict Sheet).

twelve jurors found that Mr. Sampson would be sentenced to life in prison without the possibility

of release if not sentenced to death; he called 911 and surrendered to the Vermont police; his

post-arrest statements led to the recovery of Mr. Rizzo's body and other physical evidence; he

offered to plead guilty and accept a sentence of life in prison without parole; and he pleaded

guilty. The jury sentenced Mr. Sampson to death.

**III.    Mr. Sampson Was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments To the U.S. Constitution and 18 U.S.C. § 3006A.**

    **A.    Mr. Sampson Is Entitled to Habeas Relief because Trial Counsel Provided Ineffective Assistance During the Sentencing Proceedings.**

As the U.S. Supreme Court has stated:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion) (footnote omitted).

When the jury is asked to determine whether a defendant will live or die for his crimes, "[w]hat

is essential is that the jury have before it all possible relevant information about the individual

defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976). The

"performance of defense counsel is a crucial component of the system of protections designed to

ensure that capital punishment is administered with some degree of rationality." *Strickland v.*

*Washington*, 466 U.S. 668, 715 (1998) (Marshall, J., dissenting). The Sixth Amendment

guarantees every criminal defendant the right to assistance of counsel, which in turn "protect[s]

the fundamental right to a fair trial." *Strickland*, 466 U.S. at 684. Moreover, "[t]he right to

counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S.

759, 771 n.14 (1970). Accordingly, a capital defendant is entitled to have his death sentence reversed where counsel renders constitutionally deficient assistance of counsel. *See Strickland*, 466 U.S. at 688.

In *Strickland*, the Supreme Court set forth the now familiar two-prong test to govern ineffective assistance of counsel claims: First, the defendant must show that counsel's performance was deficient in that it fell below "an objective standard of reasonableness" such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687–89. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687.

To satisfy the first prong, the Supreme Court has stated that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 689. In determining the prevailing professional norms and duties of counsel, the Supreme Court has stated that courts should rely on, *inter alia*, the 1989 and 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"). *See, e.g., Rompilla v. Beard*, 545 U.S. 374 (2005) (relying on the 2003 Guidelines); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (incorporating the 1989 Guidelines).[3] To satisfy the second *Strickland* factor, a capital habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors,

---

[3] The most recent version of the ABA Guidelines was published in February 2003, though they were made official in October 2003. Nevertheless, as the Supreme Court has recognized, for purposes of assessing attorney competence the 1989 and 2003 versions of the ABA Guidelines are interchangeable. *See Rompilla*, 545 U.S. 387 n.7 (citing 1989 ABA guidelines for 1988 trial); *Dickerson v. Bagley*, 453 F.3d 690, 693-94 (6th Cir. 2006) (applying 2003 ABA guidelines to pre-2003 case because new guidelines simply explain 1989 Guidelines in greater detail.); *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (citing 2003 Guidelines in pre-2003 case); *Shelton v. Carroll*, 464 F.3d 423, 439 n.8 (3d Cir. 2006) (same); *Canaan v. McBride*, 395 F.3d 376, 384–85 (7th Cir. 2005) (same).

the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of a capital case, this means that there is a reasonable probability that absent counsel's unreasonable conduct, the jury "would have concluded that the balance of the aggravating and mitigating factors did not warrant death." *Id.* at 695. *See also Wiggins*, 539 U.S. at 537 (stating that prejudice is established if the petitioner shows that "there is a reasonable probability that at least one juror would have struck a different balance" between life and death).

## MITIGATION INEFFECTIVENESS

**B.       Trial Counsel Has a Duty To Investigate and Present Mitigating Evidence.**

A capital case defendant has "a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence [which] might well . . . influence[ ] the jury's appraisal of his moral culpability." *Williams v. Taylor*, 529 U.S. 362, 393, 398 (2000). "The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make the case for life. The purpose of the investigation is to find witnesses *to help humanize* the defendant." *Marshall v. Cathel*, 428 F.3d 452, 468 (1st Cir. 2005) (internal quotations omitted). Thus, evidence of a defendant's deprived background, mental illness, or mental impairment is of critical importance in a capital sentencing proceeding; it bears on the sentencer's evaluation of the defendant's moral culpability. *See Williams*, 529 U.S. at 398 (citing *Boyde v. California*, 494 U.S. 370 (1990)). *See also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, may be less culpable than defendants who have no such excuse."). (citation omitted). Mitigation evidence gives a jury deciding whether to sentence a defendant to

life or death an explanation, though not a justification, for the behavior that led to the defendant's arrest. *See* ABA Guidelines ¶ 10.11, cmt. at 106–07 (internal quotations omitted).

