### f.    Prison Trauma.

Mr. Sampson first went to jail in 1977, after he had just turned eighteen years old. He spent the majority of his time from 1977 until 1995 in different jails and prisons in Massachusetts, New Hampshire, Connecticut, and Maine. The longest period of time he was not in custody was the two and one half years before the crimes occurred. The years Mr. Sampson was in prison were marked by brutality and torturous living conditions, which left him terrified, traumatized, and bereft of any successful coping strategies to manage a world that was already confusing to him. A full depiction of Mr. Sampson's experience in prisons is set forth more fully, *infra* at Part III.E.

### g.    Parole and North Carolina.

In 1995, a parole plan was put together for Mr. Sampson that called for him to live at his parents' home and work for his brother Wayne. In July 1995, Wayne Sampson was living with a friend in Freedom, New Hampshire. Though Wayne had agreed to hire Mr. Sampson, the friend remembers Wayne dreading the approach of his brother's parole date and lamenting Mr. Sampson's uncontrollable, irrational behavior and alcohol abuse. The friend was surprised upon meeting Mr. Sampson and finding a pleasant and polite recovering alcoholic who openly encouraged others to join him at his regular Alcoholics Anonymous meetings.

Mr. Sampson did not last long at Wayne's logging business, but he got himself hired at Affinity Industries and seemed to be enjoying his work. He started dating a woman he had met in AA. Parole reports from this period confirm that Mr. Sampson was making consistent progress. Numerous witnesses who attended their wedding in June 1997 report that Mr. Sampson seemed to be the most genuinely happy, healthy, and well-adjusted that they had ever seen him, with his new wife expecting a child.

Mr. Sampson's behavior on their honeymoon, however, is described by his then-wife as irritable and erratic. She was confused by the change, but attributed it to her unfamiliarity with anyone who had been incarcerated. The truth was much more serious. A witness intimately familiar with the history of New Hampshire's parole system confirms that the close supervision of Mr. Sampson's intensive parole option required AA meetings and regular drug testing. When Mr. Sampson was granted an early discharge from parole on January 2, 1997, due to his exemplary compliance with his parole conditions, he immediately started to slip. He purchased marijuana almost immediately upon release.

Shortly afterward, Mr. Sampson quit his job at Affinity. His wife discovered marijuana in his truck and left him after he refused to cease use of all such substances. Without the supports of intensive parole, and the increased self-esteem provided by job and family he was unable to meet her conditions. Mr. Sampson continually called his wife and asked her to take him back, but she was steadfast in her insistence on abstinence and treatment. In Mr. Sampson's then-current state he could not comply.

Mr. Sampson went to Wilmington, North Carolina, for about two months for a job, during which time he was arrested for Driving While Intoxicated. On September 19, 1997, he reported for a DWI Substance Abuse Assessment that determined he had a Substance Abuse Handicap. It was recommended that he complete a Long Term Outpatient Treatment Program. *See* Ex. 9 (Harvest of Wilmington records). A month later he was back in New Hampshire, where his drug and alcohol abuse continued to propel him on a downward spiral. During a traffic stop on October 24, 1997, he passed a sobriety test but then spontaneously confessed to having marijuana in his possession. After two subsequent arrests for substance-related incidents,

on May 3, 1998, he was arrested with a friend for the burglary of an antique shop and incarcerated at the Carroll County House of Corrections.

Records from his first few months at Carroll County and letters to his attorneys, as well as the trial testimony of Dennis Robinson, reveal that Mr. Sampson was depressed yet newly determined to address his alcoholism. In the summer of 1998, while still incarcerated, Mr. Sampson began a relationship with a female inmate. They fell in love and decided to marry. When his fiancée completed her sentence, her grandfather, who was also a preacher who ministered to Mr. Sampson at the jail, posted bail for Mr. Sampson. Mr. Sampson was married again on November 4, 1998.

Shortly after their wedding his wife became pregnant. Mr. Sampson was ecstatic. His twenty-two-year-old wife, however, was distressed by the development. Around Thanksgiving, her mother accused Mr. Sampson of irresponsibly creating an untenable situation and, unbeknownst to Mr. Sampson's wife, her mother ordered Mr. Sampson to get out of her home and cease all contact with her daughter.

With nowhere to go, facing pending charges, and believing he had irrevocably burned any bridge to his family, he hitched a ride with a truck driver and spent the next month traveling between northeastern cities, helping the driver transport Christmas wreaths. The second truck driver who offered him a ride and job was from Lexington, North Carolina. When he decided to head home, he invited Mr. Sampson to join him. Mr. Sampson accepted.

Mr. Sampson decided to make a go of it on his own in Lexington. He moved in with a transvestite to whom he had been introduced by the second truck driver. He obtained a landscaping job, where his supervisor noted from the first day that it was clear something heavy was weighing on Mr. Sampson. He describes Mr. Sampson as pensive, and remembers days

- 40 -

when he would overreact defensively to benign comments or situations. Otherwise the supervisor found Mr. Sampson to be a dedicated worker and a pleasant person, grateful for guidance and supervision.

During the summer of 1999, however, the supervisor began to notice a difference in Mr. Sampson. Formerly a reliable employee, there came more and more frequent days when Mr. Sampson would not be home when the supervisor arrived to pick him up. It is clear that Mr. Sampson was using at least some substances, as a friend reports seeing him smoke marijuana and finish off twelve-packs of beer frequently. This friend also observed Mr. Sampson with glassy eyes at times, and, by the summer of 2000, acting "jumpy," hyperactive, unpredictable, and paranoid.

Mr. Sampson's increasingly irregular behavior and substance abuse soured his living arrangement, and in August 2000 he moved into a low income motel. Mr. Sampson had a new landscaping job. His boss there appreciated both the quality and enthusiasm of Mr. Sampson's work; he found Mr. Sampson polite, efficient, and meticulous. He also observed dramatic mood swings, witnessed Mr. Sampson would go from polite and focused on the task at hand to angry, defensive, and paranoid, suddenly and for no discernible reason.

Some days the moods were so extreme that Mr. Sampson simply failed to show up. When his boss went to Mr. Sampson's home to ask what the problem was, Mr. Sampson could offer no reason other than that he had no energy and would therefore be of no use on the job. His boss would reluctantly fire Mr. Sampson, but after a few days Mr. Sampson would call and apologize, saying that he did not know why he had behaved as he did. His boss gladly rehired him each of the six or seven times this pattern repeated itself.

His boss was forced to fire Mr. Sampson for the last time after an incident during which Mr. Sampson's odd behavior was attributed by others to his use of marijuana. Though he knew that Mr. Sampson liked to buy beer on his way home from work, his boss never witnessed him smoking marijuana or drinking alcohol on the job. But when this last incident occurred in November 2000, his boss discovered Mr. Sampson at his then-current residence both drinking and smoking. His boss had noticed that since Mr. Sampson's relocation to the motel his mood swings had become not only more frequent but also more dramatic. Mr. Sampson was increasingly agitated and irritable, jumpy and paranoid. The last time his landscaping boss saw Mr. Sampson was when he returned to the motel to rehire him once again. But for the first time Mr. Sampson refused to be re-engaged. His boss believed Mr. Sampson was in the worst state he had ever seen him.

Mr. Sampson picked up some masonry work with a man who also employed one of Mr. Sampson's neighbors. The neighbor reports that Mr. Sampson started drinking as soon as they got home: he saw Mr. Sampson go through a case of beer in a night. He saw Mr. Sampson drink almost every day, and smoke marijuana as well, and accept invitations to another neighbor's room to smoke crack and cocaine.

The wife of the neighbor who invited Mr. Sampson to smoke crack and cocaine reports that Mr. Sampson tried to convince her to leave her husband because he beat her. She did not leave, but she and Mr. Sampson became close. When Mr. Sampson's former association with the transvestite was discovered by someone at the motel, Mr. Sampson confided in the neighbor's wife his pain from the resultant teasing and name-calling. She suspected that Mr. Sampson had other painful things in his past; she perceived some of the stories he told (such as being a hitman for the mafia) as a desire to block them out. She attributed his unrealistic

- 42 -

proposals (such as robbing the Burger King where she worked to get enough money to rescue her and her kids from her husband and run away together) to a similar inclination to conjure up a life *better than the one he had known.*

Mr. Sampson continued to deteriorate even beyond what his boss had observed in November 2000. A motel neighbor reports that Mr. Sampson's drug use escalated in early 2001 after the demise of his relationship with a maid at the motel. The neighbor with the abusive husband saw Mr. Sampson become more confrontational, ostensibly on her behalf. A man who hired Mr. Sampson to do vinyl siding work in 2001 remembers stopping every day on the way home from work for Mr. Sampson to buy a twelve-pack of beer. He watched Mr. Sampson start drinking the beer before they got back to the motel; he also saw Mr. Sampson smoke pot and crack once they arrived.

This last boss found Mr. Sampson to be an excellent worker, but sporadic. There were times when Mr. Sampson would just stand and stare off into space, and days when Mr. Sampson was so deflated that he was essentially unable to work; he could not focus and he would not talk to anyone. He was having financial difficulties at this point; he asked his boss for several loans.

A motel friend recalls Mr. Sampson's obvious joy during the quick courtship and engagement to his next fiancee, and his determination to hire an attorney so that they could bring his fiancee's four children to live with them (none, at the time, were in her custody). But within a few weeks, she noticed a change in Mr. Sampson's behavior. He became distant with her, and looked unhealthy and tired. They moved away from the motel for about a week. When they returned a neighbor learned they had nothing to eat, so he brought them food. He recalls that Mr. Sampson looked worn down and spoke very little. Mr. Sampson told another neighbor that he needed to get away from Lexington and go home.

Mr. Sampson met his first bank robbery co-defendant in early May 2001; they committed three bank robberies together later that month. The co-defendant viewed Mr. Sampson as an inept, agitated, and easily flustered partner in crime; his own calm was the key to their successful escapes. The second bank robbery co-defendant aided him in the robberies in June and July of 2001. This co-defendant was as surprised as the first by Mr. Sampson's failure to plan either robbery.

### h.    Late July 2001.

An adequate investigation and presentation would have revealed much about Mr. Sampson's downward spiral during the week of the murders. That week, Mr. Sampson was experiencing the combined effects of alcohol and drug use, was at times non-responsive to verbal and environmental stimuli, visually appeared to be in the throes of a psychiatric disorder, appeared to be suicidal, and demonstrably was intent on turning himself in for the North Carolina bank robberies prior to committing the murders. Trial counsel failed to talk to a number of readily available witnesses who would have provided this information. All these facts, not properly investigated or presented, were available to the defense and important for the jury's deliberations. Defense investigators can often trigger different memories than investigators pursuing the case for the prosecution. It is not possible to know, eight years later, what more positive evidence was capable of being developed, but what follows are some examples.

Mr. Sampson's decayed mental and physical condition was apparent on sight. Joseph Casey, a supervisor at Myles Standish State Forest, responded to another employee's call for assistance with Mr. Sampson. That employee, Joseph Barrett, "was uncomfortable, and he would like . . . someone to respond to him because he did not wish to stay there alone." Ex. 10 (Casey Grand Jury Testimony). More specifically, "Barrett said he was having a problem with a man at the pond who seemed to have psychiatric problems and he wanted someone to watch his

-44-

back." Ex. 11 (Casey Decl. ¶ 2).[10] *See also* Ex.12 (Casey DEM Report) (incident involved "psych disorder"). When he responded to Mr. Barrett's plea for help, Mr. Casey met Mr. Sampson, who had "a great amount of tension in his lower face and a hollow, distant look in his eyes." Ex. 13 (Casey statement). After the incident, Mr. Casey classified the incident as "Major" in a Department of Environmental Management report. Ex. 12.

Trial counsel had this information about Mr. Casey, but he was never interviewed. Had he been, trial counsel would have found out that Mr. Casey had told the Government prior to his grand jury testimony that:

> there was something deeply wrong with the man, that he was different than 99.9 percent of the people I encounter who are causing problems at the park. I said that Sampson's eyes were cold and empty, yet there was also something disturbing about them. I said that Sampson never threatened me or said anything alarming, yet I definitely felt uncomfortable and I was glad there were other people around. Basically, I said I felt there was something just very off or abnormal about Sampson's presence.

