Guideline 10.11 (I) requires counsel to "carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading, or not legally admissible." Here, Mr. Sampson's counsel failed effectively to rebut the government's evidence that Mr. Sampson suffered no abuse growing up in the home and was instead raised in a fully nurturing environment. This went directly against one of the proferred mitigating circumstances put forth by trial counsel. Further, it was important evidence going to the heart of a part of Mr. Sampson's background that is central to the determination of his moral culpability. Commentary to Guideline 10.11 ("Counsel should use available discovery mechanisms to ascertain the aggravating *and rebuttal* evidence the prosecution intends to introduce and then thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut.") (emphasis added); *see Wiggins*, 539 U.S. at 535, *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Counsel's failure to insure that this testimony was not misleading or inaccurate fell below reasonable professional norms.

In addition, as part of counsel's duty to conduct thorough and independent investigations relating to the issues of both guilt and penalty, ABA Guidelines ¶ 10.7(A), counsel were required to review reasonably available information pertaining to witnesses who would testify about their client's life history. Because the sentencer in a capital case must consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history. *Id.* at Commentary, p. 81 (citations omitted); *see generally Wiggins v. Smith*, 539 U.S. 510 (2003) (failure to present mitigating life history evidence at capital sentencing proceedings violates the Sixth Amendment right to effective assistance of counsel and falls below standard of reasonableness of prevailing

professional norms). The personal and family history investigation involves obtaining all manner of records, including family court records. ABA Guidelines ¶10.7(A), cmt. at 84. Records may disclose myriad mitigating circumstances, including a history of domestic violence or inadequate parenting. *Id.* at 81.

Unfortunately, with respect to Mr. Flanagan, trial counsel here failed to conduct the thorough and independent investigation called for by both relevant caselaw and the ABA Guidelines. Consequently, counsel failed to obtain readily available public records pertaining to Mr. Flanagan, including court records of his divorce. Those records show that Mr. Flanagan himself was an abusive husband and father, and would have provided the basis for counsel to impeach Mr. Flanagan as a poor and unreliable judge of family dynamics. *See* Ex. 57 (Pretrial Memorandum of Plaintiff, Norfolk County Probate Court No. 96D0473-D1, at 2, ¶¶ 10,11). Had counsel reviewed these records and spoken to the former Mrs. Flanagan, counsel would have learned that John Flanagan was psychologically abusive toward her and physically abusive toward her daughter. Counsel would have further learned that a social worker had intervened as a result of the physical abuse against the daughter, which indicates that the Massachusetts Department of Social Services investigated the abuse and maintains records which document it.

**Redacted**

Redacted

Redacted

### 2.    Trial Counsel's Failure To Investigate Mr. Flanagan Prejudiced Mr. Sampson.

Trial counsel's failure to adequately investigate and impeach Mr. Flanagan prejudiced Mr. Sampson. Mr. Flanagan was a crucial government witness; he was, purportedly, an eyewitness to the Sampson family dynamics, and given his lack of actual blood ties to the family, would have been viewed by the jury as an impartial witness, without an axe to grind against Mr. Sampson. His testimony that Mr. Sampson grew up in a loving and supportive environment, therefore, was uniquely damaging to the defense mitigation case. Moreover, Mr. Flanagan's testimony was particularly significant here because no one else who had lived with Mr. Sampson's family, and no family members themselves, testified at the trial. Thus, the task of impeaching Mr. Flanagan's credibility was of central importance. The prejudice of counsel's failure to adequately and properly impeach Mr. Flanagan is clearly reflected in the special verdict form. Not a single juror found that a preponderance of the evidence established that: "As a child, Gary Sampson was the subject of verbal, emotional and/or physical abuse."

Had defense counsel conducted a basic investigation of this key prosecution witness, however, a very different picture of Mr. Flanagan's credibility would have emerged, and there is a reasonable probability that the outcome of the proceedings would have been different.

Redacted

- 98 -

**Redacted**

Moreover, had counsel comported with their duty to thoroughly investigate the government's witnesses, counsel would have discovered additional readily available records and witnesses that could have been used to further impeach Mr. Flanagan. As noted above, this included Mr. Flanagan's publicly available divorce records, which could have been used to impeach Mr. Flanagan with information that he had both psychologically and physically abused his own family members, and therefore was uniquely unsuited to be a reliable judge of "normal" family dynamics. Additionally, those divorce records disclosed information that Flanagan had a propensity for untruthfulness and fraudulent conduct. Specifically, in those proceedings, his wife alleged that Mr. Flanagan had failed to report income, see Ex. 57 at 3, ¶ B(1), and that Mr. Flanagan periodically lied about having a "bad back" when it "suit[ed] his purposes" and allowed him to get out of obligations. *Id.* at 6, ¶ J (4).

Unfortunately, not only did counsel fail to conduct an independent investigation of Flanagan, counsel failed to even make effective use of the impeachment material they did have as a result of the government's disclosures; the cross-examination of Flanagan on this point was limited to the fact that Flanagan received disability. Tr., Dec. 15, 2003, at 28–29. Consequently, the jury had no basis to doubt any of the testimony provided by Flanagan about Mr. Sampson's upbringing and home environment.                **Redacted**

and propensity for being untruthful and engaging in fraudulent behavior, their assessment of Flanagan's credibility would have been greatly altered and one or

more jurors would have rejected his rebuttal testimony or concluded that Mr. Sampson was a victim of abuse at home.

