2003) (quoting *Adams*, 768 S.W.2d 281 (Tex. Crim. App. 1989) (granting new trial because of failure to disclose prior inconsistent statement of witness, misidentification of defendant by witness, and improper coaching of witness by police)). *See also Banks v. Dretke*, 540 U.S. 668 (2004) (reversing Fifth Circuit's denial of a certificate of appealability regarding a claim that improperly withheld evidence would have shown a witness was coached by the Government). *Cf. Kyles v. Whitley*, 514 U.S. 419, 443 (1995) ("A jury would reasonably have been troubled by the adjustments to [the witness]'s original story by the time of the second trial. . . . These developments would have fueled a withering cross-examination, destroying confidence in [the witness]'s story and raising a substantial implication that the prosecutor had coached him to give it.").

Coaching a witness is prejudicial if that witness's testimony is a central part of the Government's case or relates to disputed facts. *Cf. Rivera-Hernandez*, 497 F.3d at 80 (noting that any alleged coaching was *not* prejudicial because it was on a fact *not* central to the Government's case). Coaching is also prejudicial if it "'so poisoned the well' as to have likely affected the trial's outcome." *United States v. Mooney*, 315 F.3d 54, 60 (1st Cir. 2002). The factors court's assess in determining such a prejudicial effect include "the severity of the misconduct; whether it was deliberate or accidental; the context in which it occurred; whether the judge gave any curative instructions and their likely effect; and the strength of the evidence against the defendant." *Id.*

Here the Government's strategy at trial was to paint Mr. Sampson as *not* mentally imbalanced at the time of the crimes by calling many lay witnesses who interacted with him during the approximately ten days in which the murders occurred. *See supra* Part II.A. The

Government's strategy was central to its case, as shown by the sheer number of witnesses they called to testify to their otherwise uneventful contact with Mr. Sampson.

*In this case, the Government improperly and prejudicially coached witnesses in violation of the Due Process Clause.* This fact is borne out in the Declaration of Joe Casey, an eye witness to Mr. Sampson's bizarre conduct in Myles Standish State Forest during the week of the offense.[41] A supervisor at the State Forest, Mr. Casey responded to another state employee's call for assistance with Mr. Sampson, who was "displaying some pscyh[iatric] problems." Ex. 89 (DEM Log Book); Ex. 11 at ¶ 2. According to Mr. Casey, Mr. Sampson's behavior that day "seemed very strange to me." Mr. Casey was called to testify before the grand jury, and when he appeared at the court house he was met by an Assistant United States Attorney. Ex. 11 at ¶ 4. At this point the following interaction occurred:

> During this interview, Mr. Gaziano asked me to describe Sampson's demeanor and my impressions of him as I talked with him at the picnic table. I told him that I immediately sensed that there was something deeply wrong with the man, that he was different than 99.9 percent of the people I encounter who are causing problems at the park. I said that Sampson's eyes were cold and empty, yet there was also something disturbing about them. I said that Sampson never threatened me or said anything alarming, yet I definitely felt uncomfortable and I was glad there were other people around. Basically, I said I felt there was something just very off or abnormal about Sampson's presence

Ex. 11 at ¶ 5. The Assistant United States Attorney, apparently dissatisfied with Mr. Casey's response, immediately pressed Mr. Casey on the foundation of his prospective testimony:

> Mr. Gaziano then asked me whether I was a trained psychologist, implying that I had no business assessing Sampson's mental state. I told him I was making these observations based on years of observing and dealing with people, both in my work as a park supervisor and general life experience. I also said I had taken

---

[41] Mr. Casey was questioned by Massachusetts State Police and testified before the grand jury, but neither the Government nor Mr. Sampson's trial counsel called him as a witness at trial.

> college psychology courses in the past but that had nothing to do
> with my impressions of Sampson.

Ex. 11 at ¶ 6. At this point, the Assistant United States Attorney engaged in even more

prejudicial "coaching" behavior:

> Mr. Gaziano appeared to be concerned that I might repeat some of
> these observations to the grand jury, because he then cautioned me
> not to provide any more information or details than were necessary
> to answer his questions. He told me to watch for signals from him,
> like raising his hand, to know when to stop talking. He explained
> that he knew exactly what he wanted to get out of me and that I
> should be very careful not to elaborate or expand my answers
> beyond the minimum to answer the question. He didn't ask me to
> lie, but it was clear to me he wanted only a very limited response
> to questions about Sampson's demeanor or mental state.

Ex. 11 at ¶ 7.[42]

The Government's "coaching" of witnesses is evident in a plain comparison of the trial

transcript to several witnesses' prior statements, both to police and to the grand jury. For

example, one witness's description of Mr. Sampson as "scraggly" on the day he picked him up in

a taxicab was not in his direct trial testimony and had to be pulled from him on cross-

examination. *Compare* Ex. 15 (Anabel statement) *with* Ex. 90 (Anabel testimony). Another

witness's description of Mr. Sampson as "fidgety" and having the appearance of a drug user is

nowhere to be seen in his grand jury testimony. *Compare* Ex. 16 (Bierweiler statement) *with* Ex.