It therefore now is well-established that trial counsel is required to make reasonable investigations into mitigation evidence. *See Rompilla,* 545 U.S. at 380; *Wiggins,* 539 U.S. at 524–25; *Williams,* 529 U.S. at 395. The "right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence." *Strickland,* 466 U.S. at 706 (Brennan, J., concurring in part and dissenting in part) (internal citations omitted). Capital defense counsel who fail to competently investigate their clients' life histories in preparation for capital sentencing proceedings provide constitutionally deficient representation. And, as stated *supra,* to establish such deficiency, a § 2255 movant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland,* 466 U.S. at 687; *Wiggins,* 539 U.S. at 521.

A petitioner demonstrates that his counsel's performance is deficient for failure to investigate by showing that counsel's investigation into the client's life history and background fell below objective standards of reasonableness. *See, e.g., Wiggins,* 539 U.S. at 522–23 (citing *Strickland,* 466 U.S. at 690–91). In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant mitigation evidence.[4] Specifically, it is well-settled that trial counsel has a duty to investigate a client's

---

[4] As relevant here, the ABA Standards of Criminal Justice provides that counsel

> has a substantial and important role to perform in raising mitigating factors . . . [at] sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating

background, including his social history and mental health to shore up the argument for life. *See id.* The Sixth Amendment requires that at the very least counsel make reasonable efforts to (1) obtain and review evidence that counsel knows the government will rely on to prove its case, and (2) discover potentially mitigating evidence. *See Rompilla*, 545 U.S. at 375; *Outten v. Kearney*, 464 F.3d 401, 419 (3d Cir. 2006) (stating that "the prevailing professional norms for capital cases instruct defense counsel 'to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'") (quoting ABA Guideline ¶ 11.4.1). Moreover, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[5] *Wiggins*, 539 U.S. at 527. *See also Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (stating that court should not focus on whether certain defense should have been

---

circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

1 ABA Standards for Criminal Justice § 4-4.1 (3d ed. 1993). *See also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.11 (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 925 (2003) ("2003 ABA Guidelines") ("The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense or other factors, which may provide a basis for a sentence less than death.").

[5] Thus, "conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland's* requirements." *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006). *See also Williams v. Allen*, 542 F.3d 1326, 1337–39 (8th Cir. 2008) (finding that trial counsel's conduct was unreasonable where counsel sought mitigating evidence only from one person with firsthand knowledge of the defendant's background, and the information that "trial counsel did acquire would have led a reasonable attorney to investigate further"); *Baxter v. Thomas*, 43 F.3d 1501, 1514 (11th Cir. 1995) (finding that counsel's limited investigation was insufficient where counsel spoke to the defendant's mother, brother, and Boy's Home, but did not request medical, school, or Department of Children Service's Records, or contact a number of relevant persons).

presented, but on whether the "investigation supporting [counsel's] pursuit of the defense was itself reasonable").

It is axiomatic that counsel's investigation affects the adequacy of the mitigation case that counsel presents to the jury. In *Wiggins*, the Supreme Court held that by failing to undertake a thorough and complete investigation, "counsel were not in a position to make a reasonable strategic choice" about how to conduct the trial and present mitigating evidence. *Wiggins*, 539 U.S. at 536. "Only after a thorough investigation can a less than complete presentation of mitigating evidence ever be deemed reasonable, and only to the extent that a reasonable strategy supports such a presentation." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007). It is therefore bedrock that capital counsel's failure "to present possibly mitigating evidence cannot be justified when counsel have not fulfilled their obligation to conduct a thorough investigation of the defendant's background."[6] *Outten*, 464 F.3d at 419.

To establish the second part of the *Strickland* test—prejudice—the capital habeas petitioner must demonstrate only a reasonable probability that absent counsel's unreasonable conduct, the jury "would have concluded that the balance of the aggravating and mitigating factors did not warrant death." *Strickland*, 466 U.S. at 695. This standard presumes an objective sentencer: "The idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency . . . are irrelevant to the prejudice inquiry." *Id.*

---

[6] Compounding the unreasonableness of any decision to limit the case in mitigation is the federal death penalty statute's requirement that the jury "weigh" all factors presented to make a determination of penalty. 18 U.S.C. § 3593(e) ("[T]he jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.").