Casey Decl. ¶ 5.[11]

Other witnesses from Myles Standish State Forest had similar comments regarding Mr. Sampson's mental state that trial counsel failed to investigate or explore further. For example, Park Ranger Kathleen Duguay of the Myles Standish State Forest described Mr. Sampson as "agitated." Ex. 14 (Duguay statement). Ranger Duguay further noted that Mr. Sampson did not

---

[10] The Government did not put Mr. Casey on its witness list, though he had been interviewed by the FBI (which produced a draft 302) and had testified before the grand jury. This should have been a further signal to trial counsel that Mr. Casey would have been an important person with whom to speak.

[11] Moreover, had trial counsel interviewed Mr. Casey, they would have found evidence of misuse of the grand jury process and potential grounds to impeach all trial witnesses that had testified before the grand jury. *See infra* Part VI.

even acknowledge her repeated verbal warnings that he should remove himself from the State Forest. *Id.*

Another witness that last week described Mr. Sampson as "scraggly" looking. Ex. 15 (Anabel statement). Another witness further described Mr. Sampson as "fidgety." Ex. 16 (Bierweiler statement). That witness's young son, who also was at home when Mr. Sampson dropped in, was scared of Mr. Sampson. Finally, Mr. Sampson visited a friend the day before Mr. Whitney's death. During that extended conversation, the friend inferred that Mr. Sampson was suicidal. Ex. 17 (Bross Statement).[12]

Trial counsel also failed to interview Michael Hannon, a witness from Mr. Sampson's last week at large whose name they had. Although not apparent from his FBI 302, Mr. Hannon states that he called the FBI's Boston Office shortly after seeing Mr. Sampson on the news after his arrest, and reported that he "had seen Sampson on the Island Grove Pond Bridge within the last two weeks." Ex. 18 (Hannon Decl.). More specifically:

> I noticed a man standing on the street side, the Lake Street side, of the bridge. Most of the time the man was on the bridge but once in a while he would walk over to the steps leading to the bridge or over to the side of the water.
>
> I remember thinking at the time that the man was waiting for someone, or so it appeared. A short time later, maybe a week but I'm not sure, I saw this man on the television news. He was on the news because he had been arrested for killing three people. I recognized him immediately as the same man I had seen on the bridge in Abington. I had seen him there for about 45 minutes to an hour.

---

[12] The friend, who worked for the Tamworth Police Department, would have made a credible witness.

*Id.* Mr. Hannon was a witness who corroborated that Mr. Sampson waited on the Island Grove Bridge to turn himself into the FBI, a mitigating factor that only eight of the jurors found during deliberations.

And it was clear too during this time that Mr. Sampson was abusing alcohol and drugs. The investigative agencies tracking Mr. Sampson's whereabouts in his final week at large found plenty of evidence of Mr. Sampson's alcohol use. At one crime scene, they found three empty bottles of Sam Adams beer. *See* Ex. 19 (police report). At a campsite, they found six Bud Light cans. *See* Ex. 20 (police report). One witness reported that Mr. Sampson said he had been drinking rum all night at the campsite. *See* Ex. 21 (DiCarlo statement). When he visited one witness's residence, he consumed at least one beer. *See* Ex. 16. At the Schlosser residence, from which Mr. Sampson called 911 and turned himself in to authorities, they discovered an empty can of Budweiser. *See* Ex. 22 (police report) Regarding drug use, one witness described Mr. Sampson as having the appearance of a drug user. *See* Ex. 16. Similarly, another witness described Mr. Sampson as having a sunken face like that of a heroin addict. *See* Ex. 23 (Mullaney Statement).

### 4. Trial Counsel's Failure To Investigate and Present Mitigating Evidence Was Prejudicial.

All of the above information was readily available to trial counsel; indeed, the people who have been spoken with in connection with this motion were either names found in the records trial counsel had gathered, in discovery provided by the Government at trial, in newspaper articles at the time of trial, or referrals from those people or from Mr. Sampson. Trial counsel failed to thoroughly investigate all possible mitigation evidence, in disregard of the prevailing professional standard of care. As a consequence, they were unable to make informed

decisions about how to conduct critical stages of the trial which, in turn, adversely impacted their ability to defend Mr. Sampson and to persuade the jury to spare his life.

As discussed *supra* Part II.B, trial counsel's presentation was marked more by the absence of relevant family history than its presence. This incomplete picture left the jury with the impression that there was insufficient mitigating evidence to warrant sparing Mr. Sampson's life. Rather than providing the jury with information that could explain the trajectory of Mr. Sampson's life and contextualize the crimes to which he had pled found guilty, trial counsel's mitigation case offered a fragmentary recitation of events in Mr. Sampson's life that lacked coherent themes and that omitted crucial information which has long been recognized as significant and compelling evidence in mitigation. Had trial counsel discovered and presented the wealth of readily available mitigation evidence discovered and presented above, there is a reasonable likelihood that the outcome of Mr. Sampson's trial would have been different.

The best evidence that Mr. Sampson's capital jury lacked sufficient information to demonstrate that they had a reason to spare his life is the jury verdict forms. Not a single juror found that Mr. Sampson was mentally ill at the time of the crimes, that he suffered from any kind of brain dysfunction, or that he was mentally ill at the time of trial. Not a single juror found that Mr. Sampson had suffered abuse as a young person. As discussed herein, there was ample lay and expert evidence that trial counsel failed to discover that Mr. Sampson had long been suffering from mental disease and brain damage and that he had suffered abuse in various settings throughout his life. Had even a single juror decided that one or more of these mitigating factors explained (but of course did not justify) Mr. Sampson's offenses and mitigated his moral culpability in the juror's eyes, there is a reasonable probability that that juror would have voted

for life. This is sufficient to demonstrate prejudice under *Strickland.* *See Strickland*, 466 U.S. at 694.

### D. Trial Counsel Was Ineffective for Failure To Investigate and Present Evidence that Mr. Sampson Suffered from Significant Brain Damage.

Trial counsel rendered constitutionally defective assistance by failing to adequately investigate and present mitigating evidence that demonstrated the extent of, or even placed in context, Mr. Sampson's head trauma, organic brain damage, and resulting mental impairments. Specifically, trial counsel was deficient by failing to provide Dr. Thomas Deters, a defense expert in neuropsychology, with sufficient evidence to ensure a thorough evaluation. The jury concomitantly lacked critical information about Mr. Sampson's life and his long history of behavioral and psychological problems.

#### 1. Trial Counsel Had a Duty To Investigate and Develop Evidence of Significant Brain Damage.

The ABA Guidelines require capital counsel to "conduct an ongoing, exhaustive and independent investigation of," *inter alia*, the defendant's medical history, which includes evidence of neurological damage. ABA Guidelines ¶ 10.11(A). Once tied into the "unique combination of factors at play in the client's life" this evidence can "demonstrate[ ] that there are causal connections between . . . neurological damage[ ] and violent behavior." ABA Guidelines ¶ 10.11, cmt. at 115 n. 314. Accordingly, the ABA Guidelines state that capital counsel should "collect[ ] . . . corroborating evidence from multiple sources—a time consuming task—. . . wherever possible to ensure the reliability and thus the persuasiveness of the evidence." *Id.* at 81. The failure to adequately investigate and present powerful mitigating evidence of brain damage falls below prevailing professional standards of care. *See e.g., Frierson v. Woodford*, 463 F.3d 982, 991–92 (9th Cir. 2006) (holding that counsel's failure to present mitigating evidence, including evidence of brain damage, during the sentencing proceedings was

- 49 -

unreasonable); *Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003) (finding ineffective

assistance where counsel failed to present mitigating evidence of brain impairment even though

counsel had knowledge that the defendant had suffered brain damage from falling off of a

ladder); *Glenn v. Tate*, 71 F.3d at 1208–09 (6th Cir. 1995) (finding ineffective assistance where

counsel failed to, *inter alia*, present evidence that defendant had neurological impairment with

evidence of brain damage); *United States v. Rudisill*, 43 F. Supp. 2d 1, 3–5 (D.D.C. 1999)

(finding that the defendant's brain impairments interfered with his cognitive abilities and

rendered him incompetent to stand trial).

> **2.    Trial Counsel Failed To Thoroughly Investigate and Develop**
> **Evidence of Mr. Sampson's Significant Brain Damage.**

Dr. Deters conducted a neuropsychological evaluation of Mr. Sampson. Based thereon,

Dr. Deters concluded that Mr. Sampson had "neuropsychological impairments," which resulted

in "executive function abnormalities" consistent with "frontal lobe abnormalities." Tr., Dec. 9,

2003, at 162. According to Dr. Deters, these impairments "had a significant effect on [Mr.

Sampson's] cognition, particularly reasoning, problem solving, . . . his ability to control

impulses, his ability to control anger, [and] his ability to have some control over his mood." *Id.*

at 163. To reach these conclusions Dr. Deters relied largely on Mr. Sampson's self-reporting, his

observations of Mr. Sampson, neuropsychological tests that he ordered to be administered, and

some limited hospital and school records.

However, trial counsel provided Dr. Deters with little corroborating information with

which to substantiate his opinions. Consequently, Dr. Deters' trial testimony focused in large

part on Mr. Sampson's self-reporting. For example, Dr. Deters testified that Mr. Sampson

reported having "difficulty sleeping," Tr., Dec. 9, 2003 at 106; a loss of consciousness on at least

four occasions, *id.* at 104; and a long history of substance abuse, *id.* at 116–118. When not

reporting on what Mr. Sampson told him, Dr. Deters told the jury about what he had observed during his interviews. For example, Dr. Deters stated that during his interviews he observed "great variability in [Mr. Sampson's] affect. One minute he might be talking very calmly about something that was pleasant to him . . . and the next minute he might be spinning off into a rage." *Id.* at 113. Dr. Deters also stated that Mr. Sampson displayed, *inter alia*, perseverative behaviors during the evaluations in that he would "go off on a tangent," *id.* at 20; circumlocutory patterns in that Mr. Sampson would "talk around something, but hav[e] a difficult time getting to the point," *id.* at 121; and rapid or pressured speech, *id.* at 122. Moreover, Dr. Deters had little documentary evidence with which to substantiate his opinions, including his opinion that Mr. Sampson had suffered head trauma.

The Government thereafter quickly dismantled Dr. Deters' testimony. The Government cross-examined Dr. Deters at length about whether Mr. Sampson had ever "suffered any head injury." Tr., Dec. 9, 2003, at 180; 181–88. The Government challenged Dr. Deters to provide direct evidence of trauma to the head. *See, e.g.,* Tr., Dec. 9, 2003, at 180–88. When Dr. Deters responded with examples of head injuries that Mr. Sampson said he had suffered, the Government inquired, but "[Mr. Sampson] had a motive to lie to you . . . ?" Tr., Dec. 9, 2003, at 183. Dr. Deters was unable to provide any direct evidence of trauma to Mr. Sampson's brain in response to the Government's questions. Dr. Deters' numerous concessions also undermined his testimony. For example, Dr. Deters admitted that the results of certain tests he administered to Mr. Sampson were "normal," *see, e.g.,* Tr., Dec. 19, 2003, at 205; that Mr. Sampson could understand the tasks given to him, that he was not "delusional," *see, e.g., id.* at 202; and that he "maintained himself" during the evaluation, *id.* at 203. Dr. Deters was generally unable to

provide the Government with examples of how Mr. Sampson's brain impairments had affected Mr. Sampson throughout his life.

### 3. If Trial Counsel Had Been Effective, They Would Have Discovered Evidence of Significant Brain Damage.

#### a. Trial Counsel Could Have Provided Dr. Deters Evidence To Corroborate His Testimony.

Trial counsel failed to provide Dr. Deters with facts sufficient for him to understand and present an accurate diagnosis and opinion of Mr. Sampson's brain damage. Specifically, trial counsel failed to provide Dr. Deters with (1) medical records that corroborated the existence of head injury, and (2) evidence from lay witnesses about how Mr. Sampson's brain impairments affected his behavior.