### L.    Trial Counsel Was Ineffective for Failure To Cross-Examine the Government's Psychiatrist on the Substance of His Conclusions.

Dr. Welner devoted his testimony to rebutting the defense experts' conclusions that Mr. Sampson was mentally ill or had organic brain damage, or that he had remorse for his actions. He diagnosed Mr. Sampson with Antisocial Personality Disorder ("ASPD"), which is described in the DSM as a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. Symptoms include failure to conform to social norms, deceitfulness, impulsivity or failure to plan ahead, reckless disregard for safety of self or others, consistent irresponsibility, and lack of remorse. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*, 701-23 (4th rev. ed. 2000).

He was an effective witness for the Government. The jury presumably agreed with Dr. Welner's conclusions, as not a single juror found that Mr. Sampson's capacity to conform his conduct to the requirements of the law was significantly impaired; that he was under a severe mental or emotional disturbance; that he was mentally ill when he committed the crimes and/or at the time of trial; that Mr. Sampson has a brain dysfunction; or that he was remorseful for his conduct. Further, the Government in closing argument pointed out that:

> The defendant spent a great deal of time trying to convince you or tell you that Dr. Welner's opinion is invalid. He asked you to find that Dr. Welner came to this Court and gave you an opinion based solely on his fee. Well, if Dr. Welner's opinion is for sale, the defendant had a chance to test that opinion. They did not. Cross-examination of Dr. Welner consisted of a lot of conversation, a lot of questions concerning his fee, and a few questions about some observations of people around the time of the crimes.... If Dr. Welner's opinion is for sale, ask the psychiatrist a psychiatric question. Test the basis of his opinion. Test the science. Test the

- 100 -

diagnosis. We had none of that. ... The reason they didn't test his opinion ... was because ... [h]e had the science on his side.

Tr., Dec. 18, 2003 at 152–53.

In fact, Dr. Welner did not have the science on his side, and could have been easily challenged, even on the basis of the information trial counsel already had, but even more forcefully so had trial counsel conducted an adequate investigation into Mr. Sampson's life history. Trial counsel's cross-examination of Dr. Welner was limited to how much money Dr. Welner made on the case. Trial counsel did not pose a single question challenging the substance of Dr. Welner's conclusions. Counsel's lack of a thorough investigation into Mr. Sampson's childhood, young adulthood, sixteen years in prison, time in North Carolina and the week of the crimes, and lack of any investigation into trauma as a mitigating theme exacerbated their inability to substantively cross-examine Dr. Welner. However, this did not have to be so, and counsel's performance in this regard was professionally unreasonable. *See Correll v. Ryan*, 539 F.3d 938, 955 (9th Cir. 2008) ("'damaging rebuttal evidence' could, in the hands of a competent attorney, have been used to support Correll's claims of dysfunctional upbringing and continuing mental disorder.").

Dr. Welner's conclusions were shallow and vulnerable to effective cross-examination. Competent counsel would have been able to cross-examine Dr. Welner on the inferences he drew from the statements Mr. Sampson made in his confessions, as argued *infra* Part N. Further, had trial counsel thoroughly investigated Mr. Sampson's life history and considered trauma as a mitigating factor or theme in Mr. Sampson's mental health picture, trial counsel would have challenged Dr. Welner's superficial conclusion. The Guidelines of the DSM underscore the importance of understanding behavior in context in order to properly identify symptoms. For

- 101 -

example, the DSM notes, "when personality changes emerge and persist after an individual has been exposed to external stress, a diagnosis of PTSD should be considered," and cautions:

> Concerns have been raised that the diagnosis [of ASPD] may at times be misapplied to individuals in settings in which seemingly antisocial behavior may be part of a protective survival strategy. . . . [I]t is helpful for the clinician to consider the social and economic context in which the behaviors occur.

*Id.* at 703-04. Where Welner saw "irritability and aggressiveness" as a symptom of ASPD, trial counsel could have cross-examined him that the behaviors in question were a consequence of the hyperarousal component of PTSD. When Dr. Welner stated that behaviors and statements from Mr. Sampson's confessions signified "lack of remorse" as a symptom of ASPD, trial counsel could have cross-examined him that the behaviors in question are a consequence of the psychic numbing component of PTSD. Dr. Welner's conclusion that a "reckless disregard for safety of self or others" was a symptom of ASPD, could have been challenged as it more accurately reflect the dysregulated affect and behavior that is associated with someone who has suffered severe trauma.

Evidence of Mr. Sampson's significant brain impairments could have also been used to challenge Dr. Welner's superficial conclusions. Where Welner saw "failure to conform to societal norms," trial counsel could have countered that Mr. Sampson's behavior is best explained by Mr. Sampson's disinhibition and failure to perceive social cues. Where Dr. Welner saw deceitfulness, trial counsel could have countered that confabulation and grandiosity are hallmarks of brain impairment, and a more credible explanation for the examples Dr. Welner relied upon to say Mr. Sampson was deceitful (*e.g.*, Mr. Sampson said he had an uncle in a trailer park and that he had been a pilot in Turkey, Tr., Dec. 12, 2003 at 100). Welner's conclusion that Mr. Sampson was "irresponsible" because he could not get a job or did not pay child support, could have been challenged by trial counsel as evidence of Mr. Sampson's difficulty adjusting to

- 102 -

society after prison, and that his severe brain impairments rendered it difficult for him to maintain employment. Dr. Welner's conclusion that Mr. Sampson showed no remorse, as discussed above, was better explained by Mr. Sampson's flat or inappropriate affect, a symptom of both PTSD and frontal lobe brain damage.