91 (Bierweiler grand jury testimony). Similarly, another witness's description of Mr. Sampson

as having a sunken face like that of a heroin addict is nowhere found in her direct testimony.

*Compare* Ex. 23 (Mullaney statement) *with* Ex. 92 (Mullaney transcript). Furthermore, Kathleen

---

[42] Mr. Casey does not recall receiving such a hand signal, but a comparison between his grand
jury testimony and his declaration shows that he never told the grand jury about his observation
of Mr. Sampson's abnormal behavior. For example, Mr. Casey never told the grand jury that
Mr. Sampson seemed "different than 99.9 percent of the people at the park." *See generally*,
Grand Jury, Tr., Sept. 26, 2001.

Duguay's description of Mr. Sampson as "agitated" at the Myles Standish State Forest is not found in her direct testimony, during which she also disavowed any belief that Mr. Sampson might be mentally ill, even though that was the reason she responded to Mr. Barrett's call for assistance. *See* Ex. 14 (Duguay statement) *with* Ex. 93 (Duguay transcript).

The Government violated Mr. Sampson's constitutional rights under the Fifth Amendment by coaching its witnesses to avoid statements that Mr. Sampson seemed mentally awry during their interactions with him at times surrounding the murders. Accordingly, Mr. Sampson is entitled to a new sentencing hearing.[43]

## VII.    The Eighth Amendment Prohibits Executing Mr. Sampson Because He Is Severely Mentally Impaired.

Mr. Sampson suffers from severe mental defects. He has severe brain damage to multiple areas of his brain. His profound deficits prohibit the United States from executing him.

It is a fundamental "precept of justice that punishment for crime should be graduated and proportioned to the offense." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). The Eighth Amendment to the Constitution therefore prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and "is directed, in part, against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." *Enmund v. Florida*, 458 U.S. 782, 788 (1982). A capital sentence is violative of the Eighth Amendment when it is "grossly out of proportion to the severity of the crime," or "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S 153, 173, 183 (1976) (joint

---

[43] Moreover, an evidentiary hearing is proper in order to probe the extent of the Government's coaching. *See United States v. Oreto*, 37 F.3d 739, 744 (1st Cir. 1994) (noting that the district court held an evidentiary hearing on petitioner's claim that Government agency coached witness as to the location of the defendant in the courtroom in order to facilitate in-court identification, including testimony of witness and FBI agent).

opinion of Stewart, Powell, and Stevens, JJ.).  The twin goals of retribution and deterrence drive the Eighth Amendment proportionality analysis, and "unless the death penalty when applied to *those in [the defendant's]* position measurably contributes" to these goals, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Enmund*, 458 U.S. at 798.

It is well settled that to determine whether a given punishment is disproportional, courts must look to "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).  As a consequence, the Supreme Court has, in measured steps, categorically prohibited the execution of certain groups of offenders and for particular crimes.  *See, e.g., Enmund v. Florida*, 458 U.S. 782 (1982) (prohibiting execution for defendant who did not take life, did not attempt to take life, and did not intend to take life); *Coker v. Georgia*, 433 U.S. 584 (1977) (prohibiting execution for rape of an adult woman); *Atkins v. Virginia*, 536 U.S. 304 (2002) (prohibiting execution of mentally retarded); *Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting execution of juveniles).

A.    *Atkins v. Virginia.*

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the execution of the mentally retarded is "cruel and unusual" for purposes of the Eighth Amendment. "Construing and applying the Eighth Amendment in light of our 'evolving standards of decency,'" the Court concluded that capital punishment for mentally retarded defendants "is excessive" and therefore "that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* at 321 (citations omitted).

In reaching its decision, the Court in *Atkins* identified three principles underlying the conclusion that executing mentally retarded offenders violated the Eighth Amendment.  First, the Court noted that "a national consensus ha[d] developed against it." *Id.* at 316.  According to the

- 135 -

Court, a large number of states which utilize the death penalty had enacted prohibitions against executing mentally retarded individuals and that even those states which had no such prohibition, rarely imposed such executions. *Id.* at 315–16. The Court stated that current legislation and practices provided "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.*

Second, the *Atkins* Court found that "[t]he reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty." *Id.* at 320. Mentally retarded defendants possess certain psychological characteristics that render them less culpable that "the average murderer," *id.* at 319, including a reduced capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reason, to control impulses, and to understand the reactions of others." *Id.* at 318. Consequently, the Court concluded that mentally retarded offenders "often act on impulse rather than pursuant to a premeditated plan," and, therefore, "[t]heir deficiencies do not warrant an exemption from criminal sanction, but they do diminish their personal culpability." *Id.* at 318. And because "just deserts . . . necessarily depends on the culpability of the offender," the "lesser culpability of the mentally retarded offender" did not warrant the imposition of the most extreme punishment. *Id.* at 319.