As the Supreme Court's recent decisions in *Wiggins*, *Williams* and *Rompilla* demonstrate, in order to properly assess whether a capital petitioner was prejudiced by counsel's deficient performance, a court must compare the mitigation evidence presented at trial with the mitigation that *could have* been presented at trial, absent counsel's deficient performance. Indeed, in each of the aforementioned cases, the petitioner was allowed to develop mitigation evidence at a post-conviction evidentiary hearing, and the Supreme Court conducted its *Strickland* prejudice analysis by comparing the trial mitigation evidence with the mitigation case that counsel demonstrated had been available. *See, e.g., Rompilla*, 545 U.S. at 391–93 (comparing the evidence that was presented at the original sentencing hearing with the mitigation evidence and testimony presented at a post-conviction hearing to conclude that the undiscovered mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability" and led to a different sentencing decision); *Wiggins*, 539 U.S. at 535–38 (comparing the evidence adduced at trial with the evidence presented at the habeas proceeding regarding the petitioner's "excruciating life history" in finding that trial counsel's failure to investigate and present such evidence resulted in *Strickland* prejudice); *Williams*, 529 U.S. at 397–98 (noting that a *Strickland* prejudice determination must take into account mitigation evidence adduced in post-conviction proceedings). The prejudice to Mr. Sampson here is amply demonstrated by comparing the evidence that was put on at his trial with the readily available evidence that could have been presented if trial counsel had conducted a proper mitigation investigation.[7]

---

[7] Further, the failure to adequately investigate and present mitigating evidence also deprives a criminal defendant of his or her right to an effective closing argument. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (stating that Sixth Amendment right to effective assistance also extends to closing arguments). As such, trial counsel's conduct here, as addressed *infra*, deprived Mr. Sampson with his Sixth Amendment right to "'counsel acting in the role of an advocate.'" *United States v. Cronic*, 466 U.S. 648, 656 (1967) (quoting *Anders v. California*, 386 U.S. 738, 743 (1967)).

C.  **Trial Counsel Was Ineffective for Failure To Conduct a Proper Investigation Into Mr. Sampson's Life and To Present a Complete Picture of Powerful Mitigating Evidence.**

1.  **Trial Counsel Failed To Conduct an Adequate Investigation of Mitigating Evidence.**

Trial counsel did not undertake an adequate investigation into Mr. Sampson's mitigating evidence. They waited months after their appointment before beginning to investigate Mr. Sampson's life history. When their investigation finally did begin, it was limited in scope despite their awareness that Mr. Sampson's background contained significant mitigating elements and the fact that his age of 42 at the time of the crimes presented a long period to cover.

The defense's unsuccessful attempts to reach Mr. Sampson's family illustrate the failure to undertake the most critical and sensitive part of the life history investigation with the care required of those defending a capital case. Mr. Sampson's family was humiliated and heartbroken over the events that led to his arrest. Mr. Sampson's parents, Elbert Henry ("Herk") and Charlotte Sampson, spoke to the media shortly after the crimes. They expressed their sorrow for the victims' families. *See* Ex. 1. On August 24, 2001, nearly four weeks after the crimes and after the family had spoken to the media, Mr. Sampson's trial counsel made their first attempt to speak directly with his family when counsel Stephanie Page sent a letter to Mr. Sampson's parents asking them to contact her. They did not respond. Despite this unsuccessful approach by letter, counsel David Ruhnke sent another letter to Mr. Sampson's parents on January 22, 2002. There was again no response. The next attempt was a letter from Mr. Sampson, sent on April 9, 2002. This letter was returned to him unopened. Gary's father passed away on July 3, 2002.

The first time any attempt was made to meet with Mr. Sampson's family in person was in May 2003, when Jill Miller went to the home of Charlene Farrell, Mr. Sampson's sister, where Charlotte Sampson, Mr. Sampson's mother, also lived. Ms. Miller spoke with Dennis Farrell,

Mr. Sampson's brother-in-law, who told her that Charlene did not want to be involved. Ms. Miller left a business card.[8]

No attempt was made to reach out to Wayne Sampson, Gary Sampson's brother, in the more than two years prior to trial. The defense team's first attempt to contact Wayne was on November 11, 2003, after the trial had begun, and after Wayne had been contacted by Dr. Welner, the Government's testifying psychiatrist. When Wayne agreed to speak with Dr. Welner, he was not even entirely certain who Dr. Welner was. John Flanagan told Wayne to talk to him, so Wayne did. Wayne realized after the fact that he had cooperated with the Government, and regretted it. When a defense team member stopped by on November 11, Wayne said he did not want to be rude but to tell others not to contact him.