For example, counsel never informed Dr. Deters that Mr. Sampson had suffered severe trauma to the head when he was a child. However, such evidence not only existed, but Mr. Sheketoff had this evidence in his possession. The Government had previously provided Mr. Sheketoff with the records showing that when Mr. Sampson was four years old he fell ten feet down the stairs and hit the back of his head. *See* Ex. 4. The trauma to Mr. Sampson's head from this ten-foot fall caused swelling. *Id.* Mr. Sheketoff also possessed hospital records establishing that on July 11, 1967, when Mr. Sampson was seven years old, he suffered a laceration on the left side of his head. *Id.* This information would have compellingly corroborated the etiology of brain damage. *See, e.g., Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991) (holding trial counsel ineffective for failing, *inter alia*, "to substantiate the existence of [petitioner's head injury] or its effects on [petitioner] by introducing [the petitioner's] medical records" or the testimony of a witness who had observed the severe headaches that were caused by this injury); *Comm. v. Alvarez*, 433 Mass. 93, 101 (2000) ("Counsel's failure to review or provide to the defense expert medical records regarding a serious automobile accident in which the defendant

sustained significant head (and other) injuries fell measurably below that of an ordinary fallible lawyer."). Mr. Sheketoff did not inform lead counsel about the existence (or even the contents) of such records, and these records were lost for critical corroboration for Dr. Deters.

Further, because of counsel's incomplete investigation and failure to properly inform Dr. Deters about Mr. Sampson's psychosocial and behavioral problems discussed *infra*, Dr. Deters considered only frontal lobe impairments. However, had trial counsel conducted a thorough life history investigation, trial counsel would have discovered evidence that demonstrated that Mr. Sampson suffered such debilitating brain damage that more testing was required to ferret it out.

> **b.      Trial Counsel's Investigation and Presentation of Mitigation Evidence Could Have Corroborated Dr. Deters' Testimony.**

Neither Dr. Deters, nor any other defense witness, corroborated Mr. Sampson's statements. Instead, as far as the jury could tell, Dr. Deters' opinions were, almost exclusively, based on (1) Mr. Sampson's self-reporting; (2) Massachusetts General Hospital records indicating that Mr. Sampson was dyslexic; (3) records pertaining to the 1979 car accident, which suggested that Mr. Sampson had suffered trauma to the head (but that did not reflect the loss of consciousness reported by Mr. Sampson); and (4) the neuropsychiatric tests that Dr. Deters administered. The jury did not accept this testimony.

Yet the jury never heard the powerful stories about the many ways in which Mr. Sampson's brain trauma had affected his behavior throughout his life, or how Mr. Sampson's substance abuse contributed to his impairments. Trial counsel presented two lay witnesses to corroborate brain damage: Wayne Brock, who illustrated Mr. Sampson's perseverative and disinhibited behaviors, and Dennis Robinson, who said Mr. Sampson was "mouthy," which can also signal frontal lobe damage. The other lay witnesses, Tina Withington and Karen Alexander, provided support only for symptoms of depression and irritability.

However, there were myriad other witnesses whose testimonies could have corroborated the existence of Mr. Sampson's brain damage by providing evidence of the manifestations of that damage. For example, witnesses could have told the jury about the frequent episodes when Mr. Sampson "spaced out." Two witnesses from adolescence remember having to snap Mr. Sampson out of his dazes. Fellow inmates recall that Mr. Sampson would stare out into space, as if he was in a trance-like state. Witnesses from just about every period of Mr. Sampson's life— from youth to adulthood—could have corroborated Mr. Sampson's statements that he had a substance abuse problem. Mr. Sampson's therapist at the Language Clinic could have provided detailed information about Mr. Sampson's reading problems. Mr. Sampson's brother could have provided numerous examples of Mr. Sampson's inability, throughout his life, to control his behaviors. Friends from Mr. Sampson's childhood and adolescence would have explained how Mr. Sampson's disinhibition, *i.e.*, his lack of restraint, manifested itself. For example, one friend always knew that there was something wrong with Mr. Sampson, something that was beyond his control in the same way the friend's brother could not control his mental retardation. Mr. Sampson's friends could have also illustrated his impulsivity. Others could have described how Mr. Sampson displayed actions of perseveration, *i.e.*, his uncontrollable repetition of behaviors, and corroborated his "mouthiness" or his tendency to talk more than he should and say inappropriate things to the wrong people. Many peers could have described his inability to perceive social cues. And countless witnesses could have described Mr. Sampson's persistent mood swings. But, because counsel failed to conduct an adequate investigation, they and Dr. Deters, and therefore the jury, never knew about any of these facts—facts relevant to deciding whether Mr. Sampson should live or die for his crimes.

c.        **Dr. Ruben Gur's Test Results.**

Had trial counsel focused on the Brockton Hospital Records showing a serious head injury to Mr. Sampson at the age of four and investigated and developed the extraordinary history of further head injuries in childhood and prison, counsel would have pursued additional forensic neuropsychological testing through Dr. Deters or consulted an expert whose professional focus is on the interface between brain injury and behavior, to ferret out specific areas of deficit. Without this record, Dr. Deters ran only a standard battery of neuropsychological screening tests and a standard clinical MRI. No PET study was performed. The MRI was clinically read as normal by visual inspection and the neuropsychological battery revealed frontal lobe damage. Dr. Deters work up, however, did not reveal the full extent of the damage to Mr. Sampson's brain or the relationship of those damaged areas to behavioral consequences, which as set forth below would have added invaluable evidence for the jury's evaluation of Mr. Sampson's conduct and a robust source of mitigation.

A more rigorous MRI and PET study, as well as additional neuropsychological testing would have shown the following. The clinical MRI conducted in 2003 was sufficient to identify the presence of a brain tumor or other type of life threatening abnormality, for example, but not the type of damage that marks Mr. Sampson's brain. Dr. Ruben Gur recently ordered an MRI with better resolution than the 2003 MRI. *See* Ex. 24 (Gur C.V.). Dr. Gur used the data that generated the MR images in a quantitative volumetric analysis of the MR signal.

The MRI ordered by Dr. Gur shows that Mr. Sampson's brain has abnormally large ventricles, a sign of significant brain cell loss. When brain cells die (atrophy) or are missing (dystrophy), cerebrospinal fluid fills the void thereby enlarging the ventricles. The results of the MRI have been analyzed by Dr. Gur and are graphically shown on Exhibit 25, with Mr. Sampson's brain compared to what one would expect to see in an average healthy brain of a man

- 55 -

of Mr. Sampson's age range. The abnormal size of the ventricles is shown in the circled area on the left.

Further to the left side of the graph are the findings with respect to the overall total volume of the four lobes of the brain—Frontal, Temporal, Parietal and Occipital. In the normal brain, these are expected to chart on a straight line. In Mr. Sampson's brain, however, there is a substantial reduction in relative brain volume in the Frontal and Occipital Lobes, pointing to brain damage in those areas, which is further borne out by the detailed analysis shown in the remainder of the chart.

The damage to Mr. Sampson's brain is localized to a specific set of regions, mostly in the front and the back of the brain. The locations and distribution are consistent with the coup/counter-coup phenomenon caused by a serious blow to the rear of the head. Such a blow causes the brain to bounce back and forth inside the skull, producing damage to both the frontal lobe and the occipital lobe that is in the back of the head. The damage to the frontal lobe is generally more severe, due to sharp surfaces encountered there as compared to the relative smoothness of the back of the skull. This is what is seen in Mr. Sampson's brain and what makes extremely significant the ten-foot fall down the stairs at the age of four when he hit the back of his head causing swelling that took him to the emergency room.

The damage in the occipital lobe is focused on the lingual area. This is the area of the brain that is critical for visual processing. It puts together the images one sees. This likely ties into Mr. Sampson's inability to read words and his tendency to see words backwards that was observed when he started school and that was diagnosed as dyslexia.

Another area of markedly reduced brain volume is that of the nucleus accumbens and the thalamus. This area can be seen as the traffic cop of the brain, sorting out incoming data for

what is important, what to forget, and then sending it to where else in the brain it should be further processed. This area plays an important role in reward systems, and damage in this area is often associated with addiction. Deficits in this area also lead to confusion, difficulties in coordinated behavior and sending bad information to the frontal lobe that could lead to bad decisions even in a well-functioning frontal lobe.

Mr. Sampson's frontal lobe, however, was far from well-functioning. Both the left and right lateral front orbital region show markedly reduced volume from normal, worse on the left. This is the area of the brain that communicates with the amygdala, the brain's threat detector. When the amygdala perceives a threat, it sends a signal to the lateral front orbital region where the threat is put into proper context; in effect, the area is a brake on the amygdala. A deficit in this area causes a person to misperceive threats, to act inappropriate to the situation, to be hyper vigilant and to lack impulse control. There is temporal lobe involvement, and the amygdala itself shows significant volumetric loss. Individuals with lesions in these areas can be susceptible to uncontrollable rage attacks.

A fourth area of major volumetric loss is the left inferior frontal, the area responsible for decision making. Deficits in this area correlate with behaviors such as compulsive gambling, compulsive womanizing and abandoning spouses.

Also deficient in brain volume is the right percuneus, which is the region of the brain that represents your "self," and which holds the self together. Loss of brain tissue here is associated with dissociative states, *i.e.*, doing complex things and not realizing you are doing them.

Mr. Sampson has gone through his life since early childhood with a severely damaged brain. His deficits could have benefited from early intervention and sustained remedial work. This would have required Mr. Sampson to be in a facility that specifically works with brain

- 57 -

damaged children, to teach and drill them on the coping skills necessary to compensate for the damaged areas. Absent such sustained and continuing aid, a child with a brain such as Mr. Sampson's will not be able to deal effectively with the world around him or succeed in relationships, school, or work.

### d.    Trial Counsel's Unreasonable Conduct Prejudiced Mr. Sampson.

Trial counsel's constitutionally defective assistance—by failing to adequately investigate mitigating evidence that demonstrated the extent of, or even placed in context, Mr. Sampson's head trauma, brain damage, and resulting mental impairments—prejudiced Mr. Sampson. The damage to Mr. Sampson's brain is not confined to the frontal lobe but is localized to a set of regions (front, back, and temporal) that are all critical for behavior control. This brain damage affects Mr. Sampson's ability to, *inter alia*, accurately perceive events, control his behavior, act appropriately in situations, and otherwise deal with the world around him. Mr. Sampson's capacity to conform his conduct to the requirements of the law was significantly impaired by this damage. Such an impairment is a mitigating factor that makes Mr. Sampson "less blameworthy than a person who does not have a comparable impairment." *See* Tr., Dec. 19, 2003, at 57 (explaining mitigating factor). Moreover, had meaningful evidence of Mr. Sampson's traumatic past been before the jury, rather than Mr. Sampson's unadorned statements to defense experts, there is a reasonable probability that one or more jurors would have found the mitigating factors of remorse and acceptance of responsibility. By failing to adequately investigate and present information that substantiated, contextualized, and illustrated Dr. Deters' diagnosis, trial counsel deprived the jury of critical information that weighed in favor of Mr. Sampson's life.

E.    **Trial Counsel was Ineffective for Failure To Investigate and Present Evidence Regarding Mr. Sampson's Trauma in Prison.**

1.    **Trial Counsel Has a Duty to Investigate Evidence of Institutional History and Adjustment.**

As discussed in detail, *supra*, trial counsel in a capital case is obligated to investigate and present mitigation evidence, which includes evidence of a defendant's background, character, and social influences. *See Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 524. Counsel must therefore seek to "discover all reasonably available mitigating evidence," including, but not limited to, "'*prior adult and juvenile correctional experience.*'" *Wiggins*, 539 U.S. at 524-25 (emphasis added) (quoting 1989 ABA Guidelines ¶ 11.4.1(a), cmt. at 93). Indeed, the 2003 ABA Guidelines provide that "[i]f counsel was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's contemporaneous and later conduct." ABA Guidelines ¶ 10.7, cmt. at 84. Because the sentence that is ultimately imposed "should reflect a reasonable moral response to the defendant's background, character, and crime," it is critical that trial counsel provide the jury with all available information relevant to assessing the appropriateness of imposing a sentence of death. *See California v. Brown*, 479 U.S. 538, 545 (1989) (O'Connor, J., concurring).