And finally, with the powerful corroborating evidence of Mr. Sampson's significant brain impairment and history of abuse, trial counsel would have been able to counter Dr. Welner's conclusions that Mr. Sampson was not mentally ill, brain damaged, or that his capacity to conform his conduct was significantly impaired. Had counsel effectively cross-examined Dr. Welner, it is likely that one or more jurors would have found that Mr. Sampson's background of abuse and neglect supported mitigating circumstances. It is also likely that at least one juror would have found the existence of statutory mitigating circumstances that Mr. Sampson had brain damage, that he was mentally ill, and that his ability to conform his conduct to the requirements of the law was substantially impaired.

## M. Trial Counsel Was Ineffective for Failure To Move for an Immediate Mistrial When the Victims' Bloody Shirts Were Improperly Exposed to the Jury.

Throughout the trial, this Court continually grappled with whether to admit into evidence the bloody, maggot infested shirts of McCloskey and Rizzo. This Court first confronted the issue on the second day of trial, when the Government tried to introduce McCloskey's shirt during the testimony of Paul Taber. At that point, this Court noted that "there's a visible reaction among some of the potential jurors [sic]." Tr., Nov. 6, 2003, at 64. (Presumably, this Court was referring to the public gallery.). This Court nonetheless provisionally admitted the shirts that day, but kept them sealed from the jury. Tr., Nov. 13, 2003, at 103–09. Toward the end of trial, with the shirts still not having been shown to the jury, this Court ultimately determined to

exclude them and forbade the government from using them in closing arguments. Tr., Dec. 17, 2003.

However, on November 10, 2003, before this Court made any final rulings as to their admissibility, the bloody shirts were actually exposed to the jury. During the testimony of the Chief Medical Examiner James Weiner, the bloody shirts were visible to the jury as established by the trial transcript. This Court itself took note of the affront to the evidentiary rules and stopped Dr. Weiner's direct examination, directing that the shirts be shielded from the jury's sight. Tr., Nov. 10, 2003, at 103. Yet the Government failed to completely cover the bloody shirts, and this Court called another sidebar, again directing that the shirts be covered. *Id.* at 105.

As a result of the Government's conduct, the jury was exposed to prejudicial, inadmissible evidence, evidence which the Government then *highlighted* by failing to follow this Court's directives to cover the shirts. It is not unreasonable to believe the jury took notice of Government counsel's movements immediately following the bench conference, and took notice of the large, mounted shirts. Additionally, since the Government failed to completely cover the shirts in accordance with this Court's instructions, the jury's exposure to the prejudicial, inadmissible evidence was prolonged. At this point, Mr. Sampson's counsel should have moved for an immediate mistrial.

The jury's exposure to the bloody shirts was particularly prejudicial because of the witness who testified at the time of the above events: Dr. Weiner, the Chief Medical Examiner. Dr. Weiner was called to testify regarding the multiple stab wounds inflicting pain and death. Literally moments before the Court interrupted the direct examination, Dr. Weiner discussed the multiple "slit-like" defects in the shirt, caused by the knife thrusts. Tr., Nov. 10, 2003, at 85.

Especially during this witness's testimony, the jury likely would have made the connection that what it was seeing in the mounted exhibits were the shirts at issue.

Despite all this, the defense failed to move for an immediate mistrial. Such a motion would have been warranted because of the "overwhelming probability that the jury could not have followed [a curative] instruction and a strong likelihood that the evidence was devastating to the defendant." *United States v. Pierre*, 484 F.3d 75, 85 (1st Cir. 2007).[28] Accordingly, since they failed to move for a mistrial that stood a reasonably likely chance of being granted, Mr. Sampson's trial counsel proved ineffective.[29]

---

[28] In an ordinary case, the jury's exposure to inadmissible evidence can be cured by an instruction to disregard the inadvertently presented evidence. *Ramirez v. Debs-Elias*, 407 F.3d 444, 447–48 (1st Cir. 2005). Such a curative instruction would not have been sufficient here because of the enormous prejudicial value of the bloody shirts, which this Court recognized in ultimately finding the shirts inadmissible. *See Hodge v. American Home Assurance Co.*, 150 F.R.D. 25, 26 (D.P.R. 1993) ("The reference to inadmissible evidence on two occasions, the objections correctly made, and the belief that the jury, now presented with a scenario which stresses a verdict for plaintiff relying upon such inadmissible evidence, have led me to the unpleasant decision to declare a mistrial.").