Finally, the Court rejected the suggestion that execution of the mentally retarded has any deterrent effect, reasoning that "capital punishment can [only] serve as a deterrent when [a crime] is the result of premeditation and deliberation," and that this type "of calculus is at the opposite end of the spectrum from [the] behavior of [the] mentally retarded," due to the cognitive and behavioral impairments. *Id.* at 319–20.

**B.**    *Roper v. Simmons.*

In *Roper v. Simmons*, the Supreme Court extended *Atkins* rationale to prohibit the execution of juveniles. Noting that "[t]he evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel," to *Atkins*, the Court concluded that "the objective indicia of consensus . . . provide sufficient evidence that today our society views juveniles . . . as categorically less culpable than the average criminal." 543 U.S. at 567 (quoting *Atkins*, 536 U.S. at 316).

The Court also rejected the suggestion that juveniles could be "classified among the worst offenders," and therefore subject to the death penalty. *Id.* at 569. The Court instead found that juveniles possess a "diminished culpability," and consequently neither the twin goals of retribution or deterrence could legitimately justify the death penalty. *Id.* at 570–71.

**C.**    **Mentally Impaired Offenders.**

The rationale of *Atkins* and *Roper* compels a conclusion that the Eighth Amendment prohibits the execution of a person so mentally impaired that he lacks the capacity to conform his conduct to the requirements of the law.[44] In *Atkins*, the Court concluded that "[i]f the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." 536 U.S. at 319. And in *Roper* the Court held that "[t]he same conclusions follow from the lesser culpability of the juvenile offender." 543 U.S. at 571. Consequently, "[o]nce the diminished culpability of [a particular class of offenders is recognized], it is evident that the

---

[44] As this court has observed, it is "the duty of the courts to reconsider periodically whether the death penalty offends contemporary standards of decency." *United States v. Sampson*, 275 F. Supp. 2d 49, 54-55 (D. Mass. 2003). That the Supreme Court has yet to speak definitively on the constitutionality of executing severely mentally ill offenders does little to deprive lower courts of this obligation. *See, e.g., State ex rel. Simmons v. Roper*, 112 S.W.3d 397 (Mo. 2003) (en banc).

penological justifications for the death penalty apply to them with lesser force." *Roper*, 543 U.S. at 571.

### 1.    Objective Indicia of Consensus.

Objective evidence of the congruence between mentally impaired offenders and mentally retarded offenders is substantial. A majority of death penalty states permit evidence of mental illness to be used as a mitigating factor.[45] *See* Laurie T. Izutsu, Note, *Applying Atkins v. Virginia to Capital Defendants With Severe Mental Illness*, 70 Brook. L. Rev. 995, 1005 n. 66 (collecting states). Since *Roper*, two more states—New Mexico and New Jersey—have abolished the death penalty, and a number of states, including Colorado Nevada, Montana, Nebraska, Kansas, and New Hampshire are currently reconsidering their policies. *Wiles v. Bagley*, __ F.3d __, 2009 WL 982087 at *7 n.17 (6th Cir. 2009) (Martin, J., concurring). Clemencies and commutations also evidence a trend toward prohibiting the execution of severely mentally impaired offenders. In 2002, the Georgia state parole board commuted Alexander Williams's death sentence to life without parole because he suffered from mental illness and was a juvenile at the time of his offense. *See* Death Penalty Info. Ctr., Clemency, http://www.deathpenaltyinfo.org/clemency. In 2005, Indiana Governor Mitch Daniels (R) commuted the death sentence of Arthur P. Baird, who suffered from severe mental illness. *See*

---

[45] Although statutory evidence of a national consensus prohibiting the execution of severely mentally ill defendants is less apparent, this is not determinative. *See Atkins*, 536 U.S. at 312 (Eighth Amendment framework requires looking for "objective evidence of contemporary values" but that this "did not wholly determine the controversy"). In fact, objective legislative evidence includes more than just outright statutory prohibitions. *See Roper*, 543 U.S. at 564-65 (looking to, *inter alia*, "the practice of executing" those within the class of offenders; commutations; and consistency of the direction of change"); *see also United States v. Sampson*, 275 F. Supp. 2d 49, 55 (D. Mass. 2003) (instructing that "the fact that a statute, or many statutes, authorize the death penalty is not the end of the inquiry" and looking to jury verdicts, polling data, and the practices of foreign countries).