Based on conversations with Mr. Sampson, Mr. Sampson's trial counsel was on notice that any approach to Mr. Sampson's family had to be handled with the utmost care; the interview his parents gave the media reveals how humiliated and traumatized they were by the crimes. Letters months apart, followed by no attempt to make face-to-face contact with a single family member until nearly two years had passed, fell below the standard of care required in capital cases.

The amount of time counsel directed Ms. Miller to spend on the investigation helps explain why much mitigation evidence was missed. Ms. Miller did not interview Mr. Sampson until January 31, 2002, and did not meet with her first witness until February 26, 2002, nearly seven months after the crimes occurred (and that was only one witness who did not know Mr. Sampson until after the crimes occurred, and was not interviewed for life history information).

---

[8] Ms. Miller attempted to use Karen Alexander, Mr. Sampson's ex-wife, as an intermediary to get information from the family. Ms. Alexander was not a trained expert, and her efforts yielded little.

*See* Ex. 2 (Miller billing records); Ex. 3 (Miller notes). She made a few phone calls to a handful of life history witnesses in February 2002. She did not meet her first life history witnesses in person until May 2002, nearly nine months after the crimes. At this point, she made one trip to Massachusetts for three days, speaking to three witnesses in person, and three on the telephone. She did not make another trip to personally interview witnesses for an entire year. During that year, her billing records reveal that she only had sporadic telephone contact with a handful of potential witnesses and single phone calls to others. Ms. Miller returned to the Massachusetts area to interview witnesses in May 2003, again only for three days. She made one three-day trip to North Carolina in June 2003 and another three-day trip to Massachusetts in August 2003. In October 2003, after Mr. Sampson pleaded guilty, she interviewed several witnesses, including Wayne Brock, one of the five testifying life-history witnesses.

### 2.    Trial Counsel Presented a Weak Mitigation Case to the Jury.

Trial counsel's failure to thoroughly investigate Mr. Sampson's family and social background resulted in a weak and unconvincing presentation in the penalty phase of critically important evidence that his life was marred by severe brain damage and recurrent violence. Trial counsel presented uncorroborated and limited evidence documenting Mr. Sampson's head trauma and underlying brain damage, and did not present appropriate medical testimony to explain it. They also failed to discover or present the extent and severity of Mr. Sampson's brain damage and mental illnesses. As a result of this incomplete investigation, they failed to discover, among other things: substantial evidence that Mr. Sampson's community and family did not recognize and adequately address early signs of Mr. Sampson's severe brain damage, which exacerbated his downward spiral; the impact of the violent time Mr. Sampson spent in state prison; and evidence of the longstanding symptoms of brain damage and mental disease that have been apparent throughout his life, including episodes of severe drug and alcohol abuse, and

a major unraveling that took place immediately before the crimes for which Mr. Sampson was sentenced to death.

Because of counsel's inadequate investigation, the testimony as developed and presented at Mr. Sampson's trial was unpersuasive, lacking the detail necessary to paint a persuasive picture of the harsh circumstances in which Mr. Sampson spent his life. The mental health presentation lacked coherence and was at times conflicting. The presentation left the false impression that Mr. Sampson had not experienced violence during his formative years, when the truth was that Mr. Sampson had suffered violence at critical times throughout his life and that violence had aggravated and enhanced his underlying brain damage.

As a result of the inadequate investigation, trial counsel presented a mitigation case that was effectively attacked by the Government. As noted above, trial counsel began their presentation by introducing returned, unopened letters that they and Mr. Sampson had sent to his family in an effort to speak to them. Their experts had very little corroborating information to substantiate their opinions or observations, and the Government pointed this out at every opportunity. Jill Miller's testimony was a chronological story of Mr. Sampson's life, which involved mostly a cold reading from a smattering of social history records, and information she received from Mr. Sampson. She gave no narrative for the information she cited from records. She was impeached as a member of the defense team and with conflicting statements in Mr. Sampson's records, because "she's buying wholesale that all these things that this guy [Mr. Sampson] says are the truth." Tr., Dec. 2, 2003 at 134.

Trial counsel's main witness was Dr. Angela Hegarty, who opined that Mr. Sampson suffered from mental illness. She also reported that Mr. Sampson was severely brain damaged and, as a result, had difficulty accurately remembering historical events. But this undercut the

- 26 -

presentation of other experts who had relied on Mr. Sampson's memory and recollection of events, as opposed to other undeveloped but available sources of information, to support their opinion.