2.    **Trial Counsel Failed To Investigate and Present Compelling Evidence of Prison Trauma.**

Mr. Sampson spent over sixteen years of his life in and out of jails and prisons. This period included critical developmental years of late adolescence and early adulthood. The brutality and deprivation that Mr. Sampson both witnessed and endured while in prison affected Mr. Sampson's mental health and psychological well-being. Yet, trial counsel failed to investigate critical aspects of his experience in correctional institutions. Trial counsel failed to

- 59 -

interview a single inmate that had been incarcerated with Mr. Sampson. Nor did counsel otherwise look into the conditions of the institutions in which Mr. Sampson was incarcerated. Further, although counsel obtained voluminous records of Mr. Sampson's prison years they did not effectively utilize or present the information. Instead, counsel used these records to discuss Mr. Sampson's prison experiences in a limited way, largely to corroborate Mr. Sampson's complaints of headaches, his requests for help with addiction, and to show that some of the behavior that Mr. Sampson exhibited in prison was consistent with Bipolar Disorder and frontal lobe damage. Trial counsel did not, however, focus on the most salient aspect of Mr. Sampson's extensive incarceration: the dangerous conditions of his confinement, and the affect of these conditions on Mr. Sampson's mental health. Counsel's failures in this regard deprived the jury of powerful mitigating evidence. It also permitted the Government to present, largely unrebutted, a misleading and prejudicial picture of Mr. Sampson's life in prison, which consisted of an escalating trajectory of violence. Tr., Nov. 5, 2003, at 73-74.

> 3.    **An Adequate Investigation Would Have Revealed Relevant Mitigating Evidence of the Conditions of Mr. Sampson's Confinement in State Prison Systems.**

If trial counsel had investigated the conditions of confinement during the period of Mr. Sampson's incarceration, the jury could have been provided with evidence about the physical, psychological, and emotional abuse inflicted on the inmates. The jury would have therefore heard about the brutal institutional conditions in which Mr. Sampson lived for over sixteen years, from Bridgewater State Hospital ("Bridgewater"), Plymouth County HOC, Carroll County HOC, New Hampshire State Prison ("NHSP"), Maine State Prison, and the several Connecticut State Prisons, and the debilitating affect of those conditions on Mr. Sampson's mental health.

Trial counsel would have discovered evidence demonstrating that during the period of Mr. Sampson's incarceration at various institutions, including Bridgewater and the NHSP,

guards were physically and psychologically abusive. An investigation would have shown that the guards: (1) subjected inmates to prolonged periods of isolation; (2) psychologically manipulated inmates; (3) frequently inflicted mental and physical pain; (4) terrorized inmates with frequent threats of violence; (5) humiliated and degraded inmates; (6) disrupted inmates' sleep and their access to food; and (7) sexually humiliated inmates, including by taunting and targeting inmates for sexual reasons, and frequent body cavity searches. Interviews of inmates and others familiar with the conditions of confinement during Mr. Sampson's years of incarceration would have shown that the guards affirmatively contributed to the chaos, violence, and predatory atmosphere, and that their behavior facilitated and exacerbated the destructive dynamics of the prison culture that was so damaging to Mr. Sampson.

For example, according to Dr. James Gilligan, the Medical Director of the Bridgewater State Prison at the time of Mr. Sampson's incarceration, guards inducted new inmates to the prison with a "Total Degradation Ceremony." Guards took inmates into the Admission's Office and taped paper over the window so that medical staff and other inmates could not see into the room while new inmates were being "processed." They would then strip the inmate naked and surround him. The inmate was ordered to bend over, and a guard put his hand in the inmate's anus. Dr. Gilligan expressed concern to the Superintendent of Bridgewater about this process. The Superintendent said this "Total Degradation Ceremony" was necessary to intimidate the inmates. The Superintendent's tenure at Bridgewater began in 1959, and lasted until the release of the film *Titicut Follies*, which showed shocking scenes of abuse of patients by guards and psychiatric workers.

Counsel also failed to locate witnesses capable of describing the extremely dangerous conditions in various parts of the NHSP, including the Secure Housing Unit ("SHU") where Mr.

- 61 -

Sampson spent a considerable amount of time. There, beatings, assaults, and rapes occurred with frequency. Inmates in protective custody, who were considered the "lowest of the low," were subjected to particular humiliation: the guards forced these inmates to engage in a "walk of shame" three times as day, which required the inmates to walk to "chow hall" in full view of guards and inmates who taunted them mercilessly.

### 4. An Adequate Investigation Would Have Revealed Relevant Mitigating Evidence of Mr. Sampson's Treatment in Prison.

Mr. Sampson directly suffered physical and psychological trauma in prison. He was seriously assaulted in prison, and in some instances these assaults were documented in photographs in the prison records trial counsel possessed and introduced.[13] While Mr. Sampson was in NHSP, records show numerous reports of physical injuries, with little or no explanation of the cause. At one point, Mr. Sampson "slipped on the floor," and was given thirty days bed rest. Ex. 26. On another occasion, a weight in the weight room "was dropped" on Mr. Sampson's throat. Ex. 27. Mr. Sampson once "fell out of bed and hit his head." Ex. 28. Another time Mr. Sampson suffered a black eye from supposedly hitting his face on the sink. Ex. 29. And on another occasion a "metal door shut on his hand." Ex. 30. Yet another time he had "face wounds." Ex. 31. Mr. Sampson also "hurt his neck and shoulder in the shower." Ex. 32. He also went to the doctor several times because of "rectal bleeding." Ex. 33.

There are also numerous explicit descriptions of beatings. In 1988, Mr. Sampson was jumped by guards, which left his back bruised. Ex. 34. In July 1989, records show that Mr. Sampson was "attacked by several inmates," had bruises on his face, a cut to his cheek, an

---

[13] These were red flags that the conditions at the prison should have been investigated. While trial counsel introduced some of the incidents that were in Mr. Sampson's prison records through Jill Miller's testimony, no context or narrative was given for them, nor did any of the psychological or psychiatric experts incorporate the relevance of these records into their mental health picture of Mr. Sampson.

"occipital hematoma," and back pain. Ex. 35, 020711. In April 1993, Mr. Sampson is sent to the infirmary after being stabbed in the leg. Ex. 36. One month later, in May 1993, Mr. Sampson was hospitalized after being beaten. Ex. 37. He had a "bad bruise" under his left eye, injury to his right shoulder and left side of his head, and "multiple abrasions on his arms, bruises on his neck, an open wound on the bridge of his nose and left corner of his mouth." *Id.* The medical record notes that "there are no marks on [his] hands or knuckles" (indicating that Mr. Sampson did not fight back). *Id.* Weeks later, Mr. Sampson requested glasses because his eyes were "still messed up" from the assault. Ex. 38. In 1995, Mr. Sampson was hit in the back of the head with a broom, and the morning after that assault he was "kicked . . . in the groin full force which caused bleeding and [forced] [him] to lay on the floor." Ex. 39.

Indeed, Mr. Sampson's entire prison file is thick with inmate request forms, expressing continuous fear of stabbings and beatings, not being in control, being picked on by guards and inmates, and desperate attempts to get protection and help from prison staff. Ex. 40. Mr. Sampson's request forms are replete with requests to be moved in order to avoid violence: he requested to stay in protective custody because of threats on his life, Ex. 41; requested to be moved to tier where there were no problems, even "death row," because he was being "pushed to the brink by other inmates," Ex. 42; requested to be moved to "MSU" because he couldn't be on the block or in PC, Ex. 43. He also constantly asked to be housed with, or not with, certain inmates for his own safety. For example, in April 1985, Mr. Sampson wanted to switch cell mates because his cellmate was "known to stab people." Ex. 44. In August 1985, Mr. Sampson requested to move because of "to [sic] much tention [sic] for me and to [sic] much trouble." Ex. 45. He requested to be placed anywhere, including SHU. Ex. 46. Requests such as these continued throughout his time in prison.

Moreover, guards were notorious for pitting inmates against each other, and given Mr. Sampson's mental impairments he had a hard time discerning between real threats and perceived ones. Mr. Sampson felt like nothing could keep him safe, and that his safety was at the whim of the very guards who assaulted him. Indeed, there were long periods when Mr. Sampson would not venture out of his cell. He would not shower with others, and would even forgo meals so that he could shower alone. Often manifestations of Mr. Sampson's brain damage, including his incapacity to control or moderate what he said, compounded the nature and degree of the brutality inflicted upon him. And Mr. Sampson, like other inmates, was in fear of possible rape. Inmates reported that guards repeatedly used this fear as a weapon to control, manipulate and terrorize them, often circulating false information that an inmate was a "baby raper." Further, Mr. Sampson was subjected to solitary confinement for extended periods of time at various penal institutions, such as NHSP.

### 5. Trial Counsel's Failure To Investigate and Present Evidence of Prison Trauma Prejudice Mr. Sampson.

The more than sixteen years of physical, sexual, psychological, emotional abuse that Mr. Sampson either witnessed or directly endured significantly and permanently affected him. Trial counsel's failure to investigate and present this abuse prejudiced Mr. Sampson. Had trial counsel properly investigated the conditions of Mr. Sampson's previous incarcerations the jury would have heard significant evidence that was independently mitigating, including evidence that Mr. Sampson: (1) endured traumatizing and unconstitutional conditions of confinement while incarcerated; (2) was in constant fear for his safety and his life; (3) endured the stigma, heightened potential danger from other inmates, humiliation and shame associated with protective custody status; (4) witnessed or was vicariously exposed to numerous acts of violence, including physical assaults, murder, and rape; (5) was himself the victim of multiple assaults;

and (6) endured psychologically damaging periods of isolation. Further, the jury would also have heard compelling testimony about how Mr. Sampson's conditions of confinement adversely affected his mental health.

Further, trial counsel's failure to investigate Mr. Sampson's previous incarcerations undermined the defense's ability to adequately explain to the jury the extent of Mr. Sampson's mental and emotional impairments, and to otherwise contextualize those impairments. Counsel's deficiencies in this regard contributed to a mental health evaluation that was not complete as necessary to uncover the full extent of Mr. Sampson's brain damage as set forth above.[14] It also deprived the jury of appropriate expert testimony which would have explained how Mr. Sampson's brain impairments, psychiatric vulnerabilities, and trauma history seriously impaired his ability to protect himself and cope in chronically dangerous prison environments, and also adversely affected his ability to function outside of institutional settings. Trial counsel's failure to adequately investigate and present evidence of Mr. Sampson's prison trauma therefore deprived the jury of mitigating evidence critical to deciding whether Mr. Sampson should live or die.

F.    **Trial Counsel Was Ineffective for Failure To Investigate and Present Evidence of Trauma and Neglect in Childhood and Adolescence.**

Despite having put forth a mitigating factor that Mr. Sampson was the subject of verbal, emotional, or physical abuse, trial counsel put on no evidence of this except Mr. Sampson's own statements to experts, one of whom was a member of the trial team and another of whom was an

---

[14] Not only would a complete investigation have permitted the defense experts to perform a more accurate (and adequate) mental health evaluation, but it would also have allowed the defense to effectively impeach the government's expert, whose opinion was based, in part, on an incomplete understanding of prison records.

employee of the state public defender office. Counsel failed to meet the standard of care required in capital cases.

### 1. Trial Counsel Has a Duty To Investigate and Present Evidence of Trauma and Neglect in Childhood and Adolescence

The Supreme Court "has made it clear and come down hard on the point that a thorough and complete mitigation investigation is absolutely necessary in capital cases." *Dickerson v. Bagley*, 453 F.3d 690, 693 (6th Cir. 2006). This fundamental obligation imposes upon counsel an obligation to "consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," and "requires extensive and generally unparalleled investigation into personal and family history." ABA Guidelines ¶ 10.7. It is well established that such an investigation undoubtedly must include evidence of trauma. *Outten*, 464 F.3d at 420–21 (finding prejudice where investigation would have revealed evidence of traumatic childhood); *Harries v. Bell*, 417 F.3d 631, 639-40 (6th Cir. 2005) (finding prejudice where investigation would have shown evidence of traumatic childhood); *see also* ABA Guidelines (noting that an investigation into family and social history may reveal traumatic events). And the obligation to investigate and develop this evidence "is impossible without consulting experts." ABA Guidelines, cmt.