[29] Similarly, Mr. Sampson's appellate counsel was ineffective for failing to raise this issue on direct appeal, under plain error review. To establish ineffective assistance of appellate counsel, just like ineffective assistance of trial counsel, petitioner must show that appellate counsel's performance was "objectively unreasonable." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Admittedly, the First Circuit has noted, as applied to appellate counsel, that standard "is difficult to meet because, to be effective, 'appellate counsel need not (and should not) raise every non-frivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal.'" *Thompson v. Spencer*, 2004 WL 1949074, *13 (1st Cir. Sept. 2, 2004) (quoting *Smith*, 528 U.S. at 288). If counsel's performance was objectively unreasonable, petitioner must further prove that "'but for his counsel's unreasonable failure to [raise a particular issue], he would have prevailed on his appeal.'" *Id.* (quoting *Smith*, 528 U.S. at 285) (alterations in original). The petitioner must overcome a presumption that the result of the proceedings on appeal is reliable. *Id.* Therefore, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). Mr. Sampson believes this issue was stronger than those presented in his direct appeal, and was prejudiced by appellate counsel's failure to raise it then.

N.    **Trial Counsel Was Ineffective for Failure To Frame Mr. Sampson's Confessions in the Context of His Severe Brain Damage and Mental Impairments.**

The government relied heavily on both the tone and the content of Mr. Sampson's confessions, citing (often quoting) them as evidence of his premeditation, his "relishing" the killing and his lack of remorse.  Despite having clear indications that Mr. Sampson's confessions were a result of his severe brain damage and mental impairments, trial counsel did nothing to explain the significance of his client's confession in terms of his severe brain defects and psychiatric impairments.  This failure  was both objectively unreasonable and remarkably prejudicial.

1.    **Trial Counsel Was Deficient for Failure To Explain Mr. Sampson's Confessions In Light of His Brain Damage and Mental Impairments.**

As stated *supra*, trial counsel has a duty to investigate and present mitigation evidence. This includes the duty to investigate and present evidence of a defendant's neurological deficits, as well as evidence of any physical, psychological, or emotional abuse suffered by the defendant (and ultimately to explain the effects thereof).  *See e.g., Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003) (holding that counsel was unreasonable in failing to discover and present mitigating evidence of the defendant's physical, psychosocial, emotional, and sexual abuse at home and in foster, which when considered along with the time the defendant "spent homeless" and his "diminished mental capacities, further augmente[d] his mitigation case"); *see also* ABA Guidelines ¶ 10.7, cmt. at 81-82 (stating that counsel "needs to explore" the defendant's medical history, which includes history of brain damage, as well as the defendant's "[f]amily and social history"); id. ¶ 4.1 Commentary, at 31 ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase.").  When counsel lacks such powerful mitigating evidence, which helps to

explain the defendant's conduct, counsel is unable to meaningfully challenge the prosecution's case. *See United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975) ("While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.").

Here, in its closing argument, the government relied heavily on Mr. Sampson's confessions to paint the picture of a cold-blooded, remorseless killer, using Mr. Sampson's own statements as evidence. The government urged the jury to:

> Look at the statements the defendant made about the murder of Philip McCloskey. Listen how he relished the killing, how he told the police. And the overall tone of the hours of tapes that you heard is very important. (Closing, at 20.)

Quoting from the confession, the government used Mr. Sampson's words to suggest that Mr. Sampson "relished" the murder of Philip McCloskey:

> To Trooper Cooke he said, I ended up stabbing him in the back, and then I didn't stop. It was like I didn't want to stop. Let me repeat that. It was like I didn't want to stop. And he wouldn't die. That's when he took the knife and slit his throat. ...

Tr., Dec. 18, 2003, at 20–21.

Despite clear evidence that, over the course of several interrogations, Mr. Sampson was verbose, grandiose, sometimes manic, paranoid, dissociative and often inappropriately jocular as he spoke not only of the crimes charged, but of many aspects of his past, trial counsel never challenged the government's characterization of Mr. Sampson's confessions.

The government's spin on the evidence of remorse in the confessions also went unchallenged. The government emphasized Mr. Sampson's statement in his confession regarding remorse, stating: "He continues all the way. You're probably wondering if I have any remorse. I don't know." Tr., Dec. 18, 2003, at 21. And again, "...he says, I don't know if I'm remorseful." *Id.* at 52. The government skipped over the parts of the confession where Mr.

Sampson reports crying for two hours after the McCloskey killing. As framed by the prosecutor, therefore, the jury heard these statement as a lack of remorse. But trial counsel never explained that Mr. Sampson's response reflected his severe psychiatric and cognitive impairments and revealed an altered state of consciousness at the time of the killing.

Trial counsel could have shown that in many places in the confessions Mr. Sampson describes his own actions as "sick" and his behavior as a "disease," thus contextualizing the confessions as an example of Mr. Sampson's inability to comprehend his own actions, despite still feeling badly. The failure in any way to challenge the Government's characterizations and marshal the mitigating evidence of Mr. Sampson's brain damage and mental impairments accordingly was objectively unreasonable.

### 2.    Trial Counsel's Failure To Mitigate the Confession Was Prejudicial.

Trial counsels' failure to explain his client's statements in the context of his profound impairments was critically prejudicial. Trial counsel did not offer the jury an understanding of Mr. Sampson's own words. Mr. Sampson's statements at the time of his confessions suggest that he was out of control and lacked the capacity to adjust his behavior. His account of the killing shows a disruption of consciousness typical of psychosis which is often associated with agitated depression or manic states. None of this was explained to the jury in an attempt to rebut the government's use of the confessions. Instead, the only explanation offered to the jury was the government's—that Mr. Sampson "relished the killing." Left unexplained, Mr. Sampson's statements sounded damning, callous, and unmitigated, and were heard by the jury without any effort to contextualize them in light of Mr. Sampson's multiple impairments and deficits.