*id.* And in 2008, Virginia Governor Timothy Kaine (D) commuted Percy Walton's death sentence to life in prison without parole, citing his serious mental illness. *See id.*

*Courts, too, have begun to recognize* "the belief, long held by this society, that defendants who commit criminal acts that are attributable . . . to emotional and mental problems[ ] may be less culpable than defendants who have no such excuse," *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring), and therefore should not be subject to the death penalty. *See Commonwealth v. Baumhammers*, 960 A.2d 59 (Pa. 2008) (Todd J., concurring); *State v. Ketterer* 855 N.E.2d 48 (Ohio 2006) (Lundberg Stratton, J., concurring); *People v. Danks*, 82 P.3d 1249 (Cal. 2004) (Kennard, J., concurring and dissenting); *Corcoran v. States*, 774 N.E.2d 495 (Ind. 2002) (Rucker, J., dissenting); *State v. Nelson*, 803 A.2d 1 (N.J. 2002) (Zazzali, J., dissenting); *Ohio v. Scott*, 748 N.E.2d 11 (Ohio 2001) (Pfeifer, J., dissenting).

Polling data is similarly persuasive. According to a 2002 Gallup poll, although almost two thirds of Americans support the death penalty, seventy-five percent of those surveyed oppose execution of the mentally ill. *State v. Ketterer*, 855 N.E.2d 48, 85 (Ohio 2006) (Lundberg Stratton, J., concurring); *compare Atkins*, 536 U.S. at 316 n.21 ("[P]olling data shows a widespread consensus among Americans, even those who support the death penalty, that executing the mentally retarded is wrong"). And a May 2006 Gallup poll revealed that overall support for the death penalty had dropped from 80% in 1994 to 65% in 2006. *See Death Penalty Info. Ctr.*, Facts About Death Penalty 1 (2007).

And professional organizations provide compelling evidence of a consensus that executing severely mentally ill offenders should be prohibited. The ABA House of Delegates, in August 2006, adopted the following recommendations:

> 1. Defendants should not be executed or sentenced to death if, at the time of the offense, they had significant limitations in both

their intellectual functioning and Defendants should not be executed or sentenced to death if, at the time of the offense, they had significant limitations in both their intellectual functioning and adaptive behavior, as expressed in conceptual, social, and practical adaptive skills, resulting from mental retardation, dementia, or a traumatic brain injury.

2. Defendants should not be executed or sentenced to death if, at the time of the offense, they had **a severe mental disorder or disability** that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct; (b) to exercise rational judgment in relation to conduct; or (c) to conform their conduct to the requirements of the law.

See ABA Report with Recommendation No. 122A, Adopted August 2006, at

http://www.abanet.org/disability/docs/DP122A.pdf (emphasis added); see also John Parry and F.

Philips Gilliam, ABA Commission on Mental and Physical Disability Law, Handbook on Mental

Disability Law 223 (2002) ("Diminished culpability, and the mental status ... defenses that derive

from this concept, constitute a fundamentally important boundary marker in the criminal law and

our notions of justice."). The National Alliance on Mental Illness ("NAMI"), American

Psychological Association, and American Psychiatric Association have all adopted one or both

of these recommendations. See Recommendation and Report on the Death Penalty and Persons

with Mental Disabilities, available at http://www.ndrn.org/issues/cj/ABA%20Resolution-

%20feature%20article305.pdf.[46]

---

[46] Additional objective factors provide similar evidence. The world community appears equally opposed to inflicting the death penalty on the severely mentally ill. See European Union, Delegation to the European Commission to the United States, EU Policy on the Death Penalty, Letter to Governor of Georgia (Feb. 2002). ("The EU strongly believes that the execution of persons suffering from a mental disorder is contrary to widely accepted human rights norms and in contradiction to the minimum standards of human rights set forth in several international human rights instruments."); see also United Nations High Commissioner for Human Rights, *The Question of the Death Penalty*, Commission on Human Rights Resolution 2002/77.

Viewed in this context, the same trends motivating the Court's prohibition on executing the mentally retarded and juveniles applies *per force* to those offenders who suffer from severe mental defect.

### 2. Deterrence.

The Court's reasoning in *Atkins* that "the same cognitive and behavioral impairments that make [mentally retarded] defendants less morally culpable . . . also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result control their conduct based upon that information," applies with equal force to severely mentally impaired offenders. *Atkins*, 536 U.S. at 320.  As discussed below, severely mentally impaired individuals lack the ability to control their impulses, engage in logical reasoning, or comprehend the possible penological implications of their conduct.  The death penalty is therefore no deterrent for this class of offenders. *See State v. Ketterer*, 855 N.E. 2d 48, 85 (Ohio 2006) (Lundberg J., concurring) ("Deterrence is of little value as a rationale for executing offenders with severe mental illness when they have diminished impulse control and planning abilities.").