Dr. Hegarty opined that Mr. Sampson's capacity to conform his conduct was significantly impaired at the time of the crimes and that, while he knew right from wrong, he lacked the ability to stop himself or to do what he knew was right. Although Dr. Hegarty also alluded to the possibility that evidence of trauma existed, she conceded that it remained unexplored and undeveloped. Finally, she testified that Mr. Sampson had expressed or felt remorse for his conduct, noting that he had told her that he was aware of his victims' families' pain, that he heard their voices, and that he thought about Mr. McCloskey not being able to see his grandchild. In spite of this overall testimony regarding Mr. Sampson's mental illness, Dr. Hegarty was unable to adequately corroborate many of her statements due to the inadequacy of trial counsel's investigation. Similarly, trial counsel's inadequate investigation prevented it from substantially challenging Dr. Welner, the forensic psychiatrist the Government called as a counterweight to Dr. Hegarty.

As previously discussed, trial counsel also presented a number of other experts: Dr. Deters opined that Mr. Sampson suffered from frontal lobe brain damage, which resulted in impairments in executive functioning. He admitted on cross examination, though, that Mr. Sampson had a motive to lie about or exaggerate his head injuries; headaches in prison could have been related to stress; on many of the neurological tests Mr. Sampson was "normal"; and Mr. Sampson was not delusional. The Government also rebutted his theories of poor executive functioning by showing the ways in which Mr. Sampson planned and plotted the murders. The other experts, Robert Smith and Mark Cunningham, gave general testimony untethered to the

- 27 -

specifics of Mr. Sampson's conditions.  And Dr. Mark Cunningham described how Mr. Sampson would not be a future danger at the Supermax facility where he likely would be sent if sentenced to life in prison without the possibility of parole.  Joan Katz testified entirely from two interviews with Mr. Sampson that Mr. Sampson was abused by his parents and her impression was that Gary was manic-depressive.  She was impeached as an employee of the public defender, because she did not record her interviews with Mr. Sampson, and because she did not fact-check any of the information she received from Mr. Sampson.

In closing, trial counsel urged the jury to find that the mitigating factors weighed in favor of a life sentence.  Trial counsel acknowledged that there was little or no evidence of childhood trauma or physical abuse, but argued that Mr. Sampson was remorseful and mentally ill, and that on this basis he did not deserve the death penalty.  The last impression trial counsel left with the jury was that "Mr. Sampson is a mentally ill loser and will never hurt anybody again.  Sentence him to life, please."

This incomplete picture left the jury with the impression that there was insufficient mitigating evidence to warrant sparing Mr. Sampson's life.  Had trial counsel discovered and presented the wealth of readily available mitigation summarized below, there is a reasonable probability that the outcome of Mr. Sampson's trial would have been different.

### 3.    An Effective Investigation Would Have Uncovered Ample Mitigating Evidence.

Mr. Sampson suffered significant neurocognitive deficits from a very early age.  He was born into a family, and grew up in a community, ill-equipped to provide the resources and support necessary for the healthy development of a child as impaired as him.  Due to these circumstances, little more than superficial attempts were made to deal with Mr. Sampson's more

obvious deficits, and his underlying and more devastating impairments went unaddressed. As a result, Mr. Sampson was left to navigate a world that was incomprehensible to him.

### a. Brief Family History.

Gary Lee Sampson was the fourth generation of a family born and raised in Massachusetts, and at least the third generation from the town of Abington. His maternal and paternal grandparents emigrated from England. His father's family was from Abington; his mother's was from Quincy. Both Gary's parents came from large families; although most of his relatives lived in close proximity, Gary rarely saw his cousins, aunts, or uncles.

Amy Taylor Sampson, Gary's paternal grandmother, reportedly had over thirty "shocks" to her heart over her lifetime. Elbert Henry Sampson, Sr., Gary's paternal grandfather, was described to others by Herk Sampson (Gary's father) as a violent alcoholic, who was "fast with his fists" and a "real son of a bitch." Childhood friends of Herk's were told not to go to the Sampson house because Herk's father was "crazy."

Samuel Trevains, Sr., Gary's maternal grandfather, met and married his first wife, Elizabeth Rennie, in Quincy. When Elizabeth died at an early age, Samuel married her younger sister Isabel, who later became Gary's maternal grandmother. Charlotte Trevains, Gary's mother, was their youngest child. Samuel died of silicosis in 1956. Isabella Trevains lived with Gary and his family when Gary was a child.