Mitigating evidence of a defendant's background is highly relevant and an important mitigation factor. An expert on trauma could have explained to the jury that chronic exposure to victimization and neglect can have profound effects on the development of a child. Thus, "counsel's decision to forego psychological mitigating factors without any competent information concerning the existence of trauma flowing from [a defendant's] childhood experiences" is unreasonable. *Buckner v. Polk*, 453 F.3d 195, 215 (4th Cir. 2006); *see also Outten*, 464 F.3d at 421 ("Counsel . . . were not in a position to make a reasonable decision

whether to focus on [defendant's] innocence or positive characteristics, the details of his traumatic background, or both, as their investigation in preparation for sentencing was itself unreasonably deficient.").

Counsel's duty includes obtaining an "adequate psychiatric evaluation of his [client's] state of mind." *Blake v. Kemp*, 758 F.2d 523, 529 (11th Cir. 1985). "In capital litigation, an accurate and reliable life history investigation is the foundation for developing and presenting pivotal mental health issues. Research has shown repeatedly that well-documented and effectively presented mental health evidence has a positive impact on capital jurors." Dudley and Leonard, Getting it Right: Life History Investigation As the Foundation for a Reliable Mental Health Assessment, *Hofstra Law Review*, Vol. 36, No. 3, 975–76 (2008) (citations omitted). Here, trial counsel did not sufficiently corroborate the claim that Mr. Sampson was subjected to verbal, emotional or physical abuse, nor did they obtain or present the testimony of an expert witness who could explain in general terms the impact victimization and neglect has on a young boy's development, the risk factors for adult criminality created by the type of environment in which Mr. Sampson was raised, and the reasons why one or more of the defendant's siblings may have developed into more successful adults despite being raised in the same environment as the defendant. When, as here, counsel is presented with general information that may reasonably lead to mitigating evidence, counsel's failure to thoroughly investigate is unreasonable. *See Wiggins*, 539 U.S. at 527; *Outten*, 464 F.3d at 418.

### 2. Trial Counsel Failed To Thoroughly Investigate or Corroborate Evidence of Trauma.

Trial counsel's inadequate investigation gave the jury the impression that Mr. Sampson had not experienced violence during his formative years, when in fact Mr. Sampson suffered

violence at critical times throughout his life, and that violence exacerbated his mental impairments.

One of defense counsel's main witnesses was Dr. Angela Hegarty. Although relying on Dr. Hegarty to conclude that Mr. Sampson's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, 18 U.S.C. § 3592(a)(1), trial counsel failed to conduct a thorough investigation and provide Dr. Hegarty the necessary information to enable her to arrive at a reliable expert assessment of all the relevant issues in the case. It was incumbent upon trial counsel to conduct a reasonable investigation that would enable Dr. Hegarty to arrive at an accurate diagnosis of Mr. Sampson, to enable Dr. Hegarty to address all the issues relevant to the case, and to produce the witnesses and evidence that would substantiate Dr. Hegarty's findings for the jury.

As discussed *supra* Part II.B, Dr. Hegarty diagnosed Mr. Sampson with Bipolar Disorder, Substance Abuse, and Psychosis (Axis I), Borderline Personality Disorder with antisocial features (Axis II), and neurocognitive deficits; psoriasis; history of head trauma and dyslexia (Axis III). Despite the ample evidence that could have been available to inform Dr. Hegarty's opinion, she was left with little corroboration for her conclusions, save for statements by Mr. Sampson. As the Government pointed out in closing, the defense's psychiatric case "imploded in court. . . . Dr. Hegarty was reduced to saying she speculated when she was challenged on cross-examination. She could not support her conclusions. The facts contradict what Dr. Hegarty had to say. She and Dr. Deters unraveled." *Id.*

Without more corroboration for Mr. Sampson's mental impairments, Dr. Hegarty was forced to agree with several harmful, and, as it turns out, misleading conclusions put to her by the Government on cross-examination. Dr. Hegarty reported that Mr. Sampson was severely

brain damaged and, as a result, a poor historian.  It took her a long time to get even a basic chronology from Mr. Sampson, as he confabulated, had difficulty time-sequencing events, had gaps in his memory, masked impairments and was guarded and defensive about being seen as a victim.  Thus, corroborating evidence about his brain impairments and trauma history were crucial to substantiating her conclusions.

Dr. Hegarty, based upon her conversations with Mr. Sampson and a review of his prison records, felt that trauma was a significant mental health area to explore.  Her observations of Mr. Sampson's behavior also signaled to her that he was a victim of severe violence: fearful, hypervigilant, guarded, identified with perpetrators, and engaged in behavior to provoke rejection and reenact traumatic events.  However, she needed corroborating events and witnesses and a narrative to be able to reliably discuss the relevance of violence in Mr. Sampson's life.

### 3.     A Thorough Investigation Would Have Revealed Relevant Mitigating Evidence of Trauma and Neglect in Childhood and Adolescence.

Had trial counsel contacted family and peers, they would have uncovered powerful evidence of victimization and neglect suffered by Mr. Sampson throughout his childhood and young adulthood. As stated above, Mr. Sampson suffered from significant brain damage from an early age. With evidence that was available to trial counsel, an expert could have explained to the jury that Mr. Sampson was a devalued child and that he was scapegoated and repeatedly assaulted.  Moreover, there is little question that Mr. Sampson suffered repeated victimization in prison.  An expert on trauma could have explained the myriad ways in which these events interacted with his cognitive impairments to further harm and isolate Mr. Sampson and to render him less able to function adequately.

For example, an expert could have explained to the jury that a child with cognitive impairments is more likely to be victimized, because he is likely to be perceived as weak, slow,

or, in Mr. Sampson's case, experienced as annoying or provocative. There is evidence that Mr. Sampson was unable to respond effectively to social cues or adapt his behavior even when in danger. He was unable to deduce how to function more adaptively. As a result, he was a target for repeated victimization which, in turn, further frightened and damaged him.

Mr. Sampson's brain impairments rendered both his internal world and his social world deeply confusing and frightening places. He was unable to make any useful sense out of what was happening to him. This confusion, and his inability to find any positive ways to interact with the social world, left him bereft of alternative, positive experiences which might have mitigated some of the harm that he was experiencing. He came to expect a certain level of victimization and like many chronically frightened children, became unable to distinguish real from perceived threats.

An expert would have been able to explain to the jury that childhood victimization, even in a child with intact brain structure, has the potential to distort the very foundations of a child's developing sense of self, including their schemes of self and world and their ways of processing emotional experience. This is especially true in cases of chronic victimization–*i.e.*, experiences of being physically hurt over a long period of time and in varying circumstances. That trauma intersects with an actively evolving maturational process and, as a result, it has a profound effect on shaping the basic building blocks of the child's psyche, including his values, expectations, beliefs, memory, judgment, and sense of self. In a child like Gary Sampson, with pre-existing vulnerabilities and scant resources, the damage done to his development is even further exacerbated.

The physical maltreatment suffered by Gary Sampson was perpetrated against a backdrop of emotional/psychological abuse and neglect. Herk Sampson was humiliated and repulsed by

his inadequate son. He was alternately disdainful and rejecting of Gary, and as a result, he either ignored him altogether or actively degraded him. An expert in trauma could have explained to the jury that this combination can be especially damaging:

> When both are present at high levels, this combination of psychological and physical aggression may be especially harmful—producing a childhood overwhelmingly characterized by punishment, engendering in the victim a chronic sense of personal badness.[15]

In Gary Sampson, that "personal badness" was manifest in his sense of shame and his belief that he was incapable of getting anything right – socially, academically, or interpersonally. Shame is a particularly toxic and disabling emotion. Unlike guilt, which includes the idea that there might be something one could do to change or improve the situation or the self, shame simply attaches to one's sense of self and breeds isolation and a sense of badness. An expert in trauma could explain to a jury that children who are demeaned and hurt repeatedly come to experience themselves as worthless and the social environment as threatening. Moreover, Mr. Sampson, because of his brain dysfunction, would have been bereft of some of the ways of coping that other children might have used to better cope with these circumstances. His brain impairments interfered with him having reparative experiences in school, with peers or with other adults.

A trauma expert would explain that victimization is especially devastating when suffered at the hands of those entrusted to protect a child, such as a father, and are intensified when victimization also occurs in multiple domains and by multiple people. Gary's experience of victimization by his father, and the chronic fear it engendered, was reinforced by the beatings he received at the hands of his brother, his peers, and others in the community. In many instances, Gary provoked these beatings, or failed to avoid them, because of the social and interpersonal

---

[15] Briere, J.N. (1992) Child Abuse Trauma: Theory and Treatment of the Lasting Effects. Newbury Park: Sage Publications, p. 8.

deficits associated with his brain damage.  He also did not fight back or resist the beatings. Friends, inmates, and even the police chief all note that, when beaten, Mr. Sampson would not defend himself or fight back.  His inability to stop himself from provoking attack and his experience of being frequently assaulted led to chronic feelings of fear and hopelessness both within the family and out in the community.  There was no environment in which he was ever truly safe from harm.

Unable to develop effective coping skills or to learn to either avoid beatings or to manage them more effectively, Mr. Sampson developed other, compensatory behaviors.  He compensated for his cognitive confusion by confabulating his experience so that it sounded like it made sense, and he coped with his degraded sense of self by developing a narrative of grandiosity which further irritated other people and endangered him.  An abuse expert could explain that this is one area where his organic deficits and trauma history merged to render him particularly vulnerable to violence and rejection.

A trauma expert would have explained to the jury that people are shaped, at least in part, by their environments, and as such, become adapted to living in whatever situations in which they find themselves, including situations of pervasive threat.  Conditions of pervasive threat and resultant fear lead to states of chronic hyperarousal.  The brain adapts to this state of chronic fear by becoming more sensitized to the possibility of threat.  At one level it may be helpful and indeed adaptive for a child growing up in a violent, chaotic environment to be hypersensitive to external stimuli, to be hypervigilant, and therefore to exist in a persistent stress-response state. While these adaptive changes in the brain of a chronically terrified child might render him slightly better suited to sense, perceive and act on threat in the home, these "survival tactics" ill-serve the child when the environment changes (*e.g.*, in school, peer relationships) and as they

grow into adolescence and adulthood. Thus, a young man abused as a child is more likely to misinterpret a behavior as threatening and, being more reactive, will be more likely to respond in a more impulsive and inappropriate fashion, leading to further endangerment. This expectation of danger leads to more danger. In this way the dangers of the past come to characterize the present even, when in reality, there are different and possibly reparative opportunities available in the present.

A trauma expert could have further explained that traumatized children, even those without Mr. Sampson's significant brain dysfunction, frequently suffer significant impairments in cognitive, social and emotional functioning. Many demonstrate extremely low self-esteem or self-loathing, sleep disturbances, affective instability, hyperactivity, substance abuse, suicidality, social withdrawal, and marked disturbances in their relationships with others. They are frequently depressed, anxious, and extremely hypervigilant.

A trauma expert could further explain the complex intersection between childhood, victimization and neuropsychological impairments. Chronic child abuse, or even chronic neglect, can cause changes in brain chemistry which in turn alters the developing child's experience of his emotions, of other people and shapes his interpretation of what happens to him. Finally, both trauma and brain damage are associated with a range of disorders and psychiatric symptoms in children and adults, including social and interpersonal impairments, dissociation, depression, severe anxiety, mania, social withdrawal, aggression, hyperactivity, paranoia, impulsivity, substance abus, and sometimes psychosis. Indeed, it is often difficult to trace the etiology of such symptoms where both trauma and brain damage are present, as there is often a synergistic effect between the two. Mr. Sampson has suffered from all of these symptoms at various points, especially in the weeks and months leading up to the tragic days of July, 2001. A

qualified trauma expert could explain the cumulative effects of his disabilities and describe for the jury how his early childhood experiences played a significant role in his adult behavior. Moreover, a trauma expert could discuss how Mr. Sampson's experiences in prison were an extension and exacerbation of what he was already experiencing, leading to a downward spiral of confusion, impulsivity, and reactivity.

### 4.   Trial Counsel's Failure To Investigate Mitigating Evidence of Trauma and Neglect in Childhood and Adolescence Was Prejudicial.