Had trial counsel explained and argued to the jury that many aspects of Mr. Sampson's confession, damning when taken out of context, in fact revealed signs and symptoms of his multiple impairments, and were consistent with severe cognitive impairments and trauma. Had

- 109 -

trial counsel presented this to the jury, there is a reasonable probability that at least one juror would have found that the confessions were the product of a severely mentally ill individual, and not, as the government argued, evidence of remorseless killer.


IV.   [An Issue Relating To the Jury – FILED UNDER SEAL]


Redacted

- 110 -

Redacted

- 111 -

Redacted

Redacted

**Redacted**

Redacted

**Redacted**

- 116 -

**Redacted**

Redacted

Redacted

Redacted

**Redacted**


**V.    The Government Violated Its Obligations Under *Brady v. Maryland* for Failure To Disclose to Mr. Sampson Information Material to His Ability To Prepare and Present a Defense at Sentencing.**

In *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, the Supreme Court defined a prosecutor's Due Process Clause obligations to produce mitigation or impeachment evidence to the defense. "'[T]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [Government], either wilfully or inadvertently; and prejudice must have ensued.'" *Kiley v. United States*, 260 F. Supp. 2d 248, 257 (D. Mass. 2003) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Prejudice is established when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Connolly*, 504 F.3d 206, 213 (1st Cir. 2007) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Moreover, "the Court must examine the materiality of suppressed evidence collectively rather th[a]n individually." *Kiley*, 260 F. Supp. 2d at 256–57 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).


**Redacted**


- 120 -

The Government's *Brady* obligations extend to all "[e]vidence 'within its possession' includ[ing] exculpatory information in the possession of any agency that participated in the investigation of the crime charged." *Ruiz v. United States*, 221 F. Supp. 2d 66, 73 (D. Mass. 2002) (Wolf, J.), *aff'd*, 339 F.3d 39 (1st Cir. 2003). Moreover, "'[t]he individual prosecutor has a <u>duty</u> to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *Id.* at 74 (emphasis added) (quoting *Kyles*, 514 U.S. at 437).

In this case, the Government committed at least two *Brady* violations that materially prejudiced Mr. Sampson.[37]

### A.    Michael Hannon.

The Government failed to disclose to trial counsel that a witness reported seeing Mr. Sampson on the Island Grove Pond Bridge soon after he had called the FBI in an attempt to turn himself in to authorities. Shortly after seeing Mr. Sampson on the news, the witness, Michael Hannon, called the FBI's Boston office to report that he "had seen Sampson on the Island Grove Pond Bridge within the last two weeks." Ex. 18. As discussed previously, *see supra* Part III.C.3(h), Mr. Hannon told the FBI that he had observed Mr. Sampson standing on the bridge for "about 45 minutes to an hour," looking as if he were waiting for someone. *Id.*

No evidence of the substance of this call was ever produced to Mr. Sampson's trial team despite it being clearly exculpatory and located within an "agency that had participated in the

---

[37] Because *Brady* claims, by their nature, involve materials and information that are frequently only known to the government and/or only in its files, it is difficult for counsel to discover the full extent of such materials and information despite diligent efforts to independently investigate. In fact, *Brady* material often becomes known to counsel only after formal discovery has occurred—something which this Court has ordered will occur after the filing of this petition. Gaps in the Government's *Brady* disclosures to date suggest the distinct possibility that discovery will reveal additional instances of *Brady* violations, which are implicitly incorporated herein.

investigation of the crime charged." *Ruiz*, 221 F. Supp. 2d at 73.[38]  The failure to disclose this evidence was clearly prejudicial.  One of Mr. Sampson's central arguments to the jury was that *he had attempted to turn himself in to the FBI*.  Although the Government stipulated that Mr. Sampson had made a phone call to the FBI asking them to pick him up on a bridge, they argued forcefully that there was no actual evidence, beyond Mr. Sampson's claims, that he intended to turn himself in.  Having no eyewitness to corroborate Mr. Sampson's statement, trial counsel was unable to adequately contradict the government's contentions, which proved successful as only eight of the jurors found Sampson's attempt to turn himself in as a mitigating factor.

**B.    Joseph Casey.**

The Government also did not turn over exculpatory statements made by Joe Casey, a key witness to Mr. Sampson's bizarre behavior at Myles Standish State Forest.  Immediately before testifying at the grand jury, Mr. Casey discussed with an Assistant United States Attorney his interactions with and impressions of Mr. Sampson at Myles Standish.  Mr. Casey told the Assistant United States Attorney that he had immediately sensed there was something "deeply wrong" with Mr. Sampson, "that he was different than 99.9 percent of the people" he encounters who are causing problems at the park.  He told the Assistant United States Attorney that "Sampson's eyes were cold and empty, yet there was also something disturbing about them," and that "there was something just very off or abnormal about Sampson's presence."  Casey Decl. ¶ 5.