### 3. Retribution.

Similarly, there is little to distinguish the culpability between severely mentally impaired offenders and mentally retarded offenders, and any proportionality analysis compels the conclusion that executing severely mentally impaired offenders is disproportionate.  "An individual with a serious mental illness may be just as seriously impaired in his ability to understand and process information as an individual with a diminished IQ or an individual who has not yet reached the age of legal majority." *Commonwealth v. Baumhammers*, 960 A.2d 59, 107 (Pa. 2008) (Todd J., concurring).  The deficiencies and limitations found in mentally retarded defendants may also be found in those who, while not retarded, are considered mentally impaired. *See* DSM-IV-TR at 41 (diagnostic features of mental retardation), 312

(schizophrenia), 329 (delusional disorders), 345–48 (mood disorders), 136 (delirium), 519 (dissociative disorders). This is true from not just a medical standpoint. *See. e.g.,* ABA Criminal Justice Standards Committee, ABA Criminal Justice Mental Health Standards, Standard 7-6.1(a) at 330 (1989) ("A person is not responsible for criminal conduct if, at the time of such conduct, and as a result of mental disease or defect, that person was unable to appreciate the wrongfulness of such conduct."); *id.* Standard 7-6.1 cmt. at 331 (tracing diminished culpability defense to the early seventeenth century); Model Penal Code § 4.01 ("A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law.").

Capital punishment presumes that a convicted criminal is fully culpable, and any diminished culpability augurs against applying that punishment. As both *Atkins* and *Roper* confirm, once the diminished capacity of a particular class of offenders is recognized, the penological justifications of deterrence and retribution apply with "lesser force" and render impermissible application of the most severe penalty. Consequently, because the Eighth Amendment hinges on the principle of individual culpability and those, like Sampson, who suffer from severe mental defects possess diminished culpability, Sampson's sentence violates the Eighth Amendment.

## VIII. Sentencing Mr. Sampson to Death is Unconstitutional because Carjacking Is Not a Valid Federal Crime.

Carjacking is not a valid a federal crime because it is not a valid exercise of congressional power.[47] It is axiomatic that the power of Congress is not absolute; rather, Congress may

---

[47] Mr. Sampson notes that other courts have upheld the constitutionality of the carjacking statute as a valid exercise of Congress's Commerce Clause power. *See, e.g., United States v. Bishop*, 66 F.3d 569, 590 (3d Cir. 1995) (upholding carjacking statute as a valid exercise of Congress's

exercise only those powers enumerated in the Constitution. *McCulloch v. Maryland*, 17 U.S. 316, 323–24 (1819). Among these powers, is Congress's ability "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST., art. I, § 8, cl. 3.

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court invalidated the Gun-Free School Zones Act, 18 U.S.C. § 922(q), because it was not a valid exercise of Congress's power under the Commerce Clause. The Court stated that under its commerce power, Congress may regulate: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558 (citation omitted). The Court found that § 922(q), which fell within this third category, did not substantially affect interstate commerce:

> Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Id.* at 561.

---

commerce power); *United States v. Jimenez*, 323 F.3d 320, 322 (5th Cir. 2003) (same); *United States v. Washington*, 1995 WL 424419, at *3 n.2 (6th Cir. July 18, 1995) (same); *United States v. Robinson*, 62 F.3d 234, 237 (8th Cir. 1995) (same); *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995) (same); *United States v. Carolina*, 1995 WL 422862, at *1 (10th Cir. 1995) (same). However, this issue has not yet been addressed by the First Circuit.

Only the second and third categories delineated in *Lopez* are even potentially applicable here; the federalization of carjacking cannot be sustained under either. First, automobiles are not *"instrumentalities of interstate commerce"* in the context of Commerce Clause jurisprudence. In *So. R.R. Co. v. United States*, 222 U.S. 20 (1911), the Supreme Court upheld the Safety Appliance Act as a valid exercise of the Congress's Commerce Clause power. The act applied to a non-conforming railroad car used only for hauling on "'a part of a through highway' over which traffic was continually being moved from one State to another." *Id.* at 23. The Court upheld the application of the regulation to intrastate railcars because the railcars are generally used in both inter-and intra-state traffic, and railcars on the same railroad are interdependent in that "whatever brings delay or disaster to one, or results in disabling one of its operatives, is calculated to impede the progress and imperil the safety of other trains." *Id.* at 27. The Court found that this connectedness between inter-and intra-state traffic justified Congress's regulation of the acts at issue. *Id.* Similarly, in *Houston, E. & W.T.R. Co. v. United States*, 234 U.S. 342 (1914), the Supreme Court held that Interstate Commerce Commission could control intrastate rates by a carrier under state authority. *Id.* at 354. The Court reasoned that Congress had such authority under the Commerce Clause because "the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other." *Id.* at 351-52.

Automobiles, however, are not inherently instrumentalities of interstate commerce. Nor are automobiles in different states somehow interdependent or closely connected to each other. Further § 2119 does not limit its application to vehicles that are used in interstate commerce. Therefore, the carjacking statute cannot be sustained under the second *Lopez* category.