Gary's parents were married in 1951. Herk was twenty years old; Charlotte was eighteen. On June 2, 1956, five years after their marriage, Herk and Charlotte had their first son, Richard Gordon Sampson. He was only eight weeks old when he died of hypostatic pneumonia. Herk was then a truck driver for Bay State Ice Cream; Charlotte was a housewife.

On August 17, 1957, a little over a year after Richard's death, Charlotte gave birth to Wayne Richard Sampson. Two years later, on September 29, 1959, Gary was born. Charlene Ann Sampson, Gary's younger sister, was born on November 15, 1961.

### b.      Early Evidence of Head Injury.

On February 10, 1964, when Gary was four years old, he fell from a height of ten feet down a flight of stairs and hit the back of his head, causing swelling. *See* Ex. 4 (Brockton Hospital Records). This was the first in a series of head traumas and other serious physical injuries that Gary suffered as a child and on through early adulthood. When Gary was seven, on July 11, 1967, he was again brought to the emergency room at Brockton Hospital. An entry in his records reads: "?? On the top of his head." *Id.* This entry is crossed out, followed by a report that Gary fell off his bicycle and had a laceration on his knee. *Id.* On September 16, 1968, Gary returned to the emergency room, again with a laceration to the left side of his head. He was eight years old. *Id.* These critical records were in the files of the defense counsel, but were not shared with lead counsel, or admitted into evidence.

On October 13, 1973, Gary was admitted to South Shore Hospital with a compression fracture. He was kept in the hospital for five days. According to the hospital record, Gary "fell [off] his bicycle." Ex. 5 (South Shore Hospital Records). Five months later, he was again in South Shore Hospital, with injuries resulting from what is described only as jumping over a fence. *Id.* The injuries were a fractured left scapula and a contusion, along with pain in his head, back, and left arm. Hospital records note that Gary was screaming and completely uncooperative when brought in by the ambulance. He spent the night in the hospital. *Id.* On September 22, 1979, two days before his twentieth birthday, Gary was hospitalized yet again, this time for injuries from a serious car accident. He suffered a fractured pelvis, fractured ankle, fractured

collarbone, and a laceration to his head. *Id.* From that point through the present, Mr. Sampson has suffered severe, recurring headaches.[9]

### c.    Early Childhood and Adolescence.

Raised in a poor family, Gary's father Herk is described by everyone who knew him as a hard worker with deep satisfaction in both his labor and its fruits. His jobs were labor intensive, and he often held more than one job at a time. He worked as a truck driver for both Bay State Ice Cream and the Abington Lumber company, and at the Abington Fire Department.

Charlotte Sampson endured persistent medical ailments. She gave herself regular injections to help with the chronic pain. She has undergone numerous joint replacements and was often in and out of the hospital. She also required surgery on her pancreas and a complete thyroidectomy.

Herk was repeatedly described as domineering and authoritarian at home; "Be quiet, Charlotte," was his perpetual refrain. A friend recalls him frequently yelling at Charlotte in public. Charlotte is described by many as meek and immediately responsive to Herk's every demand. By all accounts, she was entirely dominated by her husband. He dictated when she got her hair done and what she wore; she was seen to change her outfit five times in one day at his whim. Friends of the couple concur that Charlotte's entire world was Herk. She scrambled when he came in the door.

Herk was described by witnesses as a man with no patience, who got "red and loud" when he was angry, a man with a quick and "violent" temper, a "yeller," and a "thrower." He was described as a short man with a "Napoleonic complex." He did not like to be wrong, and insisted that everything be done his way. He was endearing to some, as he could be jovial and

---

[9] Importantly, Mr. Sampson's children also appear to experience mental issues.

generous, especially with his carpentry skills. But friends also say he was a hard man. Those who knew him attribute to him an almost childish bullheadedness that often created recurring and deep conflict.

Herk was often observed to anger quickly at slight or incomprehensible provocation. A former family member recalls several dinners disrupted when Herk up-ended the table, sending plates and glasses shattering to the floor. These incidents were not discussed and the family acted as if they had not happened. Herk's unpredictability extended to his decisions as well; a friend says that he never made a decision that he did not regret five or six months later.