Had trial counsel performed a thorough investigation, counsel would have uncovered the wealth of corroborating evidence, witnesses, and the narrative around Mr. Sampson's early childhood and adolescence, years in prison and the period before the crimes that is narrated above, to allow Dr. Hegarty to make a more reliable assessment of Mr. Sampson. With corroborating evidence of Mr. Sampson's more extensive brain damage, and violence and neglect he suffered throughout his life, particularly the devastatingly brutal conditions he endured during his lengthy incarceration, Dr. Hegarty would have been able to reliably articulate that Mr. Sampson suffered severe trauma; she would have been able to credibly substantiate the neuropsychologist's conclusion that Mr. Sampson was severely brain damaged; and she would have been able to reliably opine that Mr. Sampson was in a compromised, psychotic deterioration at the time of the crimes.

Had counsel conducted an adequate investigation, there is a reasonable probability that one or more jurors would have found that Mr. Sampson's background of abuse and neglect supported mitigating circumstances. It is also likely that jurors would have found the existence of statutory mitigating circumstances that Mr. Sampson had brain damage, that he was mentally ill, and that his ability to conform his conduct to the requirements of the law was substantially

- 74 -

impaired. Trial counsel's failure to do so in this case violated Mr. Sampson's Sixth Amendment

right to effective representation.

## LITIGATION INEFFECTIVENESS

G.    **Trial Counsel Was Ineffective by Failing To Plead Mr. Sampson Guilty prior to the Supreme Court's Decision in *Ring v. Arizona*.**

The Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), on June 24, 2002,

constitutionally precluded the imposition of the death penalty on both federal indictments that

Mr. Sampson had faced to that point. Had Mr. Sampson pleaded guilty to either indictment prior

to *Ring*, he would not have been subject to the death penalty. Reasonably competent counsel in a

capital case have a duty to anticipate, litigate, and preserve legal issues that stand a reasonable

likelihood of success. An important component of that duty is to stay apprised of certiorari

grants in the Supreme Court on potentially relevant issues so that counsel can adequately raise

and preserve issues in order to later benefit from any change in law. *See, e.g.*, ABA Guidelines,

¶ 10.8, cmt. ("If a claim, whether meritorious or not, is being litigated anywhere in the country,

counsel is likely to be charged with knowledge that the tools to construct their constitutional

claim exist and be expected to raise it."). As applied here, that duty required competent counsel

to anticipate the ruling in *Ring*; trial counsel's failure to do so prejudiced Mr. Sampson by

making him subject to the death penalty, which the jury later found and this Court imposed.[16]

---

[16] There is of course no general duty to anticipate all beneficial changes in law, *see Sistrunk v. Vaughan*, 96 F.3d 666, 670–71 (3d Cir. 1996), but trial counsel may have a duty in certain fact-specific circumstances, *see Bloomer v. United States*, 162 F.3d 187, 193 (2d Cir. 1998) ("Although an attorney is not usually faulted for lacking the foresight to realize that a higher court will subsequently identify a defect in jury instructions similar to those used at his client's trial, an attorney nonetheless may be held responsible for failing to make such an objection when precedent supported a 'reasonable probability' that a higher court would rule in defendant's favor."); *Romero v. United States*, 2001 WL 921167 (S.D.N.Y. Aug. 15, 2001) ("If at the time of [defendant's] trial, there was evidence that the law on [jury] instructions might change,

Mr. Sampson's trial counsel had two opportunities to plead Mr. Sampson guilty to indictments for which Mr. Sampson could not *constitutionally* be sentenced to death under *Ring*. Trial counsel's first opportunity came after October 24, 2001, the date the grand jury first indicted Mr. Sampson on two counts of violating 18 U.S.C. § 2119(3). The grand jury did *not* allege in that indictment that it had found any of the aggravating circumstances which, under the Federal Death Penalty Act, must be found at trial in order to render the defendant eligible for the death penalty. Rather, pursuant to the statutory language of the FDPA, those factors were separately alleged in the Government's notice of intent to seek the death penalty against Mr. Sampson. Yet Mr. Sampson's trial counsel pleaded him not guilty to this first indictment on November 5, 2001. This was error. Trial counsel was given a second opportunity after June 5, 2002, when a grand jury returned a superseding indictment "which corrected some errors in the original indictment, but did not substantively change the charges against Sampson." *United States v. Sampson*, 245 F. Supp. 2d 327, 328 (D. Mass. 2003). Yet instead, trial counsel pleaded Mr. Sampson not guilty on June 14, 2002. This too was error.

A mere ten days later, the Supreme Court announced its verdict in *Ring v. Arizona*, which made crystal clear what had been evident for some time: "that a jury, not a judge, must decide if aggravating factors required to impose the death penalty have been proven beyond a reasonable doubt." *Sampson*, 245 F. Supp. 2d at 328. After the fact, on August 5, 2002, trial counsel

---

[defendant's] attorney may have been obliged to object, even though the instructions given had not yet been declared erroneous."). Mr. Sampson's present counsel has been unable to find controlling authority that would dictate an outcome under the specific facts alleged below, though certain First Circuit cases discuss the general notion that effective counsel need not anticipate all changes in applicable law. *See Campbell v. United States*, 108 F. App'x 1 (1st Cir. 2004) ("Moreover, counsel's failure to anticipate *Blakely* would not constitute unreasonable performance under *Strickland* because 'First Circuit jurisprudence on this point ha[d] been well established.'"); *Powell v. United States*, 430 F.3d 490, 491 (1st Cir. 2005) (citing extra-Circuit

moved to withdraw the most recent not guilty plea and to plead guilty to the First Superseding Indictment, which contained the constitutional defects precluding the Government from seeking a sentence of death. Ex. 47. But by then it was too late: the grand jury returned a Second Superseding Indictment on August 8, 2002, and this Court denied trial counsel's motion on February 18, 2003. *See United States v. Sampson*, 245 F. Supp. 2d 327 (D. Mass. 2003).

Trial counsel should have anticipated the Supreme Court's decision in *Ring*. The *Ring* verdict was plainly preordained by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, five Justices of the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Pursuant to this maxim, the Supreme Court invalidated a state sentencing scheme that removed the jury from "an assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* Two years later, in *Ring*, the Supreme Court extended this premise to capital trials.[17] Due to the Fifth Amendment requirement of a grand jury in the federal criminal justice system, the application of *Apprendi* and *Ring* to federal cases required that all sentencing factors first be proven to a grand jury prior to submission to a petit jury.[18]

---

authority for the proposition that "the case law is clear that an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law").

[17] In so doing, the Supreme Court overruled in relevant part *Walton v. Arizona*, 497 U.S. 639 (1990).

[18] Even if any doubt existed that the five Supreme Court justices who had voted one way on a substantially identical issue two Terms previous in *Apprendi* would somehow not prevail in *Ring*, the effective course of action would have been to plead Mr. Sampson guilty to the First Superseding Indictment on June 14, 2002. Should *Ring* have been decided differently, Mr. Sampson could later have moved to withdraw the guilty plea. A court has discretion to permit a defendant to withdraw a guilty plea "after the court accepts the plea, but before it imposes sentence if the defendant can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. PROC. 11(d)(2)(B). *See United States v. Patriarca*, 912 F. Supp. 596 (D. Mass. 1995)

Trial counsel surely knew of the *Apprendi* holding and its consequences, and the potential

for its extension in *Ring*. Indeed, trial counsel made *Apprendi* claims for several other

defendants they individually represented at or before the time they represented Mr. Sampson.[19]

Moreover, it is clear that effective counsel would have monitored (and trial counsel did in fact

monitor) capital cases granted certiorari by the Supreme Court.[20]  On January 11, 2002, the

Supreme Court granted certiorari on *Ring v. Arizona*. *See* 534 U.S. 1103 (2002).  The certiorari

grant was widely publicized because of its potential affect on at least 800 death penalty

convictions. *See* "Major Death Penalty Appeal Accepted," N.Y. TIMES, Jan. 12, 2002.

Concurrently, other learned counsel at the time were petitioning the Supreme Court for certiorari

---

(Wolf, J.) ("The court has the discretion to permit a plea to be withdrawn for 'any fair and just reason.'").  The relevant factors a court must weigh in determining whether to permit withdrawal are "whether the plea was voluntary, intelligent, knowing and complied with Rule 11; the force of the reasons offered by the defendant; whether there is a serious claim of actual innocence; the timing of the motion; and any countervailing prejudice to the government if the defendant is allowed to withdraw his plea." *United States v. Padilla-Galarza*, 351 F.3d 594, 597 (1st Cir. 2003).  Mr. Sampson respectfully submits that, had *Ring* turned out differently, this Court would have permitted Mr. Sampson to withdraw his guilty plea had he moved to do so.  The withdrawal would have occurred approximately ten days after it was tendered, and would have resulted in no prejudice to the Government whatsoever. *But see United States v. Ruiz*, 536 U.S. 622 (2002) ("[T]he Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor," including failure to anticipate a change in law regarding relevant punishments).  In any event, trial counsel ended up pleading Mr. Sampson guilty in 2003, so it is unlikely they would have moved to withdraw any guilty plea post-*Ring* under the instant circumstances.

[19] *See, e.g., United States v. Marino*, 277 F.3d 11 (1st Cir. 2002) (denying an *Apprendi* sentencing claim by Robert Sheketoff); *United States v. O'Driscoll*, 203 F. Supp. 2d 334 (M.D. Penn. 2002) (denying a motion by David Ruhnke to dismiss the Government's notice of intent to seek the death penalty, based on an *Apprendi* argument that the indictment did not allege the intent and aggravating factors).

[20] For example, trial counsel's notes from January 25, 2002, suggest a possible mental retardation defense based on the "pending-argument case" dealing with that issue—presumably, the notes refer to *Atkins v. Virginia*, 536 U.S. 304 (2002), which had been granted certiorari on September 25, 2001, and which was argued on February 20, 2002. *See* Ex. 48.

to extend *Apprendi* in the FDPA context. *See Allen v. United States*, 536 U.S. 953 (2002) (remanding, a mere four days after *Ring*, an FDPA death sentence in light of *Ring*). Arguments in *Ring* were heard on April 22, 2002, and also received widespread publicity. *See* "Justices Review Judges' Role in Deciding Death Penalty," N.Y. TIMES, Apr. 23, 2002. Trial counsel should have been aware of *Ring* and the demonstrative probability that *Ring* would reverse *Walton*, and on that likelihood pleaded Mr. Sampson guilty prior to June 24, 2002.[21]

The case of Tiffany Pennington serves as an example of what trial counsel should have done. Mr. Pennington pleaded guilty on April 19, 2001, to an indictment deficient under *Ring*; the trial court deferred acceptance pending the Government's determination of whether to file a notice of intent to seek the death penalty. *See* 3:01-cr-00035-TBR-1, D.E. 37, Apr. 23, 2001. The Government filed a notice of intent to seek the death penalty on July 18, 2001. *See* D.E. 42. The court accepted Mr. Pennington's guilty plea on February 21, 2002. *See* D.E. 79. Prior to the penalty phase, the defense moved under *Ring* to preclude imposition of the death penalty. *See* D.E. 175. After substantial motions practice, the trial court granted his motion to strike the notice of intent as incompatible with *Ring*, on February 21, 2003. *See* D.E. 237. Mr. Pennington is currently serving a life sentence at U.S.P. Big Sandy in Inez, Kentucky.

Trial counsel cannot be said to have executed a strategy in pursuing the course it did; no benefit whatsoever could inure to Mr. Sampson by pleading him not guilty on June 14, 2002. The defense used the incentive of a guilty plea as a carrot to implore the Government not to seek the death penalty; that carrot was unnecessary, however, since a guilty plea prior to *Ring* would

---

[21] It is unlikely that the Government could have undone the guilty plea once this Court accepted it. *See United States v. Ventura-Cruel*, 356 F.3d 55, 61 (1st Cir. 2003) (noting approvingly extra-Circuit authority for the proposition that "a district court generally may not accept a guilty plea and then subsequently reject it."). *See also United States v. Mueffelmann*, 327 F. Supp. 2d

have garnered exactly the result trial counsel sought to obtain from the Government, a sentence of life imprisonment without the possibility of parole. Indeed, Mr. Sampson's trial counsel considered pleading him guilty as early as December 18, 2001, in exchange for the Government taking the death penalty off the table. *See* Ex. 49. On January 20, 2002, Mr. Sampson's lead trial counsel considered writing the victims' families to alert them to Mr. Sampson's willingness to plead guilty, and at that point already had drafted a letter to Mr. Sampson's family explaining his willingness to plead guilty. *See* Ex. 50. On February 22, 2002, in a submission to the Department of Justice, trial counsel offered to plead Mr. Sampson guilty on the condition that he not face the death penalty. *See* Ex. 51. Yet the first time any discussion of *Ring* appears in trial counsel's notes is on July 15, 2002, almost three weeks after the decision is rendered. *See* Ex. 52.[22] And ultimately, of course, trial counsel did in fact plead Mr. Sampson guilty to the Second Superseding Indictment, which had corrected the constitutional defects in the First Superseding Indictment.