The Government's failure to make any disclosure of either the substance of the statements or the fact of their existence, despite their clearly exculpatory and material nature,

---

[38] The Government produced to trial counsel both the 302 and FBI agent's notes of the conversation with Mr. Hannon.  The 302 bears no indication that Mr. Hannon reported seeing Mr. Sampson on the bridge that day.  The agent's notes are inconclusive as to what Mr. Hannon actually reported to the FBI.

constitutes a clear *Brady* violation. This failure was also severely prejudicial. Mr. Sampson's

mental condition throughout the week of the murders was a central and critical issue in this case.

Impressions from a witness who had observed Mr. Sampson and whose job required keen

observation would have helped establish and corroborate trial counsel's claims that Mr. Sampson

was suffering from severe mental illness during that final week. Trial counsel received none of

the Assistant United States Attorney's notes (if any) memorializing these statements; moreover,

even if the Assistant United States Attorney did not record Mr. Casey's statements, the

Government remained under an obligation to disclose their existence to trial counsel. That the

Government did not do so, and that the exculpatory evidence addressed a central issue in this

case, requires reversal.

## VI. The Government's Misconduct in the Grand Jury Violated Mr. Sampson's Rights Under the Fifth and Eighth Amendments to the U.S. Constitution.

The grand jury's functions are twofold. First, "it bears the weighty responsibility of

investigating crime and determining whether there is probable cause to believe that a crime has

been committed." *United States v. Mechanik*, 475 U.S. 66, 73 (1986) (citing *United States v.*

*Calandra*, 414 U.S. 338, 343 (1974)). *See also United States v. R. Enterprises, Inc.*, 498 U.S.

292, 297 (1990) ("The function of the grand jury is to inquire into all information that might

possibly bear on its investigation until it has identified an offense or has satisfied itself that none

has occurred."). Second, it "'has been regarded as a primary security to the innocent against

hasty, malicious and oppressive prosecution; it serves the invaluable function in our society of

standing between the accuser and accused.'" *Id.* (quoting *Wood v. Georgia*, 370 U.S. 375, 390

(1962)). But the potential for prosecutorial misconduct before the grand jury is also

"substantial" because in that room "the prosecutor operates without the check of a judge or a

trained legal adversary, and [is] virtually immune from public scrutiny." *United States v.*

*Serubo*, 604 F.2d 807, 817 (3d Cir. 1979).  Justice Sutherland has explained the prosecutor's

special role as follows:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935) (referring to prosecutorial misconduct

generally).

"Like the Hydra slain by Hercules, prosecutorial misconduct has many heads." *United

States v. Williams*, 504 U.S. 36, 60 (1992) (Stevens, J., dissenting).  One is when the prosecutor

abdicates his or her responsibilities; this misconduct becomes "a ground for § 2255 relief if it

violates [a] petitioner's due process rights." *Moreno-Morales v. United States*, 334 F.3d 140,

148 (1st Cir. 2003).  *See also Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("A federally issued

writ of habeas corpus, of course, reaches only convictions obtained in violation of some

provision of the United States Constitution.").  Prosecutorial misconduct violates a defendant's

due process rights "if the conduct 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.'" *Moreno-Morales*, 334 F.3d at 148 (quoting *Donnelly v.

DeChristoforo*, 416 U.S. 637, 643 (1974)).  A criminal defendant is denied due process when the

prosecutorial misconduct is of sufficient significance to result in the denial of the defendant's

right to a fair trial.  *Greer v. Miller*, 483 U.S. 756, 765 (1987).  *See also Smith*, 455 U.S. at 219

("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

fairness of the trial.").  Thus, if prosecutorial misconduct precludes, for example, evidence

- 124 -

material to the defendant's guilt or punishment from reaching the jury, the court should grant

habeas relief. *See id.* at 219–20. *See e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding

that the prosecutor's failure to disclose evidence "violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or the bad faith of the

prosecution").

Here, the Government misused the grand jury process to foreclose witness testimony that

would have been favorable to Mr. Sampson, violating Mr. Sampson' rights under the Fifth

Amendment to the U.S. Constitution.[39]  As such, the Government's misconduct in this case

warrants habeas relief.

**A.      The Government Violated Mr. Sampson's Rights by Misusing the Role of the Grand Jury To Foreclose Trial Testimony from Mitigating Witnesses.**

It is improper for the Government to use the grand jury process to strengthen its own case

by, for example, locking-in a witness's testimony. *See United States v. Jackson*, 863 F. Supp.