Second, carjacking does not involve any commercial activity. *See, e.g., United States v. Morrison,* 529 U.S. 598, 613 (2000) (finding that "gender-motivated crimes of violence are not, *in any sense of the phrase, economic activity,*" and invalidating Violence Against Women Act of 1994); *Jones v. United States,* 529 U.S. 848, 851 (2000) (holding that an "owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity"). Merely using goods that have traveled in interstate commerce is insufficient to establish that the activity has a substantial effect on interstate commerce. Otherwise, Congress could use the Commerce Clause to regulate just about any activity. *See Lopez,* 514 U.S. at 567 (stating that making such inferences converts "congressional authority under the Commerce Clause to a general police power of the sort retained by the States"). Allowing the federal government to regulate carjacking impermissibly permits it to infringe on the authority of the States to define and enforce criminal law. Thus, the carjacking statute unconstitutionally extends beyond Congress's Commerce Clause authority under the third *Lopez* category.

**IX.     The Death Penalty and the Federal Death Penalty Act Violate the U.S. Constitution.**

The claims below were raised on direct appeal. Mr. Sampson raises them now in this proceeding so as not to waive them. *See United States v. Butt,* 731 F.3d 75, 76 n.1 (1st Cir. 1984) ("It is settled that a § 2255 motion may not revive issues previously determined on direct appeal.").

**A.     The Federal Death Penalty is Unconstitutional as Applied in this Case because the Statute Does Not Permit Aggravating Factors Necessary for a Death Verdict to be Presented to a Grand Jury, as Required by *Ring v. Arizona.***

The FDPA suffers from a fatal flaw made apparent by the Supreme Court's decision in *Ring v. Arizona*: it grants authority to allege aggravating factors exclusively to the prosecutor,

- 145 -

while the Constitution requires that such elements be presented to a grand jury and charged in an indictment. While this Court endeavored to apply a judicially created patch to the FDPA's fundamental flaw, it lacked the authority to do so.

It is axiomatic that "[i]t is the legislature, not the court, which is to define a crime and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 93 (1820). Yet here, the application of the FDPA violated that fundamental principle by means of improper executive and judicial redrafting of the statute in order to avoid the statute's obvious unconstitutionality in light of *Ring*.

Despite *Ring*, the FDPA fails to provide for presentation of the aggravating factors to a grand jury, but instead explicitly leaves them to the exclusive discretion of the prosecutor. As a result, this Court's decision denying Mr. Sampson's pre-trial motion on this issue, *see Sampson*, 245 F. Supp. 2d 327 (D. Mass. 2003), and in turn permitting the Government to unilaterally rewrite the FDPA and submit the aggravating factors to the grand jury for inclusion in the indictment, was erroneous. The FDPA must be declared unconstitutional, and Mr. Sampson's death sentence reversed.

**B.      The Federal Death Penalty Is Unconstitutional because It Is Rarely Sought or Imposed and, Therefore, Operates in a Fundamentally Arbitrary and Capricious Manner.**

The essence of the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. at 309–10, is captured in Justice Stewart's concurring opinion:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . . I simply conclude that the Eighth and Fourteenth

> Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

In *Furman*, arbitrariness and caprice were seen as the inevitable side-effects of a rarely imposed punishment of death. After 21 years of experience, it is now apparent that the federal death penalty is sought and imposed far more rarely than in the cases examined by *Furman*. Being sentenced to death in the federal system is truly akin to being struck by lightning; indeed, no meaningful basis may be discerned for distinguishing the cases—even among the most extreme—where death is imposed from cases in which it is not.

This Court was presented in the summer of 2003 with information covering nearly 15 years of data regarding the operation of the federal death penalty. At that time, there had been more than 1,700 federal defendants exposed to a potential sentence of death. Of that number, a total of 304 defendants were actually authorized for capital prosecution. By the summer of 2003, 235 of those authorized cases has been concluded. The overwhelming majority ended without a sentence of death being imposed. Of the 32 occasions (involving 31 defendants) where a federal jury actually imposed a sentence of death, five have been reversed on appeal and one was set aside via executive clemency. At the time, there were 24 defendants on the federal death row at Terre Haute in various stages of the direct appeal or post-conviction process. The percentages reflected by the above numbers have not substantially changed in the interim.

In *Furman*, the Supreme Court found the death penalty to be an arbitrary, capricious, and decidedly "unusual" infringement of Eighth Amendment protections. The very infrequency with which the death penalty was sought and imposed served to guarantee arbitrary and capricious application of the ultimate penalty. This conclusion was reached on the basis of a showing that fewer than 20% of defendants charged with capital crimes were actually sentenced to death. In the federal system, the figure is lower by a factor of 10. In fact, far fewer than 20% of those

- 147 -

eligible for federal capital punishment are even exposed to the death penalty by way of capital authorization, let alone actually sentenced to death.