From an early age, Gary appeared to be less competent and "slower" than his older brother, Wayne. It is reported that Gary was late to speak and arrived at first grade unable to read, to do the alphabet, or to understand words, which he often saw backwards. Although the source of these disabilities can be understood as a result of severe damage in multiple areas of his brain, discussed below but undiscovered by trial counsel, at the time neither Mr. Sampson's family nor his schools understood this.

Herk Sampson was neither patient nor forgiving of Gary's impairments. In fact, he was embarrassed by his son who simply could not get it right. He ignored Gary and ridiculed him. In an effort to correct Gary's behavior Herk demeaned him, sometimes backhanding him in front of others. A friend of Herk's remembers him telling her a story of how he hit Gary for screaming too loud when he was at the hospital for treatment after a serious car accident. Herk was sometimes known to refer to his second son not by name but as "the little shit," "f. . .ing Gary," or "the kid."

There is ample evidence that many people reacted to the behavior resulting from Gary's brain injuries with frustration and hostility. Several witnesses attest that it was not uncommon to

see Gary with a black eye throughout his childhood and adolescence. One witness states that he saw Gary's body covered with bruises, and that on at least one occasion Gary stayed at his house and slept in the closet and was afraid to go home. Witnesses report seeing Wayne beat up Gary, often in public, and in front of his peers.

Gary was in many respects in need of special attention; his family was at a loss as to how to meet his needs or control his erratic and unpredictable behavior. Wayne often found himself in the position of having to beat Gary up in a misguided attempt to keep him in line. By all reports, Charlotte was a well-meaning mother, but she had little control over her own life because she was constantly tending to Herk's needs. People acquainted with the family saw little room in the Sampsons' marriage for the needs of their children, especially the damaged Gary.

### d.     Educational Difficulties and Early Brain Dysfunction.

In 1966, Gary failed the first grade. Records show a continued language difficulty even after he repeated the year; he still could not read and did not know the full alphabet. Herk Sampson told the principal of Woodsdale Elementary School that "it is difficult to reach Gary." *See* Ex. 6. The mother of an older child at Gary's school with reading difficulties of his own sought out specialized assistance for her son, and discovered the Language Clinic at Massachusetts General Hospital in Boston. After she convinced the school board to allow her son to attend, the principal at Woodsdale referred Gary to the program because of his "severe dyslexia." *See* Ex. 7.

Gary attended tutoring sessions at the Language Clinic three afternoons a week for two years. Clinic records state that Gary was "easily distracted," "slightly depressed," and distrustful of his own abilities when he began, but the final report notes that "[h]e improved in ability to work under direct supervision." Ex. 8 (MGH Language Clinic records). Forty years later, his tutor—who is named in records that were in trial counsel's possession—still recalls the positive

impact that her individualized, patient, and specialized attention had on Gary's development. The tutoring sessions were discontinued in 1968 when the Abington public schools hired a "tutor for dyslexic children." Reviewing the records that document this decision, the MGH tutor was stung by regret that Gary was removed from an environment that encouraged such progress and returned to one where he previously had known only failure.

School continued to be a struggle for Gary. He was promoted to Abington High School for the ninth grade in 1974. Yet, in November of that year testing placed his IQ at 74, in the mentally retarded range. At that point, Gary was transferred to South Eastern Academy, an alternative school in East Bridgewater, Massachusetts. He completed the rest of the school year there. This placement in a private school for students with learning disabilities might have been exactly what Gary needed if it had not turned out to be under the control of a man whose actions and behavior ultimately got him indicted and the school shut down.

South Eastern Academy was founded in Duxbury, Massachusetts, in 1969 by a small group of parents with dyslexic children. The school was run by the parents, and was attended by children with learning disabilities generally, and, later, by children with behavioral problems. In 1972, the school moved to the property of the Unitarian Universalist church in East Bridgewater, where the minister eventually became the functional headmaster of the school. Because no records from the now-defunct school appear to be available, the quality of Gary's education there is unknown. The psychological impact of the school's environment is, however, of significant concern. Investigative authorities state that the headmaster misrepresented that the school was accredited, and improperly received state funds on the basis of that misrepresentation. The school was consistently embroiled in legal and other controversies. Several allegations of child sexual abuse were lodged against the headmaster others in the school environment. The students

at South Eastern Academy were well aware of these allegations, and were therefore exposed on a daily basis to the concept and possibility of sexual exploitation. The school subsequently shut down after an investigation by state authorities.