Besides the fact that no strategic reason for trial counsel's decision is discernible, the fact that trial counsel *later* pleaded Mr. Sampson guilty is also probative evidence that their prior decisions *not* to plead him guilty were not strategic. Between June 14, 2001 (when Mr. Sampson pleaded not guilty) and September 9, 2003 (when Mr. Sampson pleaded guilty), no dispositive factual developments occurred in the case. The police found no new evidence that made a guilty plea advisable in 2003 but not in 2001. Mr. Sampson's confessions and the physical evidence

---

79, 81 n.1 (D. Mass. 2004) (noting that while jeopardy does not *per se* attach once a guilty plea is entered, it arguably does in certain circumstances).

[22] On that date, trial counsel considers the question it should have answered months before: "What would happen, in light of Ring, if GLS (or O'D[riscoll, another of trial counsel's clients] for that matter) plead to indictment?"

were the same on the latter date as on the former. And no new developments in the caselaw required the guilty plea.[23]

In failing to properly advise Mr. Sampson and failing to plead him guilty not once but *twice* prior to *Ring*, trial counsel allowed Mr. Sampson to be exposed to the death penalty as properly provided in the Second Superseding Indictment. Trial counsel's ineffectiveness and the resultant prejudice are patent: Mr. Sampson was sentenced to death.

### H.    Trial Counsel Was Ineffective by Pleading Mr. Sampson Guilty to the Second Superseding Indictment after the Supreme Court's Decision in *Ring v. Arizona*.

The only benefit of pleading guilty was to take advantage of the *Ring* preclusion of the death penalty in the first two indictments. After the Government cured the *Ring* deficiency with the Second Superseding Indictment, Mr. Sampson could receive no benefit from pleading guilty absent an agreement by the Government not to seek the death penalty. There was no tactical reason for counsel to plead Mr. Sampson guilty to the Second Superseding Indictment in the absence of a known benefit.

As discussed, on November 5, 2001, and June 14, 2002, Mr. Sampson's trial counsel pleaded him not guilty to the federal charges related to the murders of McCloskey and Rizzo. On August 5, 2002, after a favorable ruling in *Ring v. Arizona*, trial counsel moved to withdraw his pleas of not guilty and to plead guilty to the First Superseding Indictment. The Government subsequently, on August 8, 2002, obtained a Second Superseding Indictment from the grand

---

[23] Resolving a case with a plea of guilt in return for a sentence other than death is an important goal in the appropriate case, as indicated in Guideline 10.9. As the commentary makes clear, however, this duty is to seek a disposition that provides a guarantee to the client that upon a plea, he receives something in return—which in potential capital cases means, at a minimum, a sentence other than death.

jury, and this Court denied Mr. Sampson's motion. A year later, on September 9, 2003, Mr. Sampson's counsel pleaded him guilty to both charges.

Counsel may have hoped that the absence of a guilt phase might advance certain defense objectives,[24] but wishfulness absent known benefits cannot be the basis of a conclusion that trial counsel's strategy was sound—as shown by the history of FDPA cases to that point and other information within trial counsel's knowledge or grasp.

Trial counsel's actions did not bear out in this case. Nor was it reasonable to believe they would given what the Government must prove, and is therefore entitled to present evidence on, under the FDPA in order to show certain aggravating factors, including for example the "heinous, cruel, and depraved" aggravator.[25] For example, this Court permitted the introduction of Mr. Sampson's confessions, much physical evidence including the murder weapons, graphic pictures, Medical Examiner testimony, and more—all the things the Government would have had to introduce during a guilt phase. *See supra* Part II.

At the time trial counsel pleaded Mr. Sampson guilty, no federal case had successfully employed the "strategy" of pleading guilty to avoid the death penalty. Prior to pleading Mr. Sampson guilty, one of Mr. Sampson's trial counsel represented another client, David Hammer, who had pleaded guilty against the advice of counsel and nonetheless received a sentence of death. Besides the Hammer case, at the time of Mr. Sampson's guilty plea only one other federal

---

[24] For example, trial counsel may have hoped the guilty plea would restrict the admission of potentially damaging evidence, be used as a carrot to incent the Government away from seeking the death penalty, or bolster the defense's argument that Mr. Sampson had accepted responsibility for his crimes.

[25] The Court recognized the Government's need to present otherwise unnecessary information about the specifics of the murders, in order to prove the HCD factor.

case tested the "strategy" of not offending the jury with a guilt phase in hopes of preventing an ultimate sentence of death, and in that case too the jury returned a sentence of death.

Trial counsel's decision to plead Mr. Sampson guilty was prejudicial because, by having the jury only sit during the penalty phase, it was reasonably probable that the jury conflated the guilt and punishment decisions. Having two phases of the trial—even where guilt may seem to be a foregone conclusion—allows the jury to register its outrage at the crimes in the first phase with a guilty verdict. The question of guilt has then been decided and expressed, and the jury's attention can then be re-focused in the second phase on what punishment should be imposed. Also, from the perspective of courtroom mechanics, the bifurcated trial serves to highlight for the jury that the penalty phase concerns something entirely different than the issue of guilt. The government's evidence regarding the crime has largely been presented in the first phase, whereas the bulk of the evidence presented at the penalty phase is the defendant's mitigation evidence, so there is a discernable difference as to what the issues are in the second phase.

Another deficiency in counsel's conduct became even more apparent during *voir dire* of the potential jurors in this case. The reservations of many prospective jurors about the death penalty were predicated on the belief that they would have lingering doubt about Mr. Sampson's guilt. That residual doubt could serve as a strong deterrent to a jury imposing a sentence of death should not have been unanticipated and would have been known to effective trial counsel. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (noting that a residual doubt strategy "has been recognized as an extremely effective argument for defendants in capital cases"); *Blankenship v. Hall*, 542 F.3d 1253 (11th Cir. 2008) ("'Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing.'"); *Bryan v. Mullin*, 335 F.3d 1207, 1241 (10th Cir. 2003) ("[T]he utilization of the "

residual doubt" strategy can be an effective form of mitigation."); *Andrews v. Collins*, 21 F.3d 612, 623 n.21 (5th Cir. 1994) ("Such a [residual doubt] strategy 'has been recognized as an extremely effective argument for defendants in capital cases.'"). While the residual doubt argument is not strong on the facts presented at trial, the argument would have been powerful in combination with the arguments trial counsel ineffectively failed to make regarding Mr. Sampson's competency and mental illness.

Trial counsel's decision to plead Mr. Sampson guilty sacrificed his ability to take advantage of residual doubt coupled with mental impairment evidence. Their hopes of bolstering the acceptance of responsibility argument were not borne out, nor was it reasonable to believe they would be. Prejudice to Mr. Sampson ensued, as proven by the jury's verdict of death.

**I.  Trial Counsel Was Ineffective by Allowing Mr. Sampson To Proceed to Trial While Incompetent, and Mr. Sampson Was Denied His Right to a Contemporaneous Determination of Competence.**

**1.  Trial Counsel's Failure to Raise Visible Signs of Mr. Sampson's Incompetency to This Court's Attention Was Ineffective and Prejudicial.**

Trial counsel's failure to request a competency hearing to determine whether Mr. Sampson was mentally able to consult with his attorneys and aid in his defense violated Mr. Sampson's right to effective assistance of counsel.

The right not to be tried while incompetent is a fundamental precept of our adversary system of justice. *See Cooper v. Oklahoma*, 517 U.S. 348 (1996). As the Supreme Court has explained, "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The test for incompetence is well-settled. "A defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a

reasonable degree of rational understanding . . . and a rational as well as factual understanding of the proceedings against him." *Drope*, 420 U.S at 171 (quoting *Dusky v. United States*, 362 U.S. 402, 403 (1960)).

Consequently, under *Strickland*, trial counsel's failure to request the trial court to order a competency hearing violates a defendant's right to effective assistance of counsel, "where there [is] evidence raising a substantial doubt about a [defendant's] competence to stand trial," *Speedy v. Wyrick*, 702 F.2d 723, 726 (8th Cir. 1983), and where there is "a reasonable probability" that the defendant would have been found incompetent. *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997). "This is a lower burden than the preponderance [of the evidence] standard." *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990). "Thus, even if [the defendant] were to fail to prove his incompetency by a preponderance of the evidence, it is still possible that he raised sufficient doubt on that issue to satisfy the prejudice prong of his ineffective assistance of counsel claim." *Id.*

In this case, the existing circumstances created grave doubt about Mr. Sampson's competence sufficient to render trial counsel's decision not to request a competency hearing professionally unreasonable and prejudicial.

Although trial counsel failed to thoroughly investigate the history of Mr. Sampson's brain damage, childhood trauma, and trauma in prison, there is little doubt that there was adequate evidence to put counsel on notice that Mr. Sampson had suffered from severe and debilitating brain damage and mental illness throughout his life. Dr. Hegarty opined that Mr. Sampson was mentally ill and unable to conform his conduct to the to the law such that he could not stop himself from committing the crimes; Dr. Deters stated that Mr. Sampson had functional impairments consistent with frontal lobe brain damage. Records in trial counsel's possession

also demonstrated that during Mr. Sampson's more than 16 years of incarceration, he had attempted suicide three times, underwent frequent psychiatric evaluation, and had a history of drug and alcohol abuse.

Trial counsel's own observations and experiences while representing Mr. Sampson provide the most objective indications that Mr. Sampson's competency was open to serious question. Mr. Sampson's conduct and relationship with trial counsel throughout the proceedings should have put counsel on notice that Mr. Sampson was not competent to assist them in his defense. Mr. Sampson's brain damage made him perseverate on minutiae, impairing his ability to see the "big picture." His impairments caused him to misperceive social cues, and resulted in disinhibited outbursts in counsel conversations, in the jail, which became part of the Government's aggravation case at trial, and during trial. His conversations with trial counsel focused predominantly on his inability to cope with his day-to-day living situation, rather than anything substantive about his case, and involved desperate pleas to get his lawyers to help resolve what he perceived to be tormenting conditions. He often acted in ways that were contrary to his own best interests, including firing his attorneys and acting out during trial. Trial counsel remarked on Mr. Sampson's inability to assist them in his defense; during a colloquy with the court, trial counsel observed that Mr. Sampson was "not the most stable guy." Tr., Aug. 15, 2003 (telephone conference).

Trial counsel was also keenly aware that Mr. Sampson's incarceration at Plymouth House of Corrections ("Plymouth") only exacerbated his conditions. Mr. Sampson was repeatedly harassed and taunted at Plymouth, where he was housed when he was first incarcerated for approximately ten months, and again over the course of the plea and beginning of jury selection in August through early October. He was also tormented at Walpole, where he was housed for

- 86 -

several months in 2002. The situation at Plymouth was so problematic that Mr. Sampson had to be transferred to another facility. The harassment and abuse Mr. Sampson suffered during his pretrial incarcerations was reminiscent of the abuse he suffered in his prior incarcerations, and combined with Mr. Sampson's severe brain damage and the stress of a capital trial, impaired Mr. Sampson's ability to assist his counsel in his own defense, and put counsel on notice that Mr. Sampson's competency was seriously in doubt.