1449, 1454 (D. Kan. 1994) (recognizing that it is improper for the government to use the grand

jury process to strengthen its own case and citing cases). *See also In re Grand Jury Proceedings*

---

[39] *United States v. Mechanik*, 475 U.S. 66 (1986) and its progeny do not foreclose Mr. Sampson's instant claim. This line of cases holds that a petit jury's verdict of guilty beyond a reasonable doubt, *see e.g.*, *United States v. Lopez-Lopez*, 282 F.3d 1, 9 (1st Cir. 2002), or the defendant's guilty plea preclude the defendant from challenging the propriety of his conviction, *see e.g.*, *Ferrer v. Superintendent*, No. 05 CV 1010, 2008 U.S. Dist. LEXIS 57189, at *26 (S.D.N.Y. July 25, 2008). The finding or pleading of guilty transforms any defect connected with the grand jury process into harmless error because it "demonstrates a fortiori that there was probable cause to charge the defendants with the offense for which they were connected." *Mechanik*, 475 U.S. at 940. *See also United States v. Ortiz de Jesus*, 230 F.3d 1, 4 (1st Cir. 2000) (holding that although a guilty plea or a "trial jury's verdict provides an adequate safeguard against the failings of the grand jury process" "dismissal after conviction is appropriate" where there is evidence of "'serious and blatant prosecutorial misconduct'— misconduct so grave that it calls into doubt the fundamental fairness of the judicial process"). In Mr. Sampson's sentencing trial, however, Mr. Sampson's guilt was no longer in dispute because he had already pled guilty. At issue here is not whether there was probable cause to find Mr. Sampson guilty, but whether the government's misconduct so undermined Mr. Sampson's mental health defense as to deprive Mr. Sampson of his rights to fair sentencing proceedings.

*(PHE, Inc.)*, 640 F. Supp. 149, 153 (E.D.N.C. 1986) ("The prosecutor may *not* conduct [preliminary] interviews for an improper purpose such as to harass witnesses or as a means to *conduct criminal or civil discovery*.") (emphasis in original). Further, the Government may not use the grand jury as a tool "'to [achieve] a tactical advantage by impairing the ability of a defendant to mount an effective defense.'" *United States v. Sherman*, 150 F.3d 306, 313 (3rd Cir. 1998) (quoting *United States v. Ciampaglia*, 628 F.2d 632, 639 (1st Cir. 1980)). *See e.g.*, *United States v. Dennis*, 625 F.2d 782, 794 (8th Cir. 1980) ("An intentional delay to gain a tactical advantage is inherently improper and violates fifth amendment due process rights."). Thus, the Government is barred, for example, from using the grand jury process to gather evidence in pending litigation. *See United States v. Brothers Const. Co. of Ohio*, 219 F.3d 300, 314 (4th Cir. 2000).

Here, the Government deprived Mr. Sampson of his right to fair sentencing proceedings because it prevented testimony that would otherwise weigh in favor of a life sentence, and against death, from reaching the jury. The Government violated Mr. Sampson's rights by using the grand jury process to freeze the testimony of witnesses who might be expected to testify on Mr. Sampson's behalf. Indeed, FBI records obtained through a FOIA request reveal that the Government expected Mr. Sampson to make a "'stability and incompetence' defense," and that in anticipation thereof it sought to interview persons of interest to "lock in witness statements." Ex. 83 (FBI record from Boston, MA to Charlotte, NC dated Aug. 29, 2001). This is in fact exactly what the Government did.

Joseph Casey provides a compelling example of this impropriety. Mr. Casey came into contact with Mr. Sampson on July 27, 2001. Mr. Casey's brief interaction with Mr. Sampson left Mr. Casey with the distinct feeling that "there was something just very off or abnormal about

[Mr. Sampson]." Casey Decl. ¶ 5.  The Government ultimately called Mr. Casey to testify before the grand jury.  Before testifying, Mr. Casey told the Assistant United States Attorney that upon meeting Mr. Sampson he "immediately sensed that there was something deeply wrong with the man, that he was different than 99.9 percent of the people [Mr. Casey had] encounter[ed] who are causing problems at the park."  Casey Decl. ¶ 5.  Mr. Casey also said that he felt "uncomfortable" around Mr. Sampson.  Casey Decl. ¶ 5.  Yet, all the grand jury heard about in this regard was that Mr. Sampson had a "hollow" look in his eyes.  Grand Jury Tr., Sept. 26, 2001, at 13.  This is because the Assistant United States Attorney made clear to Mr. Casey that "he wanted only a very limited response to questions about Sampson's demeanor or mental state."  Casey Decl. ¶ 7.  What the Assistant United States Attorney wanted, he got: Mr. Casey's grand jury testimony did not contain the powerful references to Mr. Sampson's troubled demeanor or psychological state.  And although Mr. Casey did not appear on the Government witness list and was (inexplicably) never called by defense counsel to testify at trial, it fits a pattern of calling witnesses to testify before the grand jury to cabin their testimony so that it lacked reference to Mr. Sampson's unstable psychological state, the ultimate goal, of course, being the undercutting of any potential mental health related defense.

For example, the Government similarly omitted critical aspects of another witness's police statements from his grand jury testimony.  In his police statements, the witness stated that Mr. Sampson was "fidgety" during their conversation and that "he looked like something was wrong."  Ex. 16.  The witness also described Mr. Sampson's eyes as being "wild" and that "he looked like he was on drugs."  *Id.*  He noted that Mr. Sampson appeared "uneasy," "harried" and "troubled."  *Id.*  None of these statements made it in to the grand jury testimony, however.  Instead, in front of the grand jury the witness testified that Mr. Sampson's mood was "upbeat and

- 127 -

pleasant" and that Mr. Sampson was "polite" and "coherent." Grand Jury Tr., Oct. 24, 2001, at 30.