Under an analysis that was persuasive to the Supreme Court in *Furman*, the federal death penalty is sought and imposed in an arbitrary, capricious, and "unusual" manner. Accordingly, the federal death penalty, is unconstitutional and the notice of aggravating factors in this case must be dismissed.

C.    **The Federal Death Penalty Is Unconstitutional Because No Principled Basis Exists To Distinguish Between Cases in which the Death Penalty is Imposed and Cases in which It Is Not.**

The Supreme Court has held that the constitution will not tolerate sentence that are imposed in an arbitrary or capricious manner. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the "flip side" of this approach, insisting "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal juries have imposed the death penalty *vel non*, or indeed which cases are allowed to plead out to terms of life imprisonment or less. All cases eligible for the federal death penalty are by their own terms horrible, and all involved the infliction of agony on victims and survivors; yet for indiscernible reasons, some defendants were sentenced to death while the overwhelming majority were not. If any basis can be distinguished, it is race and region. Fairness and consistency are the opposite of arbitrariness and capriciousness. In the demonstrated absence of fairness and consistency, the federal death penalty must be set aside.

**D.    The Death Penalty Is Unconstitutional because, as a System, It Is Sought on the Invidious Basis of Race and the Irrational Basis of Geography.**

On September 12, 2000, prior to Mr. Sampson's trial before this Court, the Department of Justice released a comprehensive study of how the federal death penalty was administered from 1988 to 2000. A complete copy of the report was filed with this Court during trial. The Justice Department completed a supplemental report on June 6, 2001, which was also filed with this Court during trial. The essence of the studies' findings was that the federal death penalty had been disproportionately sought against minorities and irrationally sought on a regional basis. As reported in the studies, after 12 years of discriminatory and irrational charging decisions, federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic, and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece. No other jurisdiction, at the time of the studies' release, had sentenced more than single defendant to death. Moreover, the U.S. Attorney and Justice Department authorization rates are much higher in cases involving white victims than in cases involving minority victims.

These facts give rise to both Fifth Amendment and Eighth Amendment claims, as well as non-constitutional claims under 18 U.S.C. § 3593. Mr. Sampson asserts that each of these constitutional and non-constitutional claims demand relief in this § 2255 motion.

**E.    The Federal Death Penalty Is Unconstitutional because of the Probability that Its Continued Enforcement Will Lead to the Execution of a Meaningful Number of Innocent People.**

The dead can never be exonerated. The issue posed is whether our Constitution can tolerate the appreciable risks of executing the innocent. Only the most naïve would take the position that the American justice system is infallible and free from the possibility of error.

- 149 -

Again and again, defendants have been wrongfully convicted and sentenced to death, only to be later exonerated. In most cases, those wrongfully condemned had their wrongful convictions and sentenced repeatedly reviewed and affirmed at many judicial levels. The numbers of demonstrably innocent people convicted and sentenced to death give rise to the overwhelming probability that some of those executed since the death penalty was reinstated in 1976 were likely to be wholly innocent of the crimes for which they were convicted and executed. To allow the machinery of death to grind inexorably onward, in the face of incontrovertible proof that our system convicts and condemns innocents to death is unconscionable and violative of at least the Fifth and Eighth Amendments.

**F.     The Death Penalty Is Unconstitutional because It Operates as a *Per Se* Denial of Due Process in All Cases.**

Justice Stevens, the longest serving member on the Supreme Court, recently renounced his long-held view that the death penalty could be squared with the Constitution:

> I have relied on my own experience in reaching the conclusion that the imposition of the death penalty represents "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State [is] patently excessive and cruel and unusual punishment violative of the Eighth Amendment.

*Baze v. Rees*, 128 S. Ct. 1520, 1551 (2008). Following Justice Stevens lead, this Court should declare the federal death penalty unconstitutional.

**X.     The Cumulative Effect of the Errors Discussed in this § 2255 Motion Demand Relief.**

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief regardless of whether the effect of individual errors warrants relief. *See United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007) ("We do not dispute the legal premise on which this

[cumulative error] argument rests."); *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993) ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect. In other words, a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." (citations omitted)).[48]

Each of the above-described claims of constitutional error stand on their own and independently require relief. If this Court finds that Petitioner is not entitled to relief based on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair trial and the heightened procedural safeguards constitutionally required in capital cases, under the Fifth, Sixth, and Eighth Amendments. Conversely, if the court finds cumulative error or prejudice, it eliminates the need to analyze the individual prejudicial effect of each error or deficiency.[49] Moreover, if the court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the

---

[48] *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996) (cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); *Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995) (granting relief for cumulative prejudicial effect of counsel's deficient performance); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (granting relief for cumulative effect of errors including counsel's failure to present mitigating evidence, the court's refusal to admit exculpatory evidence, and improper sentencing phase instructions); *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors"; Strickland "clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced").