### e. Substance Abuse, Continuing Signs of Brain Impairment, and Petty Crimes.

Interviews with Sampson family friends, as well as with Wayne Sampson reveal that Gary Sampson continually exhibited signs of mental disease including failure to control his impulses, regulate his behavior, appreciate the consequences of his actions, and understand social cues, along with instances of dissociation.

Gary had trouble fitting in with his peers. He was often the subject of ridicule by others, and was considered annoying, "crazy," "mouthy," and "impulsive." Several peers report that Gary's behavior was odd, and that it was obvious that there was something wrong with him. They report that he did not recognize social cues and never learned appropriate ways of making friends; he made it hard for people to like him. He would hang around where he was not wanted. He annoyed others with his incessant talk and hyperactive behavior. Several of his peers admit beating him up, including one who dropped Gary on his head in the process. Despite the many times he was beaten up by others, however, Gary reportedly did not fight back. All witnesses agree—many of whom are named in trial counsel's file, but none of whom were interviewed by them—that Gary, while provocative with his words, was physically extremely passive and timid.

A social outcast, frustrated in school, vexed and pained by the humiliation at home, Gary turned to abusing both marijuana and alcohol. He reported using both on a regular basis at twelve years old, and cocaine by age fifteen. Witnesses confirm that he drank and smoked heavily until his habits were later interrupted by incarcerations. Upon release, he would again resume use of these drugs.

Gary started engaging in petty crimes with peers during his teenage years. But even his partners in those activities, those with whom he was trying to fit in, report that Gary's behavior during these crimes was odd. They report that Gary did not seem to have a goal for his actions. During one break-in, while the rest of the participants were rifling through a home for items of value, Gary went into the kitchen to make himself a sandwich. In another instance, Gary broke into a well-lit supermarket the night before its grand opening. He ran up and down the aisles, taking nothing, while his friends hooted outside. His desire appeared to be for the company or attention of his friends, not his own personal material gain.

Even when he and his friends became known for their criminal activities, Gary's behavior continued to stand out. When the local police questioned Gary and his friends about an incident, the others knew to stay quiet. Gary did not. He talked back to them, so even when all members of the group were equally to blame, Gary was singled out. The result was that he became the "usual suspect." A peer reports that the police twice came to the Sampson home during parties and accused Gary of committing crimes that had been committed on those nights, despite the fact that all the party's attendees witnessed to his presence at the party throughout the relevant period.

Herk Sampson considered himself friendly with the police officers in town due to his position in the fire department. Early on, he took it personally when his son was picked up, and he intervened. Later he threw his hands up and let the police handle Gary as they would. Witnesses report that some local law enforcement could be rough with certain adolescents. After a time, Gary became a target. (A peer puts stock in the rumors that this was at Herk's request.) On the day in 1977 when Gary was arrested for a crime for which he was later acquitted, he had a black eye and bruised knee upon being admitted to Bridgewater State Hospital. Gary has described being beaten by the police, and has named two officers in particular who took him into

the woods and beat him up badly. (He cited this experience as the main reason for not wanting to turn himself in to the local police for the bank robberies that preceded the instant murders.)

*When he dropped out of school* in 1976 at sixteen years old, Gary got hired at South Shore Disposal Company, where Wayne also worked. Wayne had been promoted to driving the trucks, while Gary retrieved and deposited rubbish. Gary's employment was sporadic. He would work for a while and then quit for a few weeks or months; he was always rehired by the owner of the company, who was a Sampson family friend. Social Security Administration records show that he also worked for three other businesses during 1976. During this time, he was arrested on a burglary charge and sentenced to one year of probation and ordered to participate in the Homeward Bound Program of the Stephen French Youth Services Board. He completed the program and probation was terminated in March 1977. In 1977, he continued to work at South Shore Disposal and was arrested twice for minor crimes in the early part of the year. He lived in the family home for most of this period.

On July 1, 1977, Gary married Nancy Judge. They were both seventeen years old; Nancy was approximately five or six months pregnant. Their daughter, Amy, was born October 11, 1977. Nancy filed for divorce less than one month after Amy's birth, while Gary was in Bridgewater State Hospital. According to records from that incarceration, Gary was devastated by this news. Upon his release from Bridgewater, Gary lived with his brother Wayne for a short period, then returned home. In 1978 and 1979, he was again in trouble with the law. One report notes that in 1978, while awaiting trial on a more serious charge, he attempted to enlist in the military. In April 1978, he was acquitted on that charge and returned to live with his parents. Gary's problems with alcohol escalated until, at some point in 1979, his father evicted him from the family home.