Further, trial counsel's decision, two years into their representation, to administer Depakote to Mr. Sampson adds another piece of objective evidence to the picture that should have put trial counsel on notice that Mr. Sampson's competency was at issue. Mr. Sampson's behavior on Depakote was unpredictable not only because it was not the appropriate drug for Mr. Sampson, but because it was administered inconsistently and incompetently by the prisons in which he was housed. Finally, the drug did nothing to control Mr. Sampson's outbursts and inappropriate conduct in the courtroom. Mr. Sampson's demeanor during trial was dramatically unpredictable. At times, Mr. Sampson was stoic, lethargic, and indifferent. At other times, he behaved inappropriately and was disruptive.

Despite observing all of this, trial counsel never requested that the court hold a competency hearing. This failure was both objectively unreasonable and prejudicial. *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) is instructive. There, the Tenth Circuit found that trial counsel's own observations and experiences while representing the defendant, which included "significant difficulties in dealing [with the defendant]" and "unpredictable" conduct in court, combined with counsel's awareness of the defendant's "history of mental problems," and the fact that the defendant was medicated, and possibly over-medicated, "triggered . . . [counsel's] duty to seek a competency hearing to determine whether [the

- 87 -

defendant] was mentally able to consult with his attorney and aid in his defense with a reasonable degree of rational understanding." *Id.* at 1518.

Here, as in *Williamson*, counsel's own observations should have compelled a request for a competency hearing. Counsel had great difficulty working with Mr. Sampson, observed him persistently disruptive and agitated in court, felt he needed to be medicated with an antipsychotic, which in turn caused even more problems, and was certainly aware of his long history of mental illness. Taken together, it is difficult to see how counsel could not have had a substantial doubt about a defendant's competency, and the failure to request a competency hearing was therefore objectively unreasonable. At base, "[o]f all the actors in a trial, defense counsel has the most intimate association with the defendant. Therefore, the defendant's lawyer is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them, she has a professional duty to do so when appropriate." *United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998).

Trial counsel's failure to request a competency hearing also prejudiced Mr. Sampson. Although the evidence known at the time of trial is sufficient to establish a "reasonable probability" that Mr. Sampson was incompetent, new evidence discovered only after trial further solidifies this conclusion. A new MRI, ordered by Dr. Ruben Gur, shows that Mr. Sampson's brain has abnormally large ventricles, a sign of significant brain cell loss. *See* Ex. 25. In Mr. Sampson's brain, there is a substantial reduction in relative brain volume in the Frontal and Occipital Lobes, pointing to brain damage in those areas. The damage to Mr. Sampson's brain is localized to several specific regions of the brain. The damage to Mr. Sampson's brain has led to

marked deficits in the area of the brain that is critical for visual processing, decisionmaking, information processing, and threat detection.

### 2.   This Court Had a Duty To *Sua Sponte* Order a Competency Hearing.

Although trial counsel is, in the first instance, responsible for determining whether their client is competent, the court is also charged with the duty to inquire into competency, *sua sponte*, where there is reason to doubt a defendant's competency.  Proceeding to trial while incompetent violates due process because it deprives the defendant of his right to a fair trial.  *See Pate v. Robinson*, 383 U.S. 375, 385 (1966) (holding that where the evidence before a trial court raises a "bona fide doubt" as to the defendant's competence, due process requires the court *sua sponte* to order a competency hearing).  "The question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).  Though the Supreme Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure," it has explained that:

> A defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.  There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Drope*, 420 U.S. at 172.  In this case, the evidence before the trial court should have raised serious doubts about Mr. Sampson's competency to plead guilty, and the failure to order a competency hearing *sua sponte* was error.

J.    **Trial Counsel Was Ineffective for Failure To Present Evidence That Mr. Sampson's Indifferent Demeanor During Court Proceedings Was Caused by His Medication.**

Mr. Sampson received 2000 milligrams of Depakote SR almost every day of the trial. *See* Ex. 53 (prescription). Depakote depresses awareness and responsiveness and creates a tranquilizing effect that "inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion." *Riggins*, 504 U.S. at 144 (Kennedy, J., concurring). The drugs left Mr. Sampson lethargic and tranquil much of the time.[26] Mr. Sampson's Depakote altered demeanor was readily apparent to anyone observing the trial. And that demeanor created the unwarranted impression that Mr. Sampson lacked remorse for his crimes. For example, one witness who watched almost every day of the trial reported that Mr. Sampson appeared "stoic" and he frequently showed "no reaction" to the sentencing proceedings. The Boston Globe also assailed Mr. Sampson, reporting that he "showed no emotion throughout the two-month trial." Ex. 54 (Boston Globe article).

By failing to explain to the jury that Mr. Sampson's demeanor during trial was attributable to Depakote, counsel violated Mr. Sampson's Sixth Amendment right to effective assistance. Unquestionably, evidence of remorse is extremely important to capital sentencing juries. *See e.g.*, Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 Cornell L. Rev. 1557, 1560 (1998). Indeed, the Supreme Court has recognized that:

---

[26] As previously noted, there were also times when Mr. Sampson sometimes acted out in court. However, this is due to inconsistent and incompetent administration of the drug. Mr. Sampson's blood levels were not monitored; he was administered the drugs sporadically, thus repeatedly causing him to experience the drug's initial phase symptoms (causing a mellow dull demeanor); and his therapeutic levels were not monitored to ensure symptom control, which triggered his outbursts and inappropriate conduct in the courtroom. For this reason, at times, Mr. Sampson was stoic, lethargic, and indifferent, clearly due to the administration of Depakote. At other times, he behaved inappropriately and was disruptive.

> At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial.

*Riggins v. Nevada*, 504 U.S. 127, 142 (1992). *See* ABA Guidelines ¶ 10.11.L ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client."). These perceptions of a defendant's emotional state are particularly important during the sentencing phase when "the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness." *Riggins*, 504 U.S. at 143–44 (concurring, Kennedy, J.); *United States v. Weston*, 255 F.3d 873, 885 (D.C. Cir. 2001) (use of psychotropic medication may "produce a flattened emotional affect that could convey to the jury a lack of remorse, a critical consideration of this case proceeded to sentencing"). Thus, "serious prejudice could result if medication inhibits [a] defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion." *Id.*

Mr. Sampson's remorse *at the time of trial* was a mitigating factor that weighed in favor of his life, and against his death. *See* Tr., Dec. 19, 2003, at 63. To rebut the defense's case in this regard, the Government elicited testimony from Dr. Welner, its psychiatrist, to prove that Mr. Sampson lacked remorse for his crimes. *See* Tr., Dec. 12, 2003, at 103–110. The Government, in its closing argument, also repeatedly urged that Mr. Sampson lacked remorse, fairly mocking the argument. For example, the Government argued: "When you consider those statements as to remorse or whatever, think about who is making the statements"; "The defendant keeps on saying, I'm sorry. He kills Philip McCloskely and then, oops, I killed Jonathan Rizzo. He's really remorseful. Then, oh, gees, I killed Robert Whitney. He's really remorseful, oh, I tried to kill William Gregory. Where does it stop? Is that remorse? It's the old

saying, actions speak louder than words." Tr., Dec. 18, 2003, at 51. And the Government repeatedly asked the jury "Is that consistent with any type of remorse, any remorse that counts?" Tr., Dec. 18, 2003, at 51.

Given the importance of demonstrating remorse and compassion during the sentencing proceedings—because it was a mitigating factor that called for a sentence less than death—it was objectively unreasonable for defense counsel to fail to humanize Mr. Sampson and attribute his indifferent demeanor to Depakote. And, where, as here, counsel's conduct undermines one of its central arguments—that Mr. Sampson had accepted responsibility and was remorseful for his actions—it is objectively unreasonable, as opposed to strategic. *Cf. Earls v. McGaughtry*, 379 F.3d 489, 494 (7th Cir. 2004) (where failure to object undercut central defense, no strategic justification). Further, since trial counsel urged the jury to weigh Mr. Sampson's remorse in favor of his life, counsel's failure to attribute Mr. Sampson's demeanor to Depokate (which undercut their defense) is inexcusable. Finally, Mr. Sampson's apparent lack of emotion was very prejudicial as it suggested that he was cruel and indifferent to the deaths of Mssrs. McCloskey and Rizzo. *See, e.g., Atkins v. Virginia*, 536 U.S. 304, 320–21 (2002) (recognizing that a defendant's "demeanor may create an unwarranted impression of lack of remorse for [his or her] crimes."). The jury obviously observed Mr. Sampson's demeanor during the trial, and his flat affect, when considered along with the Government's evidence and argument, likely contributed to the jury's ultimate determination that Mr. Sampson lacked remorse at the time of the trial. *See* Ex. 55 (McCloskey Verdict Form); Ex. 66 (Rizzo Verdict Form).

## K.    Trial counsel Was Ineffective For Failure To Properly Investigate and Impeach Government Witness John Flanagan.

John Flanagan testified on December 15, 2003 as a rebuttal witness for the government, ostensibly to rebut any claims that Mr. Sampson grew up in an abusive home environment and in

order to portray the Sampson family as loving and supportive of Mr. Sampson. Tr., Dec. 15, 2003 at 6–30. Mr. Flanagan testified that he had known Mr. Sampson's parents since the beginning of their marriage, when he was a small child. *Id.* at 7. He said that he babysat for them on a regular basis starting at the age of 12 or 13. *Id.* at 6–7. He claimed that he suffered physical and verbal abuse from his step-father, that when he was 16 they got into a fight, and that as a result of the fight his step-father threw him out of the home. *Id.* at 9. Mr. Flanagan then went to live with the Sampsons: "I knocked on the door. . . . And Herk, the elder Sampson, came to the door and looked at me, and I said, 'Do you want to adopt a son?'" *Id.* Mr. Flanagan moved in with the Sampsons and lived with them for a little under a year, from September 1963 until he joined the military in July 1964. *Id.* at 23. Mr. Flanagan came back to the Sampson home after he returned from military service, and he lived with them for a brief period after he married. *Id.* at 16.

Mr. Flanagan testified regarding the Sampson family dynamic. He said that Gary Sampson had a "very good" relationship with his parents. *Id.* at 13. He said the family often ate together, went camping together, and did other activities together as a family. *Id.* at 17. He said he never witnessed any physical or psychological abuse within the Sampson home. *Id.* at 15, 17. To the contrary, according to Mr. Flanagan, Mr. Sampson's father had spent thousands of dollars for "psychiatrists and psychologists and for any kind of program that he could possibly find to help his kid." *Id.* at 28.

Mr. Flanagan's testimony was critical to the Government's rebuttal case, for it painted a picture of a nurturing home and parents who did everything possible to meet Mr. Sampson's needs. Despite powerful impeachment evidence in trial counsel's possession that called into question the integrity of Mr. Flanagan's memory and his ability to accurately perceive and recall

events because of various medical and neurological conditions, counsel unreasonably failed to utilize that evidence to impeach Mr. Flanagan's credibility during cross-examination. Moreover, despite the fact that trial counsel was put on notice at least as early as September 29, 2003, that the Government might call Mr. Flanagan as a witness, trial counsel failed to conduct a proper investigation into Mr. Flanagan, and thereby unreasonably failed to discover and present readily available impeachment evidence that further established Mr. Flanagan's impairments, as well as demonstrated that Mr. Flanagan had a documented propensity for untruthfulness. Given Mr. Flanagan's central importance to the government's efforts to rebut the defense mitigation case, counsel's failure to adequately investigate and impeach Mr. Flanagan resulted in prejudice to Mr. Sampson.

### 1.    Trial Counsel's Performance Was Deficient for Failure To Investigate Readily Available Records of Mr. Flanagan's Background.

It is well established that counsel in a capital case have the duty to investigate Government witnesses. *See* ABA Guidelines ¶ 4-4.1 (Duty to Investigate); *Strickland*, 466 U.S. at 691 (1984) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) (counsel ineffective in failing to investigate memory implications of government witness' blood loss, thereby failing to support impeachment of witness); *Groseclose v. Bell*, 895 F.Supp. 935, 951, 956–57 (M.D. Tenn. 1995) (trial counsel ineffective in failing to investigate state's witnesses). *Cf. Rompilla v. Beard*, 545 U.S. 374 (2005) (defense counsel had duty to look in court file of prior conviction government intended to introduce as aggravator).

Paragraph 10.11 of the ABA Guidelines states, "counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation *or rebuts the prosecution's case in aggravation*." (emphasis added). In addition,

- 94 -