The Government's practice in this regard continued with other witnesses. Kathleen Duguay also reported to police that during her interaction with Mr. Sampson, he "babbled" about the CIA and traveling up and down the East Coast, that he "glared" at another individual, Joe Barrett, and that Mr. Sampson had seemed "agitated" with her during their interaction. Ex. __. Again, the Government did not elicit any of these statements during Ms. Duguay's grand jury appearance. *See generally*, Ex. 10. Instead, "babbling," "glaring," and "agitated" became testimony by Ms. Duguay that Mr. Sampson was "pretty relaxed," "very calm," and "casual." Ex. 10. Mr. Casey's declaration provides insight into how this transformation occurred.

Similarly, Joe Barrett's report of his interaction with Mr. Sampson on July 27, 2001, indicates that the incident was a "major" one, and that Mr. Sampson exhibited symptoms of a "psych disorder." Ex. 84 (Barrett DEM Incident Report). However, none of this made it to the grand jury. *See generally* Ex. 85 (Barrett Grand Jury Testimony). Instead, Barrett told the grand jurors that he asked his supervisors at Myles Standish State Forest to speak to Mr. Sampson because Mr. Sampson seemed "shady," and like a "weirdo." *Id.* Yet, Mr. Barrett told Mr. Casey that "he was having a problem with a man [Mr. Sampson] at the pond who seemed to have psychiatric problems and he wanted someone to watch his back." Ex. 11 at ¶ 2. And Barrett told the police that he was upset that his supervisors failed to order Mr. Sampson to "leave" the park. Ex. 86 (Barrett statement). Further, although Mr. Barrett conceded that Mr. Casey had described Mr. Sampson as having "psyche problems," before the grand jury, Mr. Barrett denied ever telling Mr. Casey, or anyone else for that matter, that Mr. Sampson had any "psychiatric disorder." Ex.

- 128 -

84 at 25. Mr. Barrett never told the grand jury that he had himself indicated that Mr. Sampson had a "psych disorder" in the report he drafted of the incident.[40] *Compare* Ex. 83 *with* Ex. 84.

The Government also elicited grand jury testimony from a friend of Mr. Sampson's that omitted significant facts previously disclosed in her police statements. Exs. 87; 88. The friend also noted that Mr. Sampson had talked about his family and that it was clear that he "loved them dearly." *Id.* During his last visit with her, in addition to noting that Mr. Sampson was "at the bottom," she thought he wanted to commit suicide. *Id.* Despite presenting the friend's grand jury testimony in nearly line-by-line congruence with her police statement, it did not elicit any of these statements. Similarly, another witness reported in her police report that Mr. Sampson's face reminded her of a "heroin addicts [sic] facial feature." Ex. 23. The Government did not elicit this testimony in front the grand jury, and it was only brought out by defense counsel on cross examination during trial. *See* Tr., Nov. 10, 2003, at 141.

The critical omissions in these witnesses grand jury testimonies served to "lock in" testimony such that any attempt by defense counsel to call these witnesses to explore their statements would have been met by the threat of almost certain impeachment. This is because had these witnesses testified to their initial observations, the Government could have impeached them with their grand jury testimony. Here, the Government's interaction with these witnesses turned what would on their face appear to be defenses witnesses into witnesses for the prosecution, leaving for defendant cross-examination to ferret out their initial, unvarnished observations.

---

[40] Because defense counsel had Barrett's write-up of the incident, counsel was able to cross-examine Barrett about his statement that Mr. Sampson had "psych problems." Tr., Nov. 12, 2003, at 60.

Although the Government may not have been required to present exculpatory evidence to the grand jury, the U.S. Constitution required it to refrain from using the process to strengthen its case, procure evidence, or as a tool to preclude Mr. Sampson from mounting certain defenses. What the Government did in this case is precisely what it is forbidden from doing: it used the grand jury process to gain a tactical advantage over Mr. Sampson by calling certain witnesses to improve its evidence. *See, e.g.*, *United States v. Gibbons*, 607 F.2d 1320, 1328–29 (10th Cir. 1979) (recognizing that it would be improper for the government to use the grand jury proceedings to freeze testimony). Its own statements show that it hoped to freeze testimony adverse to Mr. Sampson, and thereby gain a tactical advantage over anticipated competency related defenses: "[i]nterviews . . . are outlined in order to lock in witness statements as to the nature of SAMPSON's relationships, length of relationships, any violent behavior observed, SAMPSON's source of financial support, general intelligence of SAMPSON, and his ability to function in society." Ex. 83 (FBI record from Boston, MA to Charlotte, NC dated Aug. 29, 2001). By doing so the Government deprived Mr. Sampson of a fair trial—one guaranteed him by the U.S. Constitution.

## B.    The Government Violated Mr. Sampson's Due Process Rights by Coaching Key Witnesses.

Further, the Government's coaching of key witnesses entitles Mr. Sampson to habeas relief. The Government of course is entitled to prepare its witnesses. *See United States v. Rivera-Hernandez*, 497 F.3d 71, 80 (1st Cir. 2007) ("Prosecutors and defense attorneys alike are entitled to prepare their witnesses."). But at some point "preparing" a witness crosses the line into "coaching" the witness, which is an improper denial of due process under the Fifth Amendment. It is well settled that convictions can be overturned because of the Government's improper coaching of a witness. *See United States v. Sampson*, 275 F. Supp. 2d 49 (D. Mass.