[49] *See, e.g., Mak*, 970 F.2d at 622 ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [relief]").

existence of prejudice," relief must be granted. *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting *O'Neal v. McAninch*, 513 U.S. 432 (1995)).

## XI.    Mr. Sampson Is Entitled to an Evidentiary Hearing.

Section 2255 provides that "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255 (emphasis added). *See Owens v. United States*, 483 F.3d 48, 60–61 (1st Cir. 2007) (emphasizing "conclusively"). Accordingly, "[a] district court may not deny a prisoner an evidentiary hearing simply because the court believes that the prisoner's allegations as stated in the habeas corpus petition are untrue." *Id.* at 60 (finding the district court abused its discretion in refusing to grant an evidentiary hearing, and remanding for an evidentiary hearing). *See United States v. Rodriguez*, 929 F.2d 747, 749–50, 753 (1st Cir. 1991) (remanding for an evidentiary hearing because, *inter alia*, Petitioner's allegations "are not inherently incredible, and are not conclusory").

Here, the petition alleges colorable Fifth, Sixth and Eighth Amendment claims, including numerous facts outside of the record which, if proved, would entitle Mr. Sampson to relief. Under *Owens, Rodriguez*, and Rule 8 of the Rules Governing § 2255 Proceedings, Mr. Sampson is entitled to an evidentiary hearing on all his claims. Although analysis of the scope of such a hearing will have to await the Government's responsive filings, at this juncture and to avoid any claim of waiver, Mr. Sampson requests that he be afforded a hearing on any disputed fact, which, if proven individually or in combination with other facts, would entitle him to relief.

- 152 -

FILED UNDER SEAL

## CONCLUSION

Mr. Sampson respectfully requests that the Court grant his motion for § 2255 relief. Mr. Sampson further asks this Court:

1. To require the Government to file an Answer to this § 2255 motion in the form prescribed by Rule 5 of the Rules Governing § 2255 Proceedings;

2. To permit Mr. Sampson to utilize the processes of discovery as set forth in Rule 6 of the Rules Governing § 2255 Proceedings

3. To permit Mr. Sampson to amend this § 2255 motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this motion, and to find that the amendment relates back to the date of the filing of this petition;

4. To conduct an evidentiary hearing to establish the facts he alleges herein and to resolve any factual disputes raised by the Government's Answer to this motion;

5. To permit oral argument as appropriate and required;

6. To vacate Mr. Sampson's conviction and sentence, and to order new proceedings to cure any constitutional defects in the prior proceedings; and,

7. To grant such further and additional relief as this Court deems in the interests of justice.

GARY LEE SAMPSON
By his attorneys,

William E. McDaniels, Esq.
Jennifer G. Wicht, Esq.
Thomas P. Windom, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

- 153 -

FILED UNDER SEAL

Susan K. Marcus, Esq.
Neighborhood Defender Service
317 Lenox Avenue, Tenth Floor
New York, NY  10027
(212) 876-5500

J. Martin Richey, Esq.
Elizabeth L. Prevett, Esq.
Federal Defender's Office
408 Atlantic Avenue, Third Floor
Boston, MA  02110
(617) 223-8061

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I, J. Martin Richey, Assistant Federal Public Defender, hereby certify that a true copy of the above document was served upon Assistant United States Attorney George W. Vien by hand delivery on May 11, 2009.

_____
Martin Richey, Esq.

## VERIFICATION

We, William E. McDaniels, Susan K. Marcus, and J. Martin Richey, hereby declare as follows:

William E. McDaniels is an attorney admitted to practice in the District of Columbia and Maryland, and before the Supreme Court of the United States, various other federal circuit and district courts, and *pro hac vice* before this Court.

Susan K. Marcus is an attorney admitted to practice in New York state and the Southern District of New York, and *pro hac vice* before this Court.

J. Martin Richey is an attorney admitted to practice in the District of Massachusetts, the United States Court of Appeals for the First Circuit, and the Supreme Court of the United States.

We were appointed by this Court to represent Gary Lee Sampson for purposes of proceedings under 28 U.S.C. § 2255. Mr. Sampson is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

We declare that to the best of our abilities based on the on-going investigation to date that the factual contents of the foregoing motion are true or believed to be true on information and belief. The sources of the information and belief include, but are not limited to, interviews with witnesses, official court records, various documents received pursuant to federal and state public record laws, consultation with subject matter experts, and information and knowledge of other lawyers, investigators, and experts consulted in connection with the preparation and presentation of this motion. We make this verification on Mr. Sampson's behalf because these matters are more within our knowledge than his, and because we are permitted to do so by Rule 2(b)(5) of the Rules Governing § 2255 Proceedings for the United States District Courts.

- 2 -

In conformity with 28 U.S.C. § 1746, we declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date, May 11, 2009.

William E. McDaniels, Esq.　　Susan K. Marcus, Esq.　　J. Martin Richey, Esq.

- 2 -