UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 01-10384-MLW |
| | ) | |
| GARY LEE SAMPSON | ) | |

MEMORANDUM AND ORDER ON SUMMARY DISMISSAL

WOLF, D.J.                                                    October 20, 2011

I.  SUMMARY

On October 24, 2001, a federal grand jury charged Gary Lee
Sampson with two counts of carjacking resulting in death in
violation of 18 U.S.C. §2119(3). As described in United States v.
Sampson, 335 F. Supp. 2d 166, 174-75 (D. Mass. 2004), the charges
arose out of the murders of Philip McCloskey and Jonathan Rizzo by
Sampson in Massachusetts in July, 2001. Sampson also killed Robert
Whitney in New Hampshire and carjacked William Gregory in Vermont
in July, 2001. Those crimes, while not charged in this case, were
considered nonstatutory aggravating factors for sentencing
purposes. The maximum penalty for the charged crimes was death.
See §2119(3).

Sampson pled guilty to the charged offenses. After a trial,
a jury unanimously decided that he should be sentenced to death on
both counts. The court sentenced Sampson to death on January 29,
2004. Sampson appealed unsuccessfully.

Following his appeal Sampson had a constitutional right to

seek relief from his conviction and death sentence through a writ of habeas corpus, which for federal prisoners is codified in 28 U.S.C. §2255. Section 2255 is a vehicle for determining, among other things, whether a defendant was deprived at trial of his constitutional right to the effective assistance of counsel. For such a claim, a motion under §2255 is often the sole avenue for relief. See, e.g., United States v. Martins, 413 F.3d 139, 155 (1st Cir. 2005)(citing United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993)). Proceedings under §2255, therefore, serve an important function in our system of criminal justice.

Sampson must satisfy a "'highly demanding' and 'heavy burden'" to justify relief based on ineffective assistance of counsel. Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006)(quoting Williams v. Taylor, 529 U.S. 362, 393 (2000)). He faces similar challenges with respect to his other allegations. The court is, however, required by statute, by the Rules Governing Section 2255 Proceedings for the United States District Courts (the "§2255 Rules"), and by a substantial body of precedent to give careful attention to each of Sampson's claims. Such attention is particularly required in capital cases, "in which avoidance of error has a very high premium." See Trapp v. Spencer, 479 F.3d 53, 62 (1st Cir. 2007).

Following some preliminary litigation, Sampson filed a First Amended Motion for a New Trial and to Vacate, Set Aside, and

2

Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. §2255 and/or Rule 33 of the Federal Rules of Criminal Procedure (the "Amended §2255 Motion"), in which he claims, among other things, that his constitutional rights were violated because he received ineffective assistance of counsel. The government has requested that the court summarily dismiss all of the claims in the Amended §2255 Motion.

The court will summarily dismiss some but not all of Sampson's claims. As explained in detail in this Memorandum, summary dismissal under §2255 Rule 4(b) is appropriate only in limited circumstances, specifically only when "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." §2255 Rule 4(b); see 28 U.S.C. §2255(b)(permitting dismissal only when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"). Potentially meritorious claims that allege specific facts, that are based on information outside the presiding judge's knowledge and the records of the case, and that are not barred by procedural considerations may not be summarily dismissed, even if the ultimate likelihood of success on the merits appears relatively low to those familiar with the trial.

In this case, many of Sampson's claims will be summarily dismissed. Specifically, the court will dismiss Sampson's claims

3

that he was denied effective assistance of counsel on the basis of trial counsel's failure to advise him to plead guilty prior to the Supreme Court's June 24, 2002 decision in Ring v. Arizona, 536 U.S. 584 (2002), on the basis of counsel's advice that he plead guilty to the Second Superseding Indictment after the Ring decision, and on the basis of counsel's failure to move for an immediate mistrial when the bloody shirts of the victims were inadvertently exposed and may have been seen by some jurors (Claims III(G), (H) and (M), respectively). The court will also dismiss Sampson's claims that he is entitled to a new trial because the government failed to disclose certain exculpatory evidence, and abused the grand jury process (Claims V and VI, respectively). In addition, the court will dismiss Sampson's challenges to the constitutionality of the carjacking statute, 18 U.S.C. §2119, and the Federal Death Penalty Act ("FDPA") (Claims VIII and IX, respectively). As to each of these claims, the court concludes that the motion, attached exhibits and the record of the prior proceedings "conclusively show that the prisoner is entitled to no relief." See 28 U.S.C. §2255(b).

However, other claims cannot be conclusively resolved based on the motion and the record before the court. For example, Sampson alleges that his trial counsel failed to give his medical experts certain medical records that, if considered, would have led to additional investigation and, in turn, would have led to

4

substantial additional evidence of brain abnormality, an important
mitigating factor to be considered by the sentencing jury in a
capital case (Claim III(C)). See, e.g., Porter v. McCollum, 130 S.
Ct. 447, 454 (2009)(per curiam). On the present record, the court
cannot conclude that Sampson's characterization of these events is
inaccurate. Nor can it conclude that Sampson was not prejudiced at
trial by the absence of this information. Similarly, the court
cannot conclude that Sampson is not entitled to relief based on his
claims that his counsel were ineffective because their
investigation and presentation of mitigating evidence was
inadequate in other respects, because their investigation and
impeachment of a government witness was inadequate, because they
did not present evidence to the jury that Sampson's demeanor in
court was caused by medication, or because they did not raise a
question with the court about Sampson's competency (Claims
III(B),(D)-(F), (I)-(L) and (N)). Nor can the court conclude that
Sampson is not entitled to relief based on the cumulative effect of
some or all of these alleged errors (Claim X).

     As to these claims, dismissal without an expansion of the
record which would permit the accuracy of Sampson's claim to be
tested would be contrary to the requirements of 28 U.S.C. §2255(b)
because Sampson's "allegations are not implausible, and because
they could, if true, entitle him to relief." Owens v. United
States, 483 F.3d 48, 60 (1st Cir. 2007). Therefore, the court must

                                5

permit discovery and expansion of the record and, if necessary,

hold an evidentiary hearing to resolve genuine disputes of material

fact.   See Blackledge v. Allison, 431 U.S. 63, 82 n.25 (1977);

United States v. Butt, 731 F.2d 75, 78 (1st Cir. 1984); De Vincent

v. United States, 602 F.2d 1006, 1010 (1st Cir. 1979).

Where courts have dismissed colorable §2255 claims, the First

Circuit has commonly remanded the case for further proceedings.

See, e.g., Owens, 483 F.3d at 60-61, 70; Dziurgot v. Luther, 897

F.2d 1222, 1227 (1st Cir. 1990). A remand at any stage of the

proceeding can cause significant delay in resolving a capital case,

where finality is both important and often elusive.   See, e.g.,

Sears v. Upton, 130 S. Ct. 3259, 3267 (2010)(Supreme Court vacating

judgment in capital case seventeen years after conviction on the

basis of ineffectiveness of counsel, where state post-conviction

court did not apply proper prejudice standard); Porter, 130 S. Ct.

at 448 (granting habeas relief more than twenty years after

sentencing phase of capital trial on grounds of ineffective

assistance of counsel, where state supreme court unreasonably

concluded that defendant was not prejudiced by counsel's failures);

Rompilla v. Beard, 545 U.S. 374, 389, 393 (2005)(requiring retrial

of penalty phase of capital case or stipulation to life sentence

for a murder committed in 1988, where state court erroneously found

counsel had adequately investigated mitigating evidence); Wiggins

v. Smith, 539 U.S. 510, 535-36 (2003)(finding investigation into

6

mitigating evidence was constitutionally inadequate and prejudiced defendant in 1989 capital case); Scott v. Schriro, 567 F.3d 573, 577 (9th Cir. 2009)(per curiam)(remanding a case for an evidentiary hearing approximately eighteen years after conviction). Accordingly, it is essential that the court make decisions that are properly informed, legally correct, and do not require reversal and remand on appeal.

For the reasons stated below, at the appropriate time an order will enter allowing the Request for Summary Dismissal as to seven of Sampson's claims and sub-claims and denying it with regard to the remainder.

II. BACKGROUND

A. Summary of Evidence

The evidence at trial proved the following chronology of events.

Gary Lee Sampson was born on September 29, 1959, and spent his childhood in Abington, Massachusetts. He relocated to New Hampshire in 1979. Between 1979 and 1995, he spent much of his time in prison, after which he was released on parole. In 1997 and 1998, he was charged with several new offenses, including a burglary that could have resulted in a substantial prison sentence. While released on bail, he fled from New Hampshire to North Carolina in late 1998. He worked for a time in North Carolina and then, in May, 2001, embarked on a series of bank robberies. In

July, 2001, he returned to Massachusetts by bus. On July 23, 2001, while in Abington, he called the Boston office of the FBI in an attempt to turn himself in. The FBI disconnected the call and, consequently, failed to take him into custody.

On July 24, 2001, Philip McCloskey was sixty-nine years old. He had a history of heart problems and shortness of breath. That day, Sampson was hitchhiking in Weymouth, Massachusetts, and McCloskey picked him up. After seeing a police officer in the vicinity of the car, Sampson pulled out a knife and ordered McCloskey to keep driving. Sampson compelled McCloskey to drive to Marshfield, Massachusetts and then to pull over near a wooded area. Sampson forced McCloskey to walk into the wooded area and up a very steep hill. Sampson attempted to tie McCloskey with a belt and then attacked McCloskey with the knife. Sampson inflicted twenty-four separate wounds, including wounds to McCloskey's neck, chest, abdomen, and back. One of the wounds to the neck, a nearly eight inch incision, damaged the trachea and completely severed the carotid artery. According to Sampson, McCloskey exclaimed, "Ah, I'm dying," shortly before Sampson "almost decapitated him." Trial Ex. CC at 8. After the killing, Sampson took McCloskey's wallet and tried, but failed, to take McCloskey's car.

On July 27, 2001, Jonathan Rizzo was a nineteen-year-old college student. Sampson was again hitchhiking, this time in Plymouth, Massachusetts. Rizzo picked up Sampson and, five or ten

minutes later, Sampson pulled out his knife and forced Rizzo to drive him to Abington. Sampson directed Rizzo to park the car and to carry Sampson's belongings into a wooded area. Sampson tied Rizzo to a tree and gagged him by stuffing a sock into his mouth. Attacking Rizzo with the knife, Sampson inflicted numerous wounds to Rizzo's neck and chest. The knife severed Rizzo's jugular vein and trachea and pierced his heart, lungs, and liver. At least seven of the wounds would have been independently, rapidly fatal. According to Sampson, this killing "was premeditated." Trial Ex. 1B at 43. Sampson took Rizzo's car and money.

Sampson subsequently drove to New Hampshire and broke into a vacation home on Lake Winnipesaukee. On July 30, 2001, Robert "Eli" Whitney, the fifty-eight-year-old caretaker of the property, discovered Sampson. Sampson threatened Whitney with a knife and tied him to a chair. Sampson wrapped a nylon line around Whitney's neck and strangled him to death. According to Sampson, Whitney "died slowly" over the course of about five minutes. See Trial Ex. 1B at 38. Sampson took Whitney's car and drove to Vermont, where the car broke down.

Sampson again began to hitchhike. On July 31, 2001, William Gregory picked up Sampson on the side of the road. Sampson pulled out his knife and ordered Gregory to park the car in a secluded area. Gregory pulled the car into a rest area, jumped out, and ran away. Sampson tried to run him over with the car. This attempt to

9

kill Gregory was unsuccessful, and Sampson drove away.

A short time later, Sampson broke into a house, called 911, and surrendered himself. He gave multiple detailed confessions and assisted police with the recovery of evidence. The government developed substantial forensic evidence linking Sampson to the crimes that he admitted.

## B. Federal Proceedings

In federal court, Sampson was charged with the carjackings of McCloskey and Rizzo. Because death resulted from both carjackings, the maximum statutory penalty was death. See 18 U.S.C. §2119(3). To represent Sampson in this case, the court appointed David Ruhnke, an attorney experienced in death penalty cases, as well as two other experienced attorneys, Robert Sheketoff and Stephanie Page, who had previously been appointed to represent Sampson in the Massachusetts state court case which was later dismissed in deference to the federal case.

The court denied a motion to dismiss the charges against Sampson. See United States v. Sampson, 275 F. Supp. 2d 49, 109 (D. Mass. 2003). Sampson pled guilty to both charges on September 9, 2003.

In accordance with the provisions of the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§3591-3598, a six-week penalty-phase trial was conducted. The jury unanimously decided that Sampson should be sentenced to death on both counts. The jury found numerous

10

aggravating factors, including that Sampson committed his crimes in an especially cruel and depraved manner, that McCloskey was particularly vulnerable due to infirmity, that Sampson killed Rizzo after substantial planning and premeditation, and that Sampson killed Whitney, carjacked Gregory, and robbed four banks. Of the mitigating factors enumerated on the verdict forms, the jury found several factors proven unanimously, including that Sampson would be sentenced to life in prison without possibility of release if he was not sentenced to death, that Sampson surrendered himself after committing the charged offenses, that Sampson's post-arrest statements led to the recovery of Rizzo's body and of physical evidence, that Sampson offered to plead guilty and accept a life sentence in February, 2002, and that Sampson pled guilty in September, 2003. Some, but not all, of the jurors found additional mitigating factors proven, including that Sampson attempted to surrender himself to the FBI before the killings (eight jurors), that Sampson cooperated with every investigating agency after his surrender (eleven jurors), that Sampson accepted responsibility for his crimes (five jurors), and that one or more people would suffer grief and loss if Sampson were executed (eleven jurors). No juror found that Sampson's capacity to conform his conduct to the requirements of the law was significantly impaired at the time of the killings, that he was under severe mental or emotional disturbance at those times, that he was mentally ill at those

times, that he was mentally ill at the time of trial, that he had a brain dysfunction at the time of trial, that he was verbally, emotionally, or physically abused as a child, or that he was remorseful for his conduct.

After the verdict, based on the information available, the court praised the performance of all counsel who participated in the case. See Dec. 23, 2003 Tr. at 29. The court denied Sampson's motion for a new trial. See United States v. Sampson, 332 F. Supp. 2d 325, 341 (D. Mass. 2004). The court sentenced Sampson to death on both counts on January 29, 2004. See United States v. Sampson, 300 F. Supp. 2d 275, 276 (D. Mass. 2004).

The United States Court of Appeals for the First Circuit affirmed the death sentence in May, 2007. See United States v. Sampson, 486 F.3d 13, 52 (1st Cir.), reh'g and reh'g en banc denied, 497 F.3d 55 (1st Cir. 2007). In doing so, the First Circuit noted that "Sampson has been ably represented by learned counsel" and that "[h]is positions have been vigorously asserted." Sampson, 486 F.3d at 52.

Sampson sought review by the United States Supreme Court. It denied his petition for a writ of certiorari on May 12, 2008. See Sampson v. United States, 553 U.S. 1035 (2008).

As required by 18 U.S.C. §3599, on June 25, 2008, shortly after the Supreme Court denied Sampson's request for review, the court appointed new counsel for post-conviction proceedings. See

12

June 25, 2008 Order at 8. The court subsequently denied without prejudice Sampson's request for discovery prior to the filing of the §2255 Motion. See May 6, 2009 Order at 2. On May 11, 2009, Sampson filed his §2255 Motion. The government filed a Request for Summary Dismissal of the entire §2255 Motion. It also requested discovery from Sampson, which the court denied without prejudice pending the outcome of the Request for Summary Dismissal. See March 1, 2010 Order at 4-5. On March 29, 2010, Sampson filed an Amended §2255 Motion. The government did not object to the amendment and again requested summary dismissal. See Gov't's Response to Pet'r's Mem. of Law Regarding Fed. R. Civ. P. 15.

Contained within the 250-page Amended §2255 Motion are eight distinct claims for relief, several of which include multiple sub-claims. On July 23, 2010, having submitted about 700 pages of text and approximately 220 exhibits, the parties completed their briefing on the Request for Summary Dismissal. The court held three days of hearings on the Request for Summary Dismissal from August 30 to September 1, 2010. At the conclusion of those hearings, the court expressed the tentative view that certain claims should be summarily dismissed and that others could not properly be decided without discovery, expansion of the record, and an evidentiary hearing if the evidence places material facts in dispute. See §2255 Rules 4, 6, 7, 8. Since that time, the court has received substantial additional briefing and conducted a series

13

of evidentiary hearings with respect to a claim (Claim IV) involving allegations of juror misconduct, which is being decided in a separate Memorandum and Order.

III. LEGAL STANDARDS

A. Summary Dismissal

The Rules Governing Section 2255 Proceedings for the United States District Courts provide a three-step process for deciding §2255 motions: preliminary review under Rule 4(b); review to determine the necessity of holding an evidentiary hearing after discovery and expansion of the record under Rules 6, 7, and 8(a);[1] and decision following an evidentiary hearing pursuant to Rule 8(c). In a March 1, 2010 Order, the court ruled that the government's Request for Summary Dismissal arises under Rule 4(b) and is essentially an aid to the court's preliminary review.

28 U.S.C. §2255(b) requires service of a motion on the government and a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Consistent with this principle, Rule 4(b) states:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the

---

[1]This process is essentially the equivalent of summary judgment in the civil context. See Blackledge, 431 U.S. at 80-82 & n.25; Figueroa Almonte v. United States, 915 F.2d 1556, at *4 (1st Cir. 1990)(per curiam)(table); De Vincent, 602 F.2d at 1010; see also Puglisi v. United States, 586 F.3d 209, 213-15 (2d Cir. 2009).

> judge must dismiss the motion and direct the clerk to
> notify the moving party. If the motion is not dismissed,
> the judge must order the United States attorney to file
> an answer, motion, or other response within a fixed time,
> or to take other action the judge may order.

§2255 Rule 4(b). Under Rule 4(b), a "§2255 motion which is facially inadequate may be summarily denied." Butt, 731 F.2d at 77 (citing Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir. 1974)); see David v. United States, 134 F.3d 470, 477 (1st Cir. 1998)(citing Rule 4(b)). Facially inadequate claims include those "which state grounds for relief not cognizable at all under §2255, as well as motions which contain only 'bald' assertions of cognizable claims without adequate supporting factual allegations." Moran, 494 F.2d at 1222 (footnote omitted); see Butt, 731 F.2d at 77 (holding facially inadequate claims include those which are "wholly incredible" or which state "conclusions without specific and detailed supporting facts"). "[A] district court can often 'test' the adequacy of accompanying factual allegations by assuming arguendo their truth, and then assessing their sufficiency in light of the relevant constitutional standards and the record." Moran, 494 F.2d at 1222; see Mack v. United States, 635 F.2d 20, 27 (1st Cir. 1980)("The 'district court may deny a hearing so long as it does so on the basis of the facts as alleged by the defendant and so long as it would be within the court's discretion to do so were the facts alleged by the defendant true.'" (quoting United States v. Fournier, 594 F.2d 276, 279 (1st Cir. 1979))). However, the

court "need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets." United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993)(citing Mack, 635 F.2d at 27).

In addition, under Rule 4(b), "[f]acially adequate §2255 claims may be summarily denied when the record conclusively contradicts them." Butt, 731 F.2d at 77 (citing Domenica v. United States, 292 F.2d 483, 484 (1st Cir. 1961)); see Ouellette v. United States, 862 F.2d 371, 377 (1st Cir. 1988)(indicating Rule 4(b) permits rejection of claims without a hearing where claims are conclusively contradicted by the record). This approach may be applied only to claims "predicated on facts inside the record, because only as to these can a district court know definitely, without a hearing, whether the petitioner's facially adequate supporting allegations are in fact untrue." Moran, 494 F.2d at 1222 n.1; see Sanders v. United States, 373 U.S. 1, 19-20 (1963); Machibroda v. United States, 368 U.S. 487, 494-95 (1962); Dziurgot, 897 F.2d at 1225. When, as here, a §2255 motion "is presented to the judge who presided at the [movant's] trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." McGill, 11 F.3d at 225.

In essence, a §2255 motion may be summarily dismissed "if the [movant's] allegations, accepted as true, would not entitle [him]

16

to relief, or if the allegations cannot be accepted as true because 'they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Dziurgot, 897 F.2d at 1225 (quoting Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1989)); see Owens, 483 F.3d at 57 (same); McGill, 11 F.3d at 226 (same); see also United States v. Giardino, 797 F.2d 30, 31-33 (1st Cir. 1986).

Doubts at this stage must be resolved in favor of the defendant. See 28 U.S.C. §2255(b); Owens, 483 F.3d at 61 (emphasizing that dismissal without an evidentiary hearing is appropriate only when the allegations and files and records conclusively show that relief is unwarranted); Giardino, 797 F.2d at 32-33 (reversing summary dismissal where the court could not conclusively determine that the defendant was entitled to no relief and requiring the district court to "take further steps to determine the truth and significance of what is alleged"). This is particularly appropriate with respect to claims of ineffective assistance of counsel, the facts of which generally cannot be investigated and developed prior to the §2255 process. See Massaro v. United States, 538 U.S. 500, 504-05 (2003)(holding §2255 is the preferred method to raise ineffective assistance claims because factual development beyond the trial record will often be necessary to resolve the claim); United States v. Rodriguez, 457 F.3d 109, 117-18 (1st Cir. 2006)(same).

## B. Ineffective Assistance of Counsel

### 1. Generally

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel," but it "does not guarantee a defendant a letter-perfect defense or a successful defense." Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993). "Not every error amounts to ineffectiveness." Cofske v. United States, 290 F.3d 437, 441 (1st Cir. 2002).

"To succeed on a claim of ineffective assistance of counsel under the Sixth Amendment, [a movant] must show both deficient performance by counsel and resulting prejudice." Peralta v. United States, 597 F.3d 74, 79 (1st Cir. 2010)(citing Strickland v. Washington, 466 U.S. 668, 687 (1984)); see Argencourt v. United States, 78 F.3d 14, 16 (1st Cir. 1996). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "The burden is on the petitioner to demonstrate ineffective assistance by a preponderance of the evidence." Lema, 987 F.2d at 51.

"In order to satisfy the 'deficient performance' prong, [a movant] must show that his trial counsel's representation 'fell below an objective standard of reasonableness.'" Peralta, 597 F.3d at 79 (quoting Strickland, 466 U.S. at 688). The court must

18

determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge in a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. "The defendant, as a result, must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Phoenix v. Matesanz, 233 F.3d 77, 81 (1st Cir. 2000)(internal quotations omitted); see Prou v. United States, 199 F.3d 37, 47-48 (1st Cir. 1999)("[T]he petitioner must show that his attorney's representation was objectively unreasonable under prevailing professional norms and cannot be reconciled with sound strategy."); Arroyo v. United States, 195 F.3d 54, 55 (1st Cir. 1999)(stating that "counsel is not incompetent merely because he may not be perfect," because the relevant inquiry was whether the omitted suppression motion "was so obvious and promising that no competent lawyer could have failed to pursue it"). Therefore, "as long as counsel performed as a competent lawyer would, his or her detailed subjective reasoning is beside the point." Cofske, 290 F.3d at 444; see Abrante v. St. Amand, 595 F.3d 11, 19 (1st Cir. 2010)(holding that an attorney's performance is considered deficient only when, "'given the facts known at the time, counsel's

19

choice was so patently unreasonable that no competent attorney would have made it'" (quoting Knight, 447 F.3d at 15)); Paul v. United States, 534 F.3d 832, 837 (8th Cir. 2008)(citing Cofske for the proposition that the First Circuit, unlike some other circuits, permits an assessment of reasonableness "solely by reference to strategy that a hypothetical attorney might have pursued under the circumstances, without any inquiry as to counsel's actual strategy"); Dugas v. Coplan, 428 F.3d 317, 328 n.10 (1st Cir. 2005)(citing Cofske and emphasizing that the Strickland standard is objective).

In evaluating this first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides." Id.; see Bobby v. Van Hook, 130 S. Ct. 13, 16-17 & n.1 (2009)(per curiam)(rejecting reliance on ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases because the guidelines were announced eighteen years after trial and should be regarded as evidence of what reasonable capital defense counsel would do rather than as inexorable commands, so long as they are not overly specific); Rompilla, 545 U.S. at 387 (relying on ABA Standards for Criminal Justice to find performance objectively unreasonable); Wiggins, 539

U.S. at 524 (citing standard local practice in capital cases and ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as sources of prevailing professional standards); see also United States v. Natanel, 938 F.2d 302, 310 (1st Cir. 1991) ("[N]o particular set of rules can be established to define effective assistance, as hard-and-fast rules would inevitably restrict the independence and latitude counsel must have in making tactical and strategic decision.").[2]

As to the second prong, "[u]nder Strickland, a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Porter, 130 S. Ct. at 453 (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see Peralta, 597 F.3d at 79-80. "When a defendant challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have

---

[2]The 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (the "2003 ABA Guidelines") were approved on February 10, 2003, after Sampson was initially charged but well before trial in this case. See 2003 ABA Guidelines at ii. Moreover, the 2003 ABA Guidelines represent the product of a drafting process that began in April, 2001, and, presumably, codify professional norms as they existed during that drafting period. Therefore, although the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the "1989 ABA Guidelines") are relevant, the court is guided primarily by the 2003 ABA Guidelines.

concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

## 2. Regarding Mitigation Evidence

When assessing an attack on a capital sentencing based on trial counsel's alleged failure to investigate, discover, and present additional mitigation evidence, the proper questions are: (1) whether the investigation conducted by trial counsel was objectively unreasonable; and (2) whether the resulting lack of evidence was prejudicial. See Sears, 130 S. Ct. at 3265; Wiggins, 539 U.S. at 522-23, 534-35.

Trial counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Counsel's obligation is "to conduct a thorough investigation of the defendant's background." Williams, 529 U.S. at 396; see Porter, 130 S. Ct. at 452; Wiggins, 539 U.S. at 524. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla, 545 U.S. at 383; see Bobby, 130 S. Ct. at 19 ("[T]here comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."); Wiggins, 539 U.S. at 533 ("[W]e emphasize that Strickland does not require counsel to investigate

22

every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing."); see also Dugas, 428 F.3d at 328. Counsel may limit their investigation "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful." Strickland, 466 U.S. at 691. Counsel is not, however, relieved of the duty to investigate merely because a defendant is uncooperative. See Porter, 130 S. Ct. at 453.

Prejudice is assessed by "'consider[ing] the totality of the available mitigation evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding - and reweigh[ing] it against the evidence in aggravation.'" Sears, 130 S. Ct. at 3266 (quoting Porter, 130 S. Ct. at 453-54). "[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker." Id. (quoting Strickland, 466 U.S. at 700). However, the possibility of prejudice is not limited only to those cases in which "little or no mitigation evidence [was] presented." See id. (internal quotation marks omitted). Rather, prejudice can be found to exist in cases "in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase," but failed to present additional mitigation evidence due to a constitutionally deficient investigation by trial counsel. See id. Such an inquiry requires a "probing and fact-specific"

23

analysis. Id.

C. Procedural Default

As the First Circuit has explained:

A significant bar on habeas corpus relief is imposed when a prisoner did not raise claims at trial or on direct review. In such cases, a court may hear those claims for the first time on habeas corpus review only if the petitioner has "cause" for having procedurally defaulted his claims, and if the petitioner suffered "actual prejudice" from the errors of which he complains.

Owens, 483 F.3d at 56 (citations omitted); see Oakes v. United States, 400 F.3d 92, 95 (1st Cir. 2005)("If a federal habeas petitioner challenges his conviction or sentence on a ground that he did not advance on direct appeal, his claim is deemed procedurally defaulted."); Knight v. United States, 37 F.3d 769, 774 (1st Cir. 1994)("Normally, failure to raise a constitutional issue on direct appeal will bar raising the issue on collateral attack unless the defendant can show cause for the failure and actual prejudice."); see also Berthoff v. United States, 308 F.3d 124, 127-28 (1st Cir. 2002); Goldman v. Winn, 565 F. Supp. 2d 200, 213-14 (D. Mass. 2008).

However, "[c]onstitutionally ineffective assistance of counsel constitutes cause sufficient to excuse a procedural default." Prou, 199 F.3d at 47. In addition, there is an exception to the procedural default rule for claims of actual innocence supported by new evidence. See House v. Bell, 547 U.S. 518, 536-37 (2006); Owens, 483 F.3d at 56 n.6.

24

IV. CLAIMS THAT WILL BE DISMISSED

Seven of the claims or sub-claims in Sampson's Amended §2255 Motion will be dismissed.

A. Ineffective Assistance of Counsel Based on Trial Counsel's Failure to Advise Sampson to Plead Guilty Prior to June 24, 2002

Claim III(G) alleges trial counsel were ineffective because they unreasonably failed to consider whether the Supreme Court's forthcoming decision in Ring, 536 U.S. 584, would preclude imposition of the death penalty in this case and, therefore, unreasonably failed to advise Sampson to plead guilty before Ring was decided. Sampson alleges these failures were prejudicial because, had trial counsel recommended that Sampson plead guilty before Ring was decided, it is reasonably likely that Sampson would have done so and would then have become ineligible for the death penalty once Ring was decided. Taking Sampson's allegations as true, this claim fails as a matter of law because, even if trial counsel had considered advising Sampson to plead guilty prior to the decision in Ring, reasonable trial counsel could fail to know the outcome of Ring in advance and could reasonably decide not to advise a guilty plea in the absence of such knowledge.

Sampson alleges the following sequence of events, which are essentially consistent with the court's recitation of procedural history in Sampson, 245 F. Supp. 2d at 328. On January 11, 2002,

the Supreme Court granted certiorari in Ring. At that time, Sampson was subject to the grand jury's original October 24, 2001 indictment, to which Sampson had earlier pled not guilty. The original indictment did not allege any of the aggravating circumstances that must be proven for Sampson to be eligible for the imposition of the death penalty pursuant to the FDPA, which provides that those factors should be alleged in the government's notice of intent to seek the death penalty. See 18 U.S.C. §§3591(a)(2), 3592(c), 3593(a), (c)-(e). Trial counsel did not, at that time, recommend that Sampson enter a guilty plea, and Sampson, therefore, maintained his plea of not guilty.

On June 5, 2002, the grand jury returned the first superseding indictment, which did not substantively alter the charges. Trial counsel advised Sampson to enter a plea of not guilty, and, following their advice, he did so on June 14, 2002.

On June 24, 2002, the Supreme Court decided Ring, which overruled Walton v. Arizona, 497 U.S. 639 (1990), and held that the Constitution requires that the aggravating circumstances required to impose the death penalty must be found by a jury beyond a reasonable doubt. See Ring, 536 U.S. at 609. This court subsequently held that, in light of Ring, the aggravating circumstances required to impose the death penalty must be charged in the indictment. See Sampson, 245 F. Supp. 2d at 333. On August 5, 2002, trial counsel moved to withdraw Sampson's not guilty plea

26

and to enter a plea of guilty to the first superseding indictment, which, under Ring, could not have supported the death penalty. However, on August 8, 2002, the grand jury returned the second superseding indictment, which was sufficient to permit the death penalty under Ring. Sampson's motion to plead guilty to the first superseding indictment was denied in early 2003. See id. at 339.

As Sampson frames his claim, he alleges that trial counsel's behavior was deficient based on a two-step argument: (1) trial counsel unreasonably failed to consider the implications of the forthcoming Ring decision; and (2) had trial counsel done so, the only reasonable course of action would have been to advise Sampson to plead guilty before Ring was decided. See Aug. 31, 2010 Tr. at 82 (clarifying claim). Sampson alleges he suffered prejudice because it is reasonably probable that: (1) Sampson would have pled guilty before Ring was decided (and, therefore, before the grand jury returned the second superseding indictment) if advised to do so; and (2) the court would not have permitted imposition of the death penalty if Sampson had pled guilty to a constitutionally deficient indictment. This claim fails as a matter of law at the second step of the deficient performance analysis because, even if trial counsel considered the pendency of Ring (as Sampson alleges they should have), they could reasonably fail to know the outcome of Ring and, absent a duty to make such a prediction, could reasonably recommend that Sampson plead not guilty.

Prior to Ring, the law clearly established that for Sixth Amendment purposes, aggravating circumstances in a capital case were sentencing factors rather than elements of the offense, even if death was only permitted after the finding of one or more aggravating factors. See Walton, 497 U.S. at 644, 648 (citing Ariz. Rev. Stat. Ann. §13-703 (1989)). In both Jones v. United States, 526 U.S. 227, 251 (1999), and Apprendi v. New Jersey, 530 U.S. 466, 496-97 (2000), the Court held that facts that increase the possible sentence are elements of the offense but carefully distinguished Walton on the ground that aggravating factors in capital cases only apply after conviction of a crime for which the maximum penalty is death. In Ring, the Court examined the same statutory scheme at issue in Walton, overruled Walton, and held that an aggravating circumstance necessary to impose the death penalty is an element of the offense that must be found by a jury. See Ring, 536 U.S. at 609.

In such circumstances, trial counsel had no duty to predict the outcome of Ring in advance. As a general matter, failure to anticipate a new rule of law is not deficient performance. See United States v. Fields, 565 F.3d 290, 296 (5th Cir. 2009)(holding that counsel need not anticipate changes in the law and that failure to predict outcome in United States v. Booker, 543 U.S. 220 (2005), was, therefore, not ineffective after Apprendi); Knox v. United States, 400 F.3d 519, 522 (7th Cir. 2005)("A failure to

28

anticipate shifts in legal doctrine cannot be condemned as objectively deficient."); Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995)(holding failure to anticipate outcome of a case pending before the Supreme Court was not unreasonable); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994)(holding attorney was not required to anticipate future decisions); Randolph v. Delo, 952 F.2d 243, 246 (8th Cir. 1991)(per curiam)(holding it was not unreasonable to fail to make a Batson challenge two days before that case was decided). Failure to anticipate the holding of Ring was particularly understandable, because, prior to Ring, Walton had been expressly excepted from the Court's evolving Sixth Amendment jurisprudence.[3] See Apprendi, 530 U.S. at 496-97; Jones, 526 U.S. at 251. It was, therefore, not clearly foreshadowed that Walton would be overruled rather than persist as an exception to Apprendi.[4] Moreover, the Supreme Court is typically reluctant to overrule prior precedent, particularly where the political branches have relied on precedent to craft legislation. See Dickerson v. United States, 530 U.S. 428, 443 (2000)(stating that overruling

_____

[3]Even the 2003 ABA Guidelines characterize Apprendi's holding as "stating that Walton remained good law." 2003 ABA Guidelines at 8 n.27.

[4]At least one exception to Apprendi remains: The First Circuit continues to recognize that the Supreme Court has not overruled Almendarez-Torres v. United States, 523 U.S. 224, 239-47 (1998), which results in an exception to Apprendi for prior convictions. See, e.g., United States v. LaFortune, 520 F.3d 50, 58 (1st Cir. 2008).

29

prior precedent requires some "special justification"); City of Boerne v. Flores, 521 U.S. 507, 536 (1997)(noting that, where political branches have relied on precedent, the Court will usually adhere to stare decisis principles); United States v. Mikos, 539 F.3d 706, 715 (7th Cir. 2008)(stating Federal Death Penalty Act was enacted based on Walton). For these reasons, reasonable trial counsel could have failed to predict the outcome of Ring with certainty.

Virgin Islands v. Forte, 865 F.2d 59 (3d Cir. 1989), a case cited by Sampson, does not alter this conclusion. In Forte, the Third Circuit held that it was objectively unreasonable for an attorney to fail to challenge a prosecutor's racially motivated peremptory challenges while Batson v. Kentucky, 476 U.S. 79 (1986), was pending. See 865 F.2d at 62-63. However, the court in that case stated that "there is no general duty on the part of defense counsel to anticipate changes in the law" and instead based its holding on the fact that the attorney had been specifically instructed by the defendant and by co-counsel to raise such a challenge but failed to do so without any reasonable excuse. See id. at 61-63. The Third Circuit expressly limited its holding to these "unique circumstances" and noted that "we are not holding that the trial attorney could be held to be ineffective if she had not on her own, even if she had known that Batson was pending, failed to object to the prosecutor's challenges." See id. at 62-

30

63. As there is no allegation that Sampson instructed his counsel
to preserve <u>Ring</u> issues or to assume a particular outcome in <u>Ring</u>,
<u>Forte</u> is not on point. <u>See</u> <u>id.</u> at 61-63.

Because trial counsel had no duty to accurately predict the
outcome of <u>Ring</u>, trial counsel could reasonably advise Sampson to
plead not guilty to the original and first superseding indictments.
The First Circuit has noted that competent counsel, without
predicting future changes in the law, may nevertheless have a duty
to challenge existing law in "unusual circumstances." <u>See</u> <u>Powell</u>
<u>v. United States</u>, 430 F.3d 490, 491 (1st Cir. 2005)(per curiam).
In an opinion later vacated for rehearing <u>en</u> <u>banc</u>, the Sixth
Circuit held that, where a change in law is likely but not certain,
counsel has a duty to create opportunities for a defendant to
benefit from the likely change. <u>See</u> <u>Nichols v. United States</u>, 501
F.3d 542, 546-47 (6th Cir. 2007)(holding that counsel unreasonably
failed, after <u>Apprendi</u>, to preserve a challenge to the
constitutionality of the sentencing guidelines), <u>reh'g en banc</u>
<u>granted and opinion vacated</u> (Jan. 3, 2008).[5]

Here, however, trial counsel had no duty to advise Sampson to
plead guilty in order to create the opportunity for a challenge to
existing law or to take advantage of possible changes in the law.

_____

[5]Ultimately, the Sixth Circuit denied relief in <u>Nichols</u>
based on a failure to show prejudice without reaching the issue
of counsel's duty to anticipate or advocate changes in the law.
<u>See</u> 563 F.3d at 251.

Unlike the challenges to sentencing calculations at issue in Powell and Nichols, a guilty plea prior to Ring would have involved significant costs to Sampson. Obviously, a guilty plea would have waived Sampson's right to a trial on the issue of guilt. Additionally, because the government did not file its Notice of Intent to Seek the Death Penalty until after Ring was decided, an unconditional guilty plea prior to Ring would have eliminated the opportunity to negotiate a plea in exchange for a sentence of life in prison. If Ring was not decided in Sampson's favor, the court would not necessarily have permitted withdrawal of the plea. See United States v. Padilla-Galarza, 351 F.3d 594, 597 (1st Cir. 2003)(affirming district court's denial of a motion to withdraw a guilty plea because a district court may deny such a motion after weighing a variety of factors). Thus, without a duty to predict correctly the outcome of Ring in advance, trial counsel could reasonably conclude that a guilty plea before Ring would involve substantial risk and promise only a speculative benefit.

To grant relief for such a claim, the court would have to impose on counsel a constitutional duty far in excess of the limited duty to advocate changes suggested by Powell, in which the First Circuit failed to find such a duty even in a situation where counsel's advocacy could not possibly have prejudiced the defendant. See Powell, 430 F.3d at 491. Even in Nichols, the now-vacated panel decision imposing a duty to challenge the sentencing

guidelines after Apprendi, the duty to preserve the Sixth Amendment challenge arose only where doing so imposed an insignificant cost. See Nichols, 501 F.3d at 547. For this reason, the decisions on which Sampson relies do not persuade the court that his trial counsel were obliged in this case to advise Sampson to plead guilty in order to create the opportunity for a constitutional challenge to existing law or to take advantage of potential changes in the law.

In view of the foregoing, it would not be unreasonable for counsel to consider the pendency of Ring but to conclude that Sampson should plead not guilty. Thus, an essential step in the deficient performance analysis fails as a matter of law, and this claim, taken as true, fails to justify relief under Strickland. This claim will be dismissed.

B. Ineffective Assistance of Counsel Based on Trial Counsel's Advice that Sampson Plead Guilty After June 24, 2002

Claim III(H) alleges trial counsel were ineffective by advising Sampson to plead guilty to the Second Superseding Indictment after the decision in Ring. Sampson alleges that, although Sampson had initially pled not guilty, on September 9, 2003, shortly before trial, Sampson entered a plea of guilty to both charges upon advice of trial counsel, without an agreement by the government not to seek the death penalty. This claim also

fails for failure to allege facts that, if true, would show deficient performance.

Regarding objectively unreasonable performance, Sampson must allege facts showing "that his attorney's representation was objectively unreasonable under prevailing professional norms and cannot be reconciled with sound strategy." Prou, 199 F.3d at 47-48. Sampson essentially cites three sources of authority for the proposition that the challenged act was objectively unreasonable: Florida v. Nixon, 543 U.S. 175 (2004); the 2003 ABA guidelines; and the Hill Declaration (an exhibit to the Amended §2255 Motion).

In 2004, in Nixon, the Supreme Court examined a case in which the defendant tricked his victim into giving him a ride in her car, took control of the car by force, drove the victim to a wooded area, tied her to a tree, and killed her to protect his identity. See Nixon, 543 U.S. at 179-80. The defendant made multiple confessions (one to his brother, another to his girlfriend), and the police gathered overwhelming physical and eyewitness evidence. See id. Although the defendant did not plead guilty, his attorney orally conceded the defendant's guilt during the guilt phase of the death penalty proceeding. Id. at 182-83. Because the defendant had been unresponsive when trial counsel attempted to discuss trial strategy with him, trial counsel made the concession without the express permission of the defendant. See id. The courts of Florida treated the matter as if counsel had entered the functional

equivalent of a guilty plea without consent and, therefore, found unreasonable performance. See id. at 188-89. The courts of Florida then presumed prejudice under United States v. Cronic, 466 U.S. 648 (1984). See id. The Supreme Court reversed and remanded on the grounds that the concession was not the functional equivalent of guilty plea and should have been analyzed under the Strickland standard only. See id. at 192.

Applying Nixon to this case is difficult for several reasons. First, regarding the reasonableness of advising a client to enter a guilty plea without an assurance that the government will not seek the death penalty, the decision points in two different directions. On the one hand, in footnote 6, the Court noted that "pleading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant" and that pleading guilty increases the likelihood that gruesome details will be presented during the sentencing phase. Nixon, 543 U.S. at 191 n.6. Elsewhere in the opinion, however, the Court indicated that avoiding a death sentence may be the best and only realistic outcome in capital cases and that counsel may reasonably decide to sacrifice guilt-phase defenses to avoid undermining penalty-phase mitigation arguments. See id. at 191-92. Second, because the defendant in Nixon did not plead guilty, footnote 6 is unnecessary to the decision and is, therefore, dicta. See id. at 191 n.6. Third, to the extent the Court evaluated

reasonableness of counsel's conduct, it did so under the standard of Cronic, which requires not merely proof that counsel was objectively unreasonable, but rather proof that counsel failed to function in any meaningful sense as the government's adversary. See id. at 190-91. Accordingly, it is difficult to draw meaningful guidance from Nixon one way or the other.

The other sources of authority cited by Sampson to show objective unreasonableness also are not persuasive. The language Sampson cites from the 2003 ABA Guidelines advises that counsel should "be extremely reluctant" to advise a defendant to plead guilty in these circumstances but establishes no definitive bar to doing so in all circumstances. See 2003 ABA Guidelines 10.9.2 cmt. Similarly, the Hill Declaration establishes that "there is a heavy default in favor of a guilt phase" and argues that guilt phase would have been helpful to Sampson, but it does not state that foregoing a guilt phase is never permissible. See Ex. D at 18. Although Sampson alleges (and the government does not dispute) that, at the time of trial, only two federal capital defendants had pled guilty and that neither avoided the death penalty, the fact that a particular defense tactic has failed twice before in different circumstances does not preclude the use of that tactic by reasonable counsel in every future case.

Countering Sampson's argument, the government has cited one case in which a court held that advising a defendant in a capital

case to enter a guilty plea is reasonable under <u>Strickland</u>. <u>See</u> <u>In re Elmore</u>, 172 P.3d 335, 345-46 (Wash. 2007). In <u>Elmore</u>, the Supreme Court of Washington held that it was objectively reasonable to advise a capital defendant to enter a guilty plea where: (1) there was no viable defense to guilt because the defendant gave a full confession; (2) two of the defense themes for sentencing were remorse and taking responsibility; (3) the defendant had a desire to plead guilty from the beginning in order to take responsibility and to spare his family from experiencing publicity associated with a trial. <u>See</u> <u>id.</u> Notably, the court in <u>Elmore</u> reached this conclusion despite submission by the defendant of affidavits from experts presenting essentially the same arguments as the Hill Declaration. <u>Compare</u> <u>id.</u> at 345, <u>with</u> Ex. D at 18.

Taking Sampson's alleged facts as true, and considering the record, trial counsel's advice to plead guilty after the <u>Ring</u> decision was not objectively unreasonable. In deciding whether to recommend proceeding with a guilt phase, trial counsel were presented with a number of competing considerations:

First, as Sampson argues, a guilt phase could have created an opportunity to address the most gruesome and damaging evidence prior to the penalty phase and to satisfy the jurors' desire to pass judgment. <u>See</u> <u>Nixon</u>, 543 U.S. at 191 n.6. However, no matter what strategy trial counsel selected, the evidence in this case was going to graphically portray the brutal killing of three helpless,

innocent people. Trial counsel could not be certain that a few additional weeks or the opportunity to decide guilt would, in any meaningful way, cause jurors to forget the most damaging evidence or assuage their sense of moral outrage.

Second, there was substantial evidence available that Sampson had accepted responsibility for his crimes and felt remorse. For example, after the murders, he contacted authorities to turn himself in, surrendered peacefully, confessed on multiple occasions, and assisted the police in recovering evidence. These mitigation arguments were among the most helpful available to Sampson for the penalty phase. Although, as Sampson argues, employing a guilt phase to focus on Sampson's mental state may not have been entirely inconsistent with making these penalty phase mitigation arguments, there was a risk that jurors presented with an initial denial of guilt would view skeptically any later attempt to claim acceptance of responsibility or remorse. See Nixon, 543 U.S. at 191-92. Therefore, a plea of not guilty could have significantly undermined two of the most important mitigating factors available to Sampson. See Elmore, 172 P.3d at 346. Moreover, as demonstrated by the verdict form, the guilty plea was itself a mitigating factor to be considered.

Third, by September 9, 2003, given the confessions, forensic evidence, and eyewitness accounts, the evidence of Sampson's guilt was overwhelming. Sampson's Motion to Dismiss had been denied.

See Sampson, 275 F. Supp. 2d at 109 (dated Aug. 11, 2003). There was no realistic probability that the court would dismiss the case or that the guilt phase would result in an acquittal.

Counsel for Sampson was, therefore, required to exercise strategic judgment in order to balance these complex and competing considerations. The strategy of recommending a guilty plea, while ultimately unsuccessful, fell within the wide range of reasonable professional assistance protected by Strickland. See Elmore, 172 P.3d at 345-46. Sampson has not alleged facts that, if true, would entitle him to relief. Therefore, this claim will be dismissed.

C. Ineffective Assistance of Counsel Based on Trial Counsel's Failure to Move for an Immediate Mistrial When the Victims' Bloody Shirts Were Exposed to the Jury

Claim III(M) alleges trial counsel were ineffective for failing to move for a mistrial when the victims' shirts were inadvertently exposed to the jury.

As described in Sampson, 335 F. Supp. 2d at 184, the shirts in question were worn by McCloskey and Rizzo when Sampson killed them. The shirts, mounted on a display, were stained with blood and torn in locations corresponding to each victim's stab wounds. Insects had laid eggs in the folds of one of the shirts. The court considered the admissibility of the victims' shirts on multiple occasions between November 6, 2003, and December 17, 2003. See id. The court concluded on December 17, 2003, that the shirts were not

39

admissible because, although relevant to whether the offenses involved serious physical abuse, the shirts: (1) were not the best evidence of the victims' wounds; (2) could have inspired inappropriate emotional responses from the jury, particularly during closing arguments and during deliberations; and (3) could have caused emotional behavior by the victims' families, which would constitute inappropriate victim impact information. Id. at 184-86 & nn.7, 8.

The event giving rise to this claim occurred on November 10, 2003.[6] Early that day, the court indicated that it had not yet made a final decision on the admissibility of the shirts and would not make such a decision until after receiving supplemental briefing the following day. Nov. 10, 2003 Tr. at 11-13. The parties agreed that this approach was appropriate. Id. at 13.

Later that day, at the conclusion of the direct examination of Dr. James Weiner, the medical examiner who examined Jonathan Rizzo, the court called the parties to side bar. Id. at 102. The court discussed the possible admission of two diagrams. Id. at 103. In the course of its examination of Dr. Weiner, the government moved those diagrams, which had covered one of the shirts. As a result, the court could glimpse the shirt among the various exhibits and

---

[6]As explained at the September 1, 2010 hearing, the court has a memory of this event and relies in part on this memory. See McGill, 11 F.3d at 225 (citing United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978)). Sampson agrees that this is permissible. See Sept. 1, 2010 Tr. at 54.

perceived that it might be exposed to some of the jurors, if they chose to look over at the group of exhibits instead of at the witness. The court told the government that "[the diagrams] have been covering the shirt, and now the shirt is exposed and can be seen from a certain area of the jury. So take them now, put them there. When the jurors leave, we'll give them a number, if there's no objection." Id. After the conclusion of the side bar conference, the court called counsel back to side bar almost immediately. Id. at 104. The court told the government that "[t]he shirt is still not completely covered" and instructed counsel to cover it. Id. at 105. That was the end of the matter.

The facts alleged do not establish prejudice, in that they do not raise a reasonable probability that the court would have granted the mistrial if asked to do so or would have committed a reversible error in denying a mistrial. Even assuming some members of the jury did see the shirt or shirts, the court would have been required to grant a mistrial "as a 'last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair.'" United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009)(quoting United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000)).

Here, the court excluded the shirts due in part to their modest probative value, given the abundance of more reliable

41

evidence of the wounds inflicted on the victims. See Sampson, 335 F. Supp. 2d at 184. To the extent the possibility of unfair prejudice drove the court's decision to exclude the shirts, such concerns were not strongly implicated by the brief and inadvertent display alleged by Sampson. Although the court was concerned that display of the shirts would exert intense emotional force on the jury, this concern was primarily directed at the effect during closing argument and deliberations, not during expert medical testimony. See id. at 185. Additionally, the court was concerned that display of the shirts would cause strong emotional reactions from the victims' families, which might constitute inappropriate victim impact information. See id. at 185-86 (citing State v. Steele, 586 P.2d 1274, 1277-78 (Ariz. 1978)). Sampson does not allege, the transcript does not reflect, and the court does not recall any such reaction during the events underlying this claim. In essence, although the shirts were disturbing, the intensely and unusually prejudicial effects that contributed to their exclusion were not presented by the circumstances alleged. Particularly in a case where the jury was going to hear and see detailed information about the victims' deaths from a variety of sources in any event, there was not any reasonable probability that the court would have granted a mistrial in these circumstances. See Dunbar, 553 F.3d at 58; United States v. Sepulveda, 15 F.3d 1161, 1184-85 (1st Cir. 1993). At most, the court might have given a curative

instruction.

The court's decision on this matter would have been reviewed "for the kind of 'clear' prejudice that would render the court's denial of [the] motion for a mistrial a 'manifest abuse of discretion.'" Freeman, 208 F.3d at 339 (quoting United States v. Torres, 162 F.3d 6, 12 (1st Cir. 1998)). The First Circuit would have been "mindful that the trial court has a 'superior point of vantage,' and that 'it is only rarely - and in extremely compelling circumstances - that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision.'" Id. (quoting United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994), overruled by United States v. Booker, 543 U.S. 245 (2005)). Given this highly deferential standard of review and the foregoing reasoning, the court finds no reasonable probability that the First Circuit would have found error and vacated the death sentence because a mistrial was not granted after the shirt may have been seen briefly by some jurors. See, e.g., United States v. Diaz, 494 F.3d 221, 226-27 (1st Cir. 2007)(holding inadvertent disclosure that defendant was an illegal immigrant did not require mistrial where the case against the defendant was "sturdy" and the remark was isolated); United States v. Rullan-Rivera, 60 F.3d 16, 18-19 (1st Cir. 1995)(holding inadvertent disclosure that defendant was the witness's drug dealer did not require a mistrial).

Additionally, to the extent Sampson alleges that counsel's

43

failure to request a mistrial entitles Sampson to relief because, even if a mistrial was denied, trial counsel could have secured a curative instruction, he has failed to allege deficient performance and prejudice.  Given the context and limited exposure, trial counsel could have reasonably declined to seek such an instruction in order to avoid drawing the jurors' attention to anything they may have glimpsed during the expert medical testimony.  See Jones v. United States, C.A. No. 06-18, 2008 WL 4643909, at *7 (N.D.W. Va., Oct. 20, 2008).  Even assuming that one or more jurors saw the shirt, the court carefully admonished the jury on numerous occasions, including in its final instructions, see Dec. 19, 2003 Tr. at 11-13, that the jurors should rely only on the admitted evidence in deciding Sampson's sentence.  It is well established that "juries are presumed to follow such instructions."  United States v. Gentles, 619 F.3d 75, 82 (1st Cir. 2010).  Given these instructions, the fact that the exposure of the shirts during expert medical testimony did not implicate the court's concerns regarding unfair prejudice, the exposure of the jury to other graphic evidence regarding the murders, and the overall weight of the aggravating factors, the court finds no reasonable probability that the outcome would have been different had the jury received a curative instruction at the time the shirts were exposed.

For all the foregoing reasons, this claim, even if factually correct, would not justify relief.  It will, therefore, be

44

dismissed.

D. Failure to Disclose Exculpatory Evidence

Claim V(A) alleges that the government violated its obligation, under Brady v. Maryland, 373 U.S. 83 (1963), to disclose material exculpatory evidence when it withheld statements by Michael Hannon that he observed Sampson waiting on the Island Grove Pond Bridge shortly after calling the FBI. Claim V(B) alleges that the government violated that same obligation when it withheld statements by Joseph Casey that he found Sampson's behavior in Myles Standish State Forest to be highly unusual.

Sampson must show three things for these claims to succeed: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was willfully or inadvertently suppressed by the government; and (3) that prejudice ensued because the evidence is material. See Lavallee v. Coplan, 374 F.3d 41, 43 (1st Cir. 2004). Materiality in post-conviction Brady claims is judged by the reasonable probability standard. See id.; Ferrara v. United States, 384 F. Supp. 2d 384, 421 (D. Mass. 2005), aff'd by 456 F.3d 278 (1st Cir. 2006). For the purposes of deciding materiality, the effect of the absent evidence is judged cumulatively. See Kyles v. Whitley, 514 U.S. 419, 436-37 (1995).

1. Hannon

Sampson alleges that the government violated its Brady

obligation by failing to disclose to his trial counsel that Hannon reported seeing Sampson on the Island Grove Pond Bridge. Sampson provides two affidavits of Hannon, in which Hannon states that he called the FBI shortly after Sampson's arrest and told an FBI Agent that he had seen Sampson on the Island Grove Pond Bridge within the last two weeks. Sampson acknowledges that his trial counsel received an FBI 302 report documenting a telephone conversation between Hannon and an FBI agent. See Sept. 1, 2010 Tr. at 70. That 302, however, states that Hannon claimed to have spoken on the bridge with an unknown man, who said that he (the unknown man, rather than Hannon) had encountered Sampson on the bridge. See Ex. 17 to Request for Summary Dismissal.

The allegedly withheld information is not material. Sampson committed the first of the murders at issue in this case on July 24, 2001. At trial, the parties stipulated that Sampson called the FBI the day before, July 23, 2001, at approximately 1:00 p.m. Nov. 20, 2003 Tr. at 26-27. The parties also stipulated that the call lasted two minutes and four seconds, and that the portion of the call in which Sampson was connected to the FBI switchboard lasted 55 seconds. Id. at 27. Sampson, in his taped confessions, stated that he called the FBI at about 1:00 p.m. in late July and asked to be arrested on the Island Grove Pond Bridge at 3:00 p.m. See Trial Ex. AA (Ex. 1 to Request for Summary Dismissal) at 27; Trial Ex. CC (Ex. 2 to Request for Summary Dismissal) at 41-43. Sampson

46

said that he did, in fact, wait on the bridge, but the FBI never showed up. See Trial Ex. AA (Ex. 1 to Request for Summary Dismissal) at 27. Jill Miller, a forensic social worker, testified for the defense that Sampson tried to turn himself in around this time. See Dec. 2, 2003 Tr. at 116. During Dr. Angela Hegarty's cross-examination, the government elicited testimony that Sampson tried to meet the FBI on the bridge. See Dec. 11, 2003 Tr. at 101. The government expressly acknowledged in its closing argument that Sampson had tried to turn himself in to the FBI but the FBI disconnected the call. See Dec. 18 2003 Tr. at 45-46. Eight jurors found that Sampson tried to surrender himself to the FBI before either of the offenses charged in this case occurred. See Ex. 55 at 8; Ex. 56 at 8.

As there was never any dispute about whether Sampson tried to turn himself in, that Miller and Hegarty testified that he did, that Sampson talked about it in his confessions, and that the parties stipulated to the existence of the telephone call, it is not reasonably probable that the result would have been different if, in addition, Hannon testified that he saw Sampson on the bridge for a period of time in late July, 2001. In light of the substantial evidence that Sampson attempted to surrender himself, and the fact that the government never contested this fact, additional testimony from Hannon would not have meaningfully tipped the scales in favor of finding this mitigating factor.

Moreover, it is not reasonably probable that this factor, even if found by additional jurors, would have materially altered the overall balance of aggravating and mitigating factors. The call to the FBI was potentially mitigating, as it could be interpreted as a sign that Sampson considered himself out of control and was trying to stop himself from committing further crimes. However, as the government argued in its closing, see Dec. 18, 2003 Tr. at 46, the call to the FBI and surrender attempt were in a significant sense not mitigating factors. They demonstrated that Sampson had the capacity to recognize his behavior as wrong and to cease his criminal activity. They suggested that, after failing once to turn himself in, Sampson could have tried again but instead elected to commit additional violent crimes. They also undercut Sampson's mental health arguments, in that the selection of the bridge, a location that afforded Sampson the ability to observe the Abington Police, whom he wanted to avoid, demonstrated organized thought processes. Therefore, it is not reasonably likely that finding this mitigating factor would significantly shift the balance of aggravating and mitigating evidence in Sampson's favor, given both the possible aggravating implications of the call to the FBI and the substantial overall weight of the aggravating evidence.[7] See United States v. Barraza Cazares, 465 F.3d 327, 334 (8th Cir.

_____

[7]Indeed, eight jurors found that Sampson tried to surrender himself before the killings and, despite that fact, concluded that death was appropriate.

2006)(holding undisclosed statement by alleged coconspirator that denied any relationship with the defendant was not material where the case against the defendant was strong).

In summary, even if Hannon's information is considered cumulatively with the statements of Joseph Casey discussed below, there is not a reasonable probability that Sampson would have been sentenced to life or that the trial was unfair.

### 2. Casey

Sampson alleges that, immediately before testifying before the grand jury, Joseph Casey, a supervisor/park manager at the Myles Standish State Forest, told an Assistant United States Attorney ("AUSA") that, at Myles Standish State Forest, Casey observed that Sampson had a disturbed and unusual mental state. Specifically, Sampson alleges that Casey told the prosecutor:

> I immediately sensed that there was something deeply wrong with [Sampson], that he was different than 99.9 percent of the people I encounter who are causing problems at the park. . . . Sampson's eyes were cold and empty, yet there was also something disturbing about them. . . . Sampson never threatened me or said anything alarming, yet I definitely felt uncomfortable and I was glad there were other people around. Basically . . . I felt there was something just very off or abnormal about Sampson's presence.

Ex. 11 ¶5.

These statements were not improperly withheld because they were disclosed in substance. Sampson received Casey's Incident Report, in which Casey wrote: "His eyes and facial ex[press]ions were distinctive and very disturbed but his body movements were

49

casual/relaxed." Ex. 12 at 3. Although the Amended §2255 Motion does not specifically acknowledge that Sampson received this document, the trial record demonstrates that his trial counsel had the report. See Nov. 12, 2003 Tr. at 51, 57 (referring to Bates 1224-1226, which corresponds to the report appended to the petition as Ex. 12). Thus, although the new information is somewhat more graphic and is embellished with Casey's opinion, the substance of alleged Brady material, that Casey thought Sampson had a very unusual demeanor, particularly with respect to his eyes, was in fact disclosed rather than suppressed. See Ellsworth v. Warden, 333 F.3d 1, 6-7 (1st Cir. 2003)(en banc)("In general, evidence is not suppressed if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." (internal brackets and quotation marks omitted)).

Additionally, regarding materiality, any possible difference between what was disclosed and what Casey allegedly said to the AUSA does not create a reasonable probability that the result would have been different or undermine confidence in the outcome, because the Myles Standish park incident was explored in great detail at trial. Regarding that encounter, Robert Akin, an environmental police officer at the park, testified that, on July 27, 2001, after a park employee notified him that he was uncomfortable that a man was following him around and claiming to be in the CIA, Akin

approached Sampson and observed him. See Nov. 10, 2003 Tr. at 178-79. Akin testified that he and Sampson talked about how Sampson was going to leave the park, that Sampson asked about Akin's law enforcement powers, that Sampson said he was in the Navy but that this was not believable due to Sampson's long hair and bad teeth, and that he eventually gave Sampson a ride out of the park in his police cruiser. See id. at 179-89. On direct examination, Akin testified that Sampson was calm and able to follow the conversation, see id. at 184, and on cross examination he testified that he never heard Sampson described as having mental problems. See id. at 199. However, Akin did admit that some of what Sampson said about being in the Navy and CIA did not make sense. See id. at 203.

Joseph Barrett, a laborer at the park, also testified about that encounter. He stated that Sampson said he was on leave from the military, that Sampson was "[c]alm in sort of a bold way," and that Barrett called Casey because Sampson was obviously lying about working for the CIA and other things. See Nov. 12, 2003 Tr. at 22-26. Barrett said Sampson was "whining a lot" and that Barrett "just felt weird" about him. Id. at 28-29. Barrett testified that later in the day, Sampson said with "a snicker" or "a little smirk" that Sampson was "very glad [Barrett] [didn't] trust people." Id. at 29. Barrett said that he wrote an incident report that specified "psych disorder" on the front page because that's what

51

Casey wrote in his own log book. Id. at 31. Themes on Barrett's cross examination and redirect were that Sampson said things about his military service and inability to drive a car that did not make sense, that Sampson caused Barrett to feel uneasy, that Barrett thought Sampson was a "weirdo," that Barrett heard Casey talk about Sampson having a psychiatric disorder and did not correct Casey, that Barrett told the police that Casey said that Sampson was "[a] little weird, but no big deal," and that Casey wrote a log entry stating that Sampson had psychiatric problems. Id. at 39, 41, 45, 47, 59, 63.

Kathleen Akin, a ranger at the park, testified that she received a call about a person with mental problems, that she saw Sampson converse in a calm, polite and attentive manner, that Sampson made the comment about trusting people to Barrett in a deeper tone and more direct manner. See id. at 68-69, 75. On cross examination, Kathleen Akin stated that she had previously testified that Barrett told her that Sampson was "unstable," that she had told the police that Sampson was "babbling about the CIA and traveling up and down the east coast," that she had described Sampson as having "mental problems" in her notes, that she did not correct Casey's description of Sampson as having a psychiatric disorder in a shared log book. Id. at 79, 82, 88-89, 90.

Joseph DeSisto testified that he gave Sampson a ride after Sampson left the park and that Sampson was polite, courteous, and

lucid, but also somewhat agitated about having purportedly lost his wallet. Id. at 101-02, 105. On cross examination, he stated that he told the grand jury that Sampson seemed anxious and distraught and seemed a little nuts, that Sampson spoke out of anxiety and nervousness, and that Sampson seemed to have a sense of despair when he got out of DeSisto's car. Id. at 107-09, 110-11.

Consequently, the jury heard that Casey and others thought that Sampson exhibited signs of a psychiatric disorder or mental problems and that Sampson made others in the park feel uncomfortable or uneasy. To the extent that there is new information that Casey thought Sampson's behavior was bizarre and extraordinarily unusual, the significance of such information would have been blunted by the extensive testimony about Sampson's interactions with other people in the park.

Moreover, in terms of proving the mitigating factor of a mental defect or extreme emotional disturbance, the Myles Standish park incident was only one event in a period of time during which, according to several witnesses, Sampson exhibited a strange but not shockingly abnormal demeanor. Regarding Sampson's time after his return to Massachusetts in 2001, Deborah Stuart testified that she encountered Sampson on the beach in Marshfield, Massachusetts, on July 25, 2001, that she conversed with Sampson, that Sampson said he had been in the military and returned home, and that Sampson seemed unremarkable. See Nov. 10, 2003 Tr. at 119-25, 129.

Valarie Mullaney, a convenience store clerk, testified she served Sampson soda several times on either July 24 or 25, 2001, that Sampson said he was back from the military and asked about bus schedules, and that Sampson, although irritable at times, engaged in other unremarkable conversation. See id. at 130-38. On cross-examination and redirect, Mullaney confirmed that she told police or the FBI that Sampson's facial features "reminded [her] of a heroin addict's facial features," meaning that Sampson "looked like he was a drug user" and had a face that was "sunken in." Id. at 140-41. Michael Anabel, a cab driver, testified that he gave Sampson a ride, that Sampson did not talk much and did not have enough money to pay, and that he told the FBI Sampson looked "scraggly." Id. at 145-47. Kerri DiCarlo, a store clerk, testified that Sampson said he was camping out, was helping to find a missing boy in the campground, was drinking by himself at night, was a former pilot who was disabled by an arm injury, asked whether there was really a tunnel from Cape Cod to Martha's Vineyard, seemed very friendly, talkative, and tired, asked for a ride, and invited DiCarlo back to his campsite to drink. See id. at 152-53, 155, 158. Paul Philbrick testified that, on July 26, 2001, he encountered Sampson in a laundromat, that Sampson stared at him while he was near his car, and that Sampson left him alone after he said, "[W]hat the fuck are you looking at?" Id. at 172.

Accordingly, because Sampson possessed the essential facts

54

concerning the allegedly new evidence relating to Casey, because the jury heard that Sampson exhibited signs of a psychiatric disorder and made others uncomfortable while in the park, because substantial evidence from this period of time, including Casey's own statement that Sampson was "a little weird but no big deal," contradicts the contention that Sampson presented an extraordinarily unusual appearance, and because the aggravating factors were sufficiently strong that they would likely outweigh any additional mitigating value derived from Casey's more detailed statement, the new evidence from Casey does not make it reasonably probable that Sampson would have been sentenced to life in prison or that his trial was unfair.

Accordingly, Sampson's Brady claims will be dismissed because, taken as true, they would not entitle Sampson to relief.

E. The Grand Jury

Claim VI(A) alleges that the government violated Sampson's Fifth and Eighth Amendment rights by using the grand jury to "lock in" or "freeze" witness statements unfavorable to Sampson. Claim VI(B) alleges that the government violated Sampson's Fifth and Eighth Amendment rights by coaching key witnesses. Because these claims are closely related, the court is addressing them together.

The facts alleged in support of these claims involve Joseph Casey, who, as discussed previously, encountered Sampson in Myles Standish State Forest while working as a supervisor and park

manager. While preparing to testify before the grand jury, Casey allegedly told the prosecutor that:

I immediately sensed that there was something deeply wrong with [Sampson], that he was different than 99.9 percent of the people I encounter who are causing problems at the park. . . . Sampson's eyes were cold and empty, yet there was also something disturbing about them. . . . Sampson never threatened me or said anything alarming, yet I definitely felt uncomfortable and I was glad there were other people around. Basically . . . I felt there was something just very off or abnormal about Sampson's presence.

Ex. 11 ¶5. According to Casey, the prosecutor "then asked [Casey] whether [Casey] was a trained psychologist, implying that [Casey] had no business assessing Sampson's mental state." Id. ¶6. After Casey informed the prosecutor that Casey had taken college psychology courses and observed people as a park supervisor, the prosecutor allegedly "then cautioned [Casey] not to provide any more information or details than were necessary to answer [the prosecutor's] questions." Id. ¶7. The AUSA allegedly then told Casey "to watch for signals from him, like raising his hand, to know when to stop talking" and further explained that "[the prosecutor] knew exactly what he wanted to get out of [Casey] and that [Casey] should be very careful not to elaborate or expand on [his] answers beyond the minimum to answer the question." Id. Sampson does not allege that the prosecutor told Casey to lie. See id. Nor does Sampson allege that the prosecutor ever actually gave Casey any hand signals during Casey's testimony.

Sampson further alleges that various other witnesses omitted

facts helpful to Sampson's mental health mitigation arguments from their grand jury testimony or direct testimony at trial. See Am. §2255 Mot. at 219-21, 225-26. He does not, however, allege any facts that directly link these differences to any action by the government, other than that the government failed to elicit testimony favorable to Sampson's mitigation theories during grand jury testimony.

For the most part, Sampson characterizes these as claims of grand jury abuse that rise to the level of a constitutional violation.[8] According to Sampson, the practical effect of the abuse was to deny the defense the ability to call these witnesses at trial, as testimony about what they really saw would be easily impeached by the more limited grand jury testimony.

"Although the grand jury operates under judicial supervision, it is essentially an independent institution." United States v. Flemmi, 245 F.3d 24, 28 (1st Cir. 2001). Grand jury proceedings are entitled to a presumption of regularity, which persists "even after the grand jury has returned an initial indictment." Id. (citing United States v. Johnson, 319 U.S. 503, 513 (1943)); see

---

[8]A portion of the witness coaching claim relates to the testimony of witnesses at trial. See Am. §2255 Mot. at 225-26. However, other than the bare fact that the witnesses in question testified in a manner that was somewhat different than their earlier statements, Sampson does not allege specific facts linking those differences to conduct by the government. Consequently, to the extent these claims relate to trial, rather than the grand jury, they will be dismissed.

United States v. R. Enterprises, Inc., 498 U.S. 292, 300-01 (1991).

"[P]rosecutors do not have carte blanche in grand jury matters." Flemmi, 245 F.3d at 28. However, a party who asserts that prosecutors have abused the grand jury "must shoulder a heavy burden." Id. This is because the presumption of regularity of grand jury proceedings generally may be dispelled only upon a showing of "'particularized proof of irregularities in the grand jury process.'" R. Enterprises, 498 U.S. at 301 (quoting United States v. Mechanik, 475 U.S. 66, 75 (1986)(O'Connor, J., concurring in the judgment)); see United States v. Salameh, 152 F.3d 88, 109 (2d Cir. 1998)(per curiam). "One way to carry this burden is to show that the government used the grand jury principally to prepare pending charges for trial." Flemmi, 245 F.3d at 28 (citing In re Grand Jury Proceedings (Fernandez Diamante), 814 F.2d 61, 70 (1st Cir. 1987)). Determining whether a prosecutor has used the grand jury for improper trial preparation "will depend on the facts and circumstances of the particular case." Id.

The government argues that, under Mechanik, 475 U.S. 66, a claim of grand jury abuse is not cognizable after Sampson's guilty plea because any defect in the indictment was rendered harmless by the plea. This argument would be persuasive if the only effect of the alleged misconduct before the grand jury was to increase the likelihood that the grand jury would indict Sampson. See United States v. Wilson, 565 F.3d 1059, 1069-70 (8th Cir. 2009)(holding

58

presentation of false testimony to grand jury rendered harmless by petit jury verdict). Even if there were flaws in the grand jury's determination of probable cause, that error was harmless because, in light of Sampson's admission of guilt, the charging decision was correct. See Mechanik, 475 U.S. at 70.

However, Sampson's allegation here is that grand jury abuse denied him the effective use of favorable evidence and, it follows, the fair trial before the petit jury guaranteed by the Due Process clause. Applying the reasoning of Mechanik to such claims is not appropriate.

The theory of Mechanik is that a conclusive determination that guilt has been proven beyond a reasonable doubt establishes that the grand jury's charging decision must have been correct. See 475 U.S. at 70. Because the grand jury's charging decision was correct, any defect that affected only the charging decision must have been harmless. See id. It does not follow from that reasoning, however, that a defect that affects something other than the charging decision must also necessarily be harmless. See United States v. Ortiz de Jesus, 230 F.3d 1, 4 (1st Cir. 2000)(stating prosecutorial misconduct before the grand jury would permit post-conviction dismissal of the indictment if it was so serious and blatant that it called into doubt the fundamental fairness of the judicial process); United States v. Font-Ramirez, 944 F.2d 42, 46 (1st Cir. 1991)(same); United States v. Giorgi, 840

F.2d 1022, 1030 (1st Cir. 1988)(noting Mechanik may not be absolute bar to claims that grand jury abuse led to fundamentally unfair proceeding); United States v. Friedman, 854 F.2d 535, 583 (2d Cir. 1988)(stating "Mechanik by its terms does not bar reversal of a conviction where misconduct before the grand jury has deprived the defendant of a fair determination of the issue of guilt or innocence" but finding defendant failed to allege trial prejudice (internal quotation marks omitted)). The cases cited by the government do not suggest that Mechanik should be applied to preclude review of errors affecting the fairness of the trial. See United States v. Lopez-Lopez, 282 F.3d 1, 9 (1st Cir. 2002)(denying relief based on alleged defect in grand jury instructions); Alston v. Ricks, C.A. No. 01-9862, 2003 WL 42144, at *7 (S.D.N.Y. Jan. 7, 2003)(denying relief where alleged defects impaired grand jury process); Jordan v. Dufrain, C.A. No. 98-4166, 2003 WL 1740439, at *3 (S.D.N.Y. Apr. 2, 2003)(denying relief where defects impaired grand jury process and any prejudice was to trial rights exclusively cognizable under state law, which cannot form a basis for federal habeas relief); Ballard v. Costello, C.A. No. 01-1000, 2001 WL 1388297, at *1, 2 (E.D.N.Y. Nov. 2, 2001)(denying relief where alleged defects impaired grand jury process); Lloyd v. Walker, 771 F. Supp. 570, 572, 576 (E.D.N.Y 1991)(same). Consequently, Mechanik does not foreclose relief here, where Sampson claims that prosecutorial misconduct before the grand jury

undermined the fairness of the trial. Such a claim of grand jury abuse is viable if adequately alleged.

Sampson's claims are not, however, adequately alleged for several reasons. First, regarding the claim of "freezing testimony" generally, using the grand jury in the manner alleged does not constitute misconduct if done prior to the return of the initial indictment. Before bringing the initial indictment, it is permissible for the government to use the investigatory powers of the grand jury to present evidence favorable to the government's case, and the government is under no duty to elicit exculpatory testimony while doing so. See United States v. Williams, 504 U.S. 36, 51-54 (1992). In contrast, cases cited by Sampson to demonstrate the impropriety of "freezing" testimony all involved the continued use of the grand jury to develop and preserve inculpatory testimony after the initial indictment. See United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979) (noting that using the grand jury to preserve evidence subsequent to the indictment could be misconduct); United States v. Fisher, 455 F.2d 1101, 1104-05 (2d Cir. 1972) (holding use of grand jury to "freeze" witness testimony after the indictment was filed was improper); United States v. Jackson, 863 F. Supp. 1449, 1454 (D. Kan. 1994) (stating, in discussion of prosecutor's use of grand jury to secure a superseding indictment, that use of grand jury primarily to lock in testimony is improper). Here, the initial indictment

was returned on October 24, 2001, at 4:15 p.m. The grand jury witnesses who are the subject of this claim are all alleged to have testified before that time. See Exs. 10 (Sept. 26, 2001), 85 (Sept. 26, 2001), 91 (Oct. 24, 2001), 92 (Oct. 10, 2001), 93 (Sept. 26, 2001). Consequently, any government failure to elicit information favorable to Sampson from these witnesses was a proper use of the grand jury to secure an initial indictment rather than an improper attempt to prepare a pending indictment for trial.

Second, with respect to the alleged "freezing" of Casey's testimony specifically, any difference between Casey's statement to the prosecutor and Casey's grand jury testimony could not have prejudiced Sampson in a way that calls into doubt the fundamental fairness of the trial or creates a reasonable probability of a different result. See Ortiz de Jesus, 230 F.3d at 4. In the grand jury, Casey testified that:

> [Sampson's] basic demeanor, physical demeanor was relaxed; however, his eyes were either very hollow or focused at a point beyond me as [sic] he were looking across the pond, but it was disconcerting the way there was contact, but there was no contact. There was a lot of tension in the lower part of his face just as if he was ready to start grinding his teeth. There was a lot of, that's where the tension and his demeanor was most apparent, sir.

Ex. 10 at 13. He further testified: "No, I, I was not [threatened]; other than a little subconscious reaction to the way he appeared." Id.

This testimony is not inconsistent with what Casey now alleges

he observed. As in his declaration, Casey testified that Sampson's presence was disconcerting, and that Sampson had strange eyes and unusual facial expressions. This lack of inconsistency makes it unlikely that Casey's grand jury testimony would have precluded trial counsel from calling Casey at trial.[9] More to the point, as explained in the discussion of Sampson's Brady claims, supra, Casey's proffered testimony on this issue was not material.

Third, with respect to the allegations of witness coaching, the only specific allegations relate to Casey, and those allegations, taken as true, do not demonstrate misconduct. Following a rather lengthy statement by Casey about Sampson's mental health, the prosecutor asked Casey if Casey was a trained psychologist, arguably "implying that [Casey] had no business assessing Sampson's mental state." Ex. 11 ¶¶5-6. However, any such suggestion was proper. Casey was a lay witness and it would be improper for him to offer expert medical or psychological testimony. Sampson acknowledges that this is true. See Sept. 1, 2010 Tr. at 88. After Casey stated that he had some expertise in this area, the prosecutor asked that Casey only provide the information necessary to answer the questions posed. This again was proper. As Sampson also recognizes, witnesses are frequently

---

[9]If the defense considered Casey to be problematic, it was probably because there was evidence that he described Sampson on one occasion as "[a] little weird, but no big deal." See Nov. 12, 2003 Tr. at 63.

63

given this instruction.  See id. at 87.  The prosecutor allegedly

mentioned that he might use signals to tell Casey when to stop

talking, but there is  no allegation that he ever did so.

"Prosecutors . . . are entitled to prepare their witnesses," see

United States v. Rivera-Hernandez, 497 F.3d 71, 80 (1st Cir. 2007),

and none of the specific conduct alleged demonstrates anything

beyond reasonable witness preparation.  Sampson's claim cannot

succeed without a showing of misconduct.  See, e.g., Ortiz de

Jesus, 230 F.3d at 4.

Fourth, with respect to the coaching of witnesses other than

Casey, Sampson alleges numerous minor differences between their

statements at various times and subsequent grand jury testimony,

but the link between these differences and any impermissible action

by the government is purely speculative.  See Am. §2255 Mot. at

219-221, 225-26.  Claims unsupported by specific and detailed facts

may be dismissed.  See, e.g., Butt, 731 F.2d at 77 (stating

"cognizable claims stating conclusions without specific and

detailed supporting facts" may be summarily dismissed).

Accordingly, although Claim VI relies on a legally cognizable

theory, Sampson has failed to allege specific facts that, if true,

would entitle him to relief.  Therefore, these claims will be

dismissed.

F.  Constitutionality of the Carjacking Statute

Claim VIII alleges that Sampson cannot be executed for

carjacking resulting in murder because the carjacking statute, 18 U.S.C. §2119, is not a valid exercise of Congress' power to regulate interstate commerce.

Sampson has not responded to the government's assertion, in a footnote, that this claim is procedurally defaulted. See Request for Summary Dismissal at 254 n.103. The claim itself suggests no obvious cause for failing to raise it at trial or on direct appeal. Accordingly, the claim is procedurally defaulted. See Owens, 483 F.3d at 56 (procedural default standard). In any event, this claim also fails on the merits.

In 1995, in United States v. Lopez, the Supreme Court identified three broad categories of activity which may be regulated by Congress under the Commerce Clause: (1) the use of the channels of commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities having a substantial effect on interstate commerce. See 514 U.S. 549, 558-59 (1995). In 2000, in United States v. Morrison, the Supreme Court again reached the same conclusion. See 529 U.S. 598, 608-09 (2000). Lopez and Morrison together stand for the proposition that the third category of activity does not reach non-economic criminal activity having some indirect and remote effect on commerce, at least where the relevant statute does not include a jurisdictional element that functions to ensure an explicit connection with commerce on a case-by-case basis. See

Morrison, 529 U.S. at 611-12, 613 & n.5; Lopez, 514 U.S. at 561-62. In 2000, in Jones v. United States, although the Court did not decide the issue, the Court noted while performing an exercise of statutory interpretation that a jurisdictional element would raise a question of constitutional sufficiency if it could be satisfied by essentially local, non-economic activity involving an incidental relationship with interstate commerce, such as the private, residential use of a home that receives the services of interstate insurance and utility entities. See 529 U.S. 848, 856, 857-58 (2000).

18 U.S.C. §2119 provides for the death penalty if death results when a person, "with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so." In 1998 the First Circuit, responding to the argument that §2119 "exceeds Congress's power under the Commerce Clause and is unconstitutional under [Lopez]," held that the statute is constitutional. United States v. Rivera-Figueroa, 149 F.3d 1, 3 (1st Cir. 1998). The First Circuit grounded its decision in the fact that, "[i]n contrast to the statute involved in Lopez, [§2119] contains an element designed to establish federal power, namely, that the vehicle must have been transported, shipped, or received in interstate or foreign

commerce." Id. The First Circuit further held that "[t]he use of motor vehicles to facilitate - indeed to conduct - interstate and foreign commerce is obvious, and Congress's effort to extend protection to the very instruments of interstate and foreign commerce is reasonable on its face and amply supported by precedent." Id. After finding the statute constitutional, the First Circuit dismissed any lingering federalism concerns as "policy disputes . . . for Congress to resolve." Id.

Because the First Circuit has decided the issue, this court is bound by its determination absent a supervening decision from the First Circuit or Supreme Court. See Agostini v. Felton, 521 U.S. 203, 238 (1997); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989); see also Sampson, 275 F. Supp. 2d at 72 (stating lower courts are bound by Supreme Court precedent). Sampson argues that Morrison and Jones effectively overrule Rivera-Figueroa and require the court to conclude that §2119 exceeds the scope of Congress's power under the Commerce Clause.

Morrison does not, however, cast doubt on Rivera-Figueroa. See Morrison, 529 U.S. at 613 & n.5. Unlike §2119, the section of the Violence Against Women Act at issue in Morrison "contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." See id. at 613. Indeed, in a footnote, the Supreme Court in Morrison cited favorably to a section of the Violence

Against Women Act that did include such an element. See id. at 613 n.5. Morrison, therefore, did not reach, much less reject, the most significant justification adopted by the First Circuit in upholding §2119 in Rivera-Figueroa.

Jones also does not cast doubt on Rivera-Figueroa. See Jones, 529 U.S. at 854. Unlike §2119, the federal arson statute in Jones required that the property destroyed must be "used in" interstate or foreign commerce or in an activity affecting interstate commerce. See id. Construing the ambiguous term, the Court concluded that "used" means "active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce" such as would arise out of purely residential use. See id. at 855-56. The Court reached this conclusion as a matter of statutory interpretation based on various considerations, one of which was that Congress should be presumed to intend to avoid the serious constitutional question that would arise if it criminalized activity that was traditionally a matter of local concern and in which neither the actors nor their conduct possessed a commercial character. See id. at 858. Because the Court interpreted the statute in a manner that avoided the constitutional question, the issue was not decided. See id. Jones could not effectively overrule Rivera-Figueroa without actually deciding the relevant issue. See id.

Moreover, in contrast to Jones, §2119 does not require that

the automobile in question be "used" in interstate commerce, an ambiguous requirement which, as Jones notes, could be problematic if construed to describe purely local, non-economic functions with only an incidental or attenuated connection to interstate commerce. Rather, §2119 imposes a jurisdictional element that explicitly and closely links the particular conduct to interstate commerce: the automobile in question must actually have been "transported, shipped, or received in interstate or foreign commerce." See §2119; Rivera-Figueroa, 149 F.3d at 3. Additionally, unlike the private, residential homes in Jones, the use of automobiles is inherently likely to affect interstate commerce. See id. Consequently, the concerns expressed in Jones do not exist with regard to §2119.

Accordingly, because no subsequent decisions of the First Circuit or Supreme Court substantially undermine its reasoning, Rivera-Figueroa remains binding authority and, therefore, the court must hold that §2119 is a valid exercise of Congress's Commerce Clause power. This conclusion is reinforced by the decisions of other circuit courts of appeal which have upheld the constitutionality of §2119 in the years since Lopez, Morrison, and Jones. See United States v. Cortes, 299 F.3d 1030, 1036-37 (9th Cir. 2002)(holding jurisdictional element, legislative findings, and legislative context establish §2119 regulates activity that substantially affects commerce); United States v. Taylor, 226 F.3d

593, 599-600 (7th Cir. 2000); see also United States v. Moore, 172
Fed. App'x 877, 882 (10th Cir. 2006)(unpublished); United States v.
Jimenez, 323 F.3d 320, 322 (5th Cir. 2003)(applying plain error
standard).   Additionally, the fact that the First Circuit has
recently upheld the constitutionality of 18 U.S.C. §922(k), which
prohibits possession of certain firearms that have, "at any time,
been shipped or transported in interstate or foreign commerce," in
response to challenges under Jones and Morrison supports the
conclusion that the past movement through interstate commerce of an
object integrally involved in the criminal conduct remains a
sufficient jurisdictional element.   See United States v. Teleguz,
492 F.3d 80, 87 (1st Cir. 2007).

Therefore, Claim VIII will be dismissed because binding First
Circuit precedent renders it facially insufficient.

## G.   Constitutionality of the Death Penalty and Federal Death
   Penalty Act

Claim IX asserts various challenges to the constitutionality
of the death penalty and Federal Death Penalty Act ("FDPA").   The
government moved to strike or dismiss this claim because Sampson
may not raise claims that were previously decided on direct appeal.
See Mot. To Strike/Dismiss (Docket No. 994).

### 1.   Motion to Strike

Federal Rule of Civil Procedure 12(f) provides in relevant
part that "[t]he court may strike from a pleading an insufficient

defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are "narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion." Boreri v. Fiat S.P.A., 763 F.2d 17, 23 (1st Cir. 1985). Even when technically appropriate, motions to strike are not typically granted absent a showing of prejudice to the moving party. See Dennison v. LaPointe, C.A. No. 06-40100, 2006 WL 3827516, at *1 (D. Mass. Dec. 21, 2006)(denying motion to strike absent a showing of prejudice); United States Sec. & Exch. Comm'n v. Nothern, 400 F. Supp. 2d 362, 365 (D. Mass. 2005).

Sampson states that he raises these arguments in order not to waive them, which the court understands to mean that Sampson is laying a foundation to challenge on appeal the First Circuit's decisions barring review of claims determined on direct appeal. Therefore, Claim IX falls outside of Rule 12(f), because Sampson's arguments have relevance and do not appear to prejudice the government. See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1382 (3d ed. 2004)("[T]here appears to be general judicial agreement . . . that [motions to strike] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."). Consequently, to the extent that the government requests that the court strike Claim IX, the request

will be denied.

## 2. Dismissal

Sampson concedes that all of these arguments were raised on direct appeal. Sampson also concedes that they are, therefore, not cognizable in the §2255 context under binding First Circuit precedent. See, e.g., Singleton v. United States, 26 F.3d 233, 240 (1st Cir. 1994)("'[I]ssues disposed of in a prior appeal will not be reviewed again by way of a 28 U.S.C. §2255 motion.'" (quoting Dirring v. United States, 370 F.2d 862, 864 (1st Cir. 1967)); Butt, 731 F.2d at 77 n.1 ("It is settled that a §2255 motion may not revive issues previously determined on direct appeal."). The First Circuit has affirmed dismissal of such claims. See Singleton, 26 F.3d at 234, 240. Accordingly, Claim IX will be dismissed.

V. CLAIMS THAT WILL NOT BE DISMISSED

A. Ineffective Assistance of Counsel Based on Inadequate Investigation

Claims III(B)-(F) allege that trial counsel were ineffective because they failed to conduct an adequate mitigation investigation and to present mitigation evidence adequately. Although the Amended §2255 Motion divides the prejudice inquiry into different subparts, Sampson characterizes this as a single claim. See Sept. 1, 2010 Tr. at 10-11. Claims III(L) and III(N) are not independent claims, but rather assert additional forms of prejudice flowing from the alleged failure to conduct and adequate mitigation

72

investigation. See Am. §2255 Mot. at 178 (Welner); Sept. 1, 2010 Tr. at 59-60 (confessions). Claim III(K) alleges that trial counsel failed to investigate John Flanagan, who lived with Sampson's family during Sampson's early childhood and who testified for the government at trial that Sampson was not abused as a child.

The court finds treatment of these claims together to be most appropriate. In deciding whether a failure to investigate a particular facet of Sampson's life was unreasonable, it may be necessary for the court to understand whether, for example, trial counsel reasonably limited that particular portion of the investigation in order to focus resources on a more promising line of inquiry. See Rompilla, 545 U.S. at 383; Bobby, 130 S. Ct. at 19; Wiggins, 539 U.S. at 533. Similarly, prejudice from an unreasonable investigation is assessed cumulatively. See Dugas, 428 F.3d at 335.

Here, at least some of the alleged conduct may have been objectively unreasonable. For example, Sampson alleges that trial counsel received medical records (the "Brockton Hospital Records," see Ex. 4) documenting at least one head injury in early childhood and did not provide those records to Sampson's experts or present them to the jury. Specifically, an emergency room record dated February 10, 1964, states that Sampson, then four years old, "fell down stairs" and "[f]ell about 10 ft. + hit back of head - has swelling post scalp." Id. Another emergency room record dated

July 11, 1967, states: "?fell off bike. lac. to right knee." Id. The words "on top of head" are written but crossed out. A third emergency room record dated September 14, 1968, appears to indicate that Sampson received sutures for "?LAC. LEFT SIDE OF HEAD." Id.

In this case, Sampson sought to prove brain damage as a mitigating factor. Trial counsel retained a medical expert for the express purpose of determining the possible existence of brain damage. It is not possible to conceive of any strategic reason for failing to provide that expert with records showing that Sampson, at the age of four, was taken to the emergency room because he fell ten feet and hit the back of his head. See, e.g., Caro v. Calderon, 165 F.3d 1223, 1228 (9th Cir. 1999)(holding failure to inform experts of essential information in lawyer's possession is unreasonable). There is also no apparent reason for declining to introduce the records at trial.

Similarly, Sampson alleges that trial counsel failed to reasonably investigate his childhood and adolescence. Sampson asserts that the investigation into his early personal history was minimal, consisting only of: a few letters to his mother (most of them unanswered and one returned); a visit to his sister's house (at which his brother-in-law indicated his sister did not want to talk); a request that Sampson's ex-wife make contact with Sampson's parents (no meaningful result); and a single attempt to reach his brother at an incorrect address. According to Sampson, readily

available sources of information were ignored, and no further attempt was made to reach Sampson's brother until trial was underway.

The trial record corroborates Sampson's account in some respects. No witness who knew Sampson before he first went to prison testified for the defense, and the account of attempts to contact Sampson's family is generally consistent with Sampson's allegations. See Dec. 2, 2003 Tr. at 23-33, 188. There is, however, evidence in the record that suggests that forensic social worker Jill Miller did something more than what is alleged. See, e.g., Dec. 2, 2003 Tr. at 16 (claiming 35 interviews), 16-17 (describing review of records), 19 (personal interviews with Sampson), 33 (attempt to speak with Flanagan), 38-51, 61-67 (introduction of various records), 39 (claim of attempt to interview two of Sampson's childhood friends, who refused to testify); 181-186 (additional attempt by a private investigator to contact Sampson's mother and sister in 2003). On the whole, the issue of whether trial counsel reasonably investigated Sampson's childhood and adolescence relates "primarily to purported occurrences outside the courtroom and upon which the record c[an], therefore, cast no real light." Machibroda, 368 U.S. at 494-95; see Moran, 494 F.2d at 1222 n.1.

The investigation alleged by Sampson might fail to satisfy the constitutional standard, depending on the particular circumstances

75

of the case. It is well established that trial counsel were constitutionally obligated to make a reasonable investigation into Sampson's personal history or to make a reasonable decision to forego such an investigation. See Porter, 130 S. Ct. at 452-453; Wiggins, 539 U.S. at 523-26; Williams, 529 U.S. at 395; Strickland, 466 U.S. at 691.

Moreover, in the aggregate, the volume of new evidence presented through this claim could possibly prove prejudice. For example, at trial, Sampson presented a diagnosis of brain dysfunction based almost entirely on Sampson's own behavior after he was charged in this case and had a strong motive to exaggerate symptoms of brain damage. Sampson now alleges that, had his childhood head injuries been fully disclosed to his medical experts, the experts would have undertaken substantial additional investigation of a possible brain injury, including medical imaging tests which would have produced objective evidence of serious brain damage. For example, Ruben Gur, Ph.D, states that the results of a high resolution volumetric MRI study, a positron emission tomography (PET) scan, and further neuropsychological testing indicated regions of markedly reduced brain volume consistent with impairment of Sampson's ability to read, to make rational decisions, to properly understand when a situation is threatening, and to control his impulses. See generally Ex. B. Gur also states that the pattern of damage is consistent with being caused by a

serious blow to the rear of the head.  Id. ¶9.  Gur ultimately concludes that the additional testing demonstrates that Sampson has organic brain damage resulting in neuropsychiatric illness, that this damage has been present since birth or early childhood, and that this damage substantially impaired Sampson's capacity to weigh the consequences of his actions and to conform his actions to the law.  Id. ¶21.

Failure to present evidence of a brain abnormality has been held to be an important indicator of prejudice. See Porter, 130 S. Ct. at 451; Frierson v. Woodford, 463 F.3d 982, 993-94 (9th Cir. 2006)(holding failure to present evidence of childhood brain injuries and resulting organic brain dysfunction contributed to finding of prejudice); Frazier v. Huffman, 343 F.3d 780, 794-800 (6th Cir. 2003)(finding, in case where almost no mitigating evidence was presented, that there was prejudice based on failure to present brain injury evidence alone); Caro v. Woodford, 280 F.3d 1247, 1257 (9th Cir. 2002)(holding omission of evidence of brain damage rendered death sentence unreliable); Cunningham v. Zant, 928 F.2d 1006, 1015-1019 (11th Cir. 1991).  Indeed, in Commonwealth v. Alvarez, the Massachusetts Supreme Judicial Court found prejudice where an expert testified to brain injury at trial and was impeached by a lack of corroborating evidence for the alleged head injury, and it was later discovered that trial counsel failed to obtain and turn over to the expert a series of medical records

77

documenting a serious head injury (although an apparently more serious head injury than that reflected in Sampson's medical records).[10]  See 433 Mass. 93, 96-104 (2000).

In addition, Sampson has also now produced declarations from various lay witnesses who say they witnessed Sampson being abused as a child.  At trial, evidence of this mitigating factor was essentially limited to experts Jill Miller and Joan Katz reporting that Sampson had told them, at a time he had a strong motive to lie, that he was subjected to verbal abuse and severe physical punishment as a child.  See Dec. 2, 2003 Tr. at 21; Dec. 3, 2003 Tr. at 191, 193, 196.  In these proceedings, Sampson has presented evidence of abuse from third parties.  Patricia Monahan states that Sampson's father called Sampson "little shit" and hit and "backhanded" Sampson frequently from at least the time Sampson was four or five years old.  Ex. 127 at 3-4.  Steven Bray states that he saw Sampson's father grab Sampson by the neck and shove him down and into a table.  Ex. 100 at 3.  Wayne Sampson, Sampson's brother, states that he and others beat up Sampson.  Ex. 131 at 6; see also Ex. 100 (reporting Wayne frequently hit Sampson); Ex. 115 (same); Ex. 120 (same).  Mary Ford reports that Sampson's father admitted

---

[10]The court is not now expressing an opinion on whether the additional evidence of brain dysfunction alone would prove prejudice.  The court notes that the government introduced testimony that Sampson was capable of the logical processes necessary to devise and execute fairly sophisticated plans at the time of the killings.  See, e.g., Dec. 12, 2003 Tr. at 135-38 (testimony of Dr. Welner).

to punching Sampson while Sampson was hospitalized after a car accident. Ex. 111 at 3. Sampson has also produced significant impeachment material to show that Flanagan's testimony about Sampson's household may not be credible because Flanagan does not have a normal understanding of family relationships, has a bad character for truthfulness, and is biased in favor of Sampson's father. See generally Ex. 57; Ex. 110.[11]

In summary, Sampson has specifically alleged certain conduct by trial counsel that could, if proven, be objectively unreasonable. The court cannot conclusively rule out a prejudicial effect. As to this set of claims, the interests of justice and finality will be best served by further development of the facts, so that the court may determine the truth and significance of what has been alleged. Therefore, the foregoing claims alleging inadequate investigation will not be dismissed.

B.   Ineffective Assistance of Counsel Based on Failure to

Raise Sampson's Incompetence

Claim III(I) alleges trial counsel were ineffective by failing to raise Sampson's inability to assist in his own defense with the court, by allowing Sampson to proceed to trial while incompetent, and by causing Sampson to be denied his right to a contemporaneous determination of competence. The Request for Summary Dismissal

---

[11]The court is not now expressing an opinion regarding whether this additional evidence of childhood abuse alone would demonstrate prejudice.

79

will be denied as to this claim because Sampson has alleged objectively unreasonable performance and prejudice.

"Due Process requires that a defendant be mentally competent to be tried, convicted or sentenced." United States v. Sanchez-Ramirez, 570 F.3d 75, 80 (1st Cir. 2009)(citing United States v. Gonzalez-Ramirez, 561 F.3d 22, 28 (1st Cir. 2009)). "Determining competency . . . involves an inquiry into whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him.'" United States v. Ahrendt, 560 F.3d 69, 74 (1st Cir. 2009)(quoting Dusky v. United States, 362 U.S. 402, 402 (1960)(per curiam)). "A court must order a competency hearing on motion from . . . the defense . . . 'if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.'" Id. (quoting 18 U.S.C. §4241).

"'The failure of trial counsel to request a competency hearing where there was evidence raising a substantial doubt about a petitioner's competence to stand trial may constitute ineffective assistance of counsel.'" Vogt v. United States, 88 F.3d 587, 592 (8th Cir. 1996)(quoting Speedy v. Wyrick, 702 F.2d 723, 726 (8th

Cir. 1983)); see Hummel v. Rosemeyer, 564 F.3d 290, 303 (3d Cir. 2009); Williamson v. Ward, 110 F.3d 1508, 1518-19 (10th Cir. 1997). This is so because "the defendant's lawyer is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them, she has a professional duty to do so when appropriate." United States v. Boigegrain, 155 F.3d 1181, 1188 (10th Cir. 1998). Indeed, the First Circuit has recently held that, "where there are substantial indications that the defendant is not competent to stand trial, counsel is not faced with a strategy choice but has a settled obligation . . . under federal law . . . to raise the issue with the trial judge and ordinarily to seek a competency examination." Robidoux v. O'Brien, 643 F.3d 334, 338-39 (1st Cir. 2011).[12] Once again, under Strickland, even if trial counsel's failure to raise the issue of competence was unreasonable, counsel's performance would only be constitutionally ineffective upon a showing of prejudice, which requires a showing that the defendant was actually incompetent during the relevant time period. See id. at 340 (analyzing an alleged failure to request a competency hearing under Strickland and requiring a showing of prejudice). Accordingly, Sampson must adequately allege that trial counsel were aware of information that would cause

---

[12]The First Circuit suggested there may be "exceptions" to this rule, but declined to elaborate. Robidoux, 643 F.3d at 339.

objectively reasonable counsel to seek a competency determination, and that there is a reasonable probability (1) that the court would have ordered a competency hearing (or would have committed reversible error in refusing to do so) and (2) that Sampson would have been found incompetent. See id. at 338-41; Williamson, 110 F.3d at 1519 (citing Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990)).

Regarding objectively unreasonable performance, Sampson alleges that trial counsel were aware of evidence raising a substantial doubt about his competence, specifically: (1) Dr. Hegarty's opinion that Sampson was mentally ill; (2) Dr. Thomas Deters' opinion that Sampson had mental impairments consistent with brain damage; (3) prison records indicating attempted suicide, frequent psychiatric evaluation, and drug and alcohol abuse; (4) the fact that, during trial counsel's personal interaction with Sampson, he was unable to see the "big picture," engaged in disinhibited outbursts, was unable to discuss the substance of the case, showed a poor memory, and acted in ways contrary to his own best interests; (5) the fact that harassment in prison was making Sampson's mental condition worse; and (6) the unpredictable effects of the drug Depakote due to Sampson's cirrhosis and incompetent administration. See Am. §2255 Mot. at 161-63. Some of these alleged facts, particularly Sampson's alleged inability to discuss the substance of the case with trial counsel, relate to Sampson's

82

private meetings with trial counsel outside the courtroom and are not, therefore, conclusively contradicted by the record. See Moran, 494 F.2d at 1222 n.1. If true, these facts might prove that trial counsel's failure to request a competency hearing was objectively unreasonable. See Williamson, 110 F.3d at 1518 (holding trial counsel had a duty to seek a competency hearing where trial counsel was aware that the defendant misbehaved at court appearances, noted that defendant was receiving medication such that he was sometimes too drowsy to be interviewed, and had records showing the defendant had some sort of mental illness or disability).

It may be that Sampson's behavior would not have caused reasonable counsel to seek a competency hearing or that trial counsel had information which reasonably justified a decision not to seek a competency hearing even in light of unusual behavior. These are not, however, questions that can be resolved at this Rule 4 stage. See Vogt, 88 F.3d at 592 (rejecting, after an evidentiary hearing, allegation of ineffective failure to request competency hearing because trial counsel reasonably determined that there was no reason to request such a hearing).

Regarding the first component of the prejudice inquiry, assuming all of Sampson's allegations to be true and drawing all inferences in favor of Sampson, it is reasonably probable that the court would have ordered the competency hearing upon motion of the

defendant.  Cf. Gonzalez-Ramirez, 561 F.3d at 27-28 (affirming denial of competency hearing where defendant made a suicide attempt around the time of trial but otherwise exhibited no past or present indicia of mental illness or defect); United States v. Bruck, 152 F.3d 40, 45-46 (1st Cir. 1998)(affirming denial of competency hearing where expert examined the defendant and concluded he was competent and probably fabricating many of his problems).

Regarding the second component of the prejudice inquiry, Sampson has alleged that he was, in fact, incompetent and has submitted the affidavit of a medical expert, Dr. George W. Woods, Jr., M.D., in support of that allegation. See Am. §2255 Mot. at 165; Ex. G ¶184. This allegation is facially sufficient. The question raised by the government is whether this allegation is conclusively contradicted by the record,  which contains: (1) expert reports and expert testimony that do not question Sampson's competence; (2) multiple assessments of Sampson's mental state by the court at various points during the proceeding; (3) Sampson's apparently lucid post-arrest interviews; and (4) the court's personal observations of Sampson's behavior. The court concludes that the present record is insufficient to resolve this issue. Courts have repeatedly reversed summary dismissal of claims based on the defendant's mental status because the record and the judge's personal observations are inadequate to decide such questions conclusively.  See Sanders, 373 U.S. at 20; United States v.

Howard, 381 F.3d 873, 880-81 (9th Cir. 2004); Dziurgot, 897 F.2d at 1226.

Indeed, in 1971, in Lopez v. United States, the Ninth Circuit reversed the summary dismissal of an incompetence claim, despite the fact that the trial judge found the claim to be contradicted by the trial record, which included a psychiatric report on the issue of competence and the judge's careful examination of the defendant at the Rule 11 hearing. See 439 F.2d 997, 1000 (9th Cir. 1971). Although the Ninth Circuit expressed "great sympathy with the judge's views" because "it appear[ed] quite improbable that [the defendant's] motion is in fact meritorious," the court nevertheless reversed because the question could not be conclusively resolved by the files and records of the case. Id. at 999. Lopez was later cited with approval by the First Circuit in Dziurgot. See Dziurgot, 897 F.2d at 1226.

Here, too, given the substantial contemporaneous evidence of his competence at the time of trial, Sampson may ultimately be unable to establish a reasonable probability that he was incompetent at trial through retrospective expert testimony. See Williams v. Woodford, 384 F.3d 567, 607-09 (9th Cir. 2004)(affirming district court's finding, after a limited evidentiary hearing, that post-conviction expert testimony offered by petitioner was not credible and was refuted by contemporaneous evidence of competence). However, it is premature to decide this

issue.

In summary, Sampson has adequately alleged objectively
unreasonable conduct by trial counsel and prejudice relating to his
possible incompetence, and these allegations are not conclusively
contradicted by the record. Therefore, Claim III(I) will not be
summarily dismissed.

C. Ineffective Assistance of Counsel Based on Failure to
Present Evidence that Sampson's Indifferent Demeanor Was
Caused by Medication

Claim III(J) alleges that trial counsel were ineffective by
failing to present evidence that Sampson's indifferent demeanor
during court proceedings was caused by his medication, Depakote.
Sampson alleges that he was prejudiced by this because the jury
necessarily factored his appearance at trial into their assessment
of whether he was remorseful.

Assuming that Sampson can prove the existence of a flat,
indifferent demeanor, it is possible that trial counsel
unreasonably failed to understand that Sampson's demeanor was
caused by Depakote and, therefore, unreasonably failed to present
this information to the jury. Although the government argues that
this claim fails because trial counsel reasonably relied on their
experts to conclude that Depakote did not affect Sampson's ability
to express emotion, there is little in the record, except for Dr.
Hegarty's brief and general testimony that she told Sampson

personally that Depakote would not sedate him to the extent that he could not fight, from which the court could conclude that trial counsel had received and reasonably relied upon such expert advice. Indeed, the cases cited by the government for the proposition that counsel can reasonably rely on experts are cases in which the courts decided that issue after an evidentiary hearing. See Fields v. Brown, 431 F.3d 1186, 1200-01, 1205 (9th Cir. 2005); Campbell v. Coyle, 260 F.3d 531, 546 (6th Cir. 2001).

Regarding prejudice, it appears that an altered demeanor in a defendant who does not testify is a cognizable form of prejudice. See generally Riggins v. Nevada, 504 U.S. 127 (1992). In Riggins, a defendant relying on the insanity defense argued that he could not be involuntarily medicated because the drug restricted his right to show jurors his true demeanor. See id. at 130. Although the defendant did testify, see id. at 131, the Court expressed concern about the effect of the drug on both his testimony and his outward appearance during trial, and compared the forced administration of the drug to compelling the defendant to wear prison clothing or restraints during trial. See id. at 137. Justice Kennedy, concurring in the judgment, wrote that observation of a defendant by the jury at all stages of the trial is a fundamental component of the adversary system of criminal justice. See id. at 142 (Kennedy, J., concurring in the judgment). Consequently, although this court has substantial concerns that

permitting the jury to rely on the appearance of a non-testifying defendant would burden the defendant's Fifth Amendment right to remain silent at trial, Riggins indicates that evidence relating to Sampson's appearance at trial can be factored into the cumulative prejudice analysis. Therefore, this claim will not be dismissed.

## D.   Juror Misconduct Claim

Claim IV alleges misconduct and bias on the part of three jurors. Sampson asserts that the three jurors dishonestly answered questions during the jury selection process. Sampson claims that he is entitled to relief (1) under McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984); (2) because these three jurors were actually or impliedly biased; and (3) because he was prevented from intelligently exercising his peremptory challenges. A separate Memorandum and Order regarding this claim is being issued.

## E.   Cumulative Effect of Errors

Claim X alleges that Sampson is entitled to relief based on the cumulative effect of the foregoing alleged errors. See Sampson, 486 F.3d at 51 (recognizing cumulative error doctrine); Sepulveda, 15 F.3d at 1195-96 ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect."). The court will not dismiss this claim to the extent that it challenges the validity of Sampson's sentence, as the motion and record now before the court do not permit the court to conclude that such challenge to Sampson's death

sentence is without merit.

However, the court will dismiss Claim X to the extent that it seeks to challenge the validity of Sampson's plea. The court has concluded that Sampson's counsel were not ineffective in not advising Sampson to plead guilty prior to the Supreme Court's decision in Ring, 536 U.S. 584, and were not ineffective in advising Sampson to plead guilty to the Second Superseding Indictment after that decision. The court will also dismiss Sampson's claim that the carjacking statute is unconstitutional. Therefore, the only alleged error which could affect the validity of Sampson's plea is the claim that trial counsel were ineffective for failing to raise a question about Sampson's competence (Claim III(I)). Because only one claim of error relates to the validity of Sampson's plea, there is no opportunity to consider the cumulative effect of multiple errors on Sampson's decision to plead guilty.

Claim X, therefore, will not be dismissed as it relates to Sampson's sentence, but will be dismissed to the extent that it challenges the validity of Sampson's plea.

F. Execution Prohibited by Eighth Amendment

Claim VII alleges that new information shows that Sampson's brain damage is so severe that it would violate the Eighth Amendment to execute him. Sampson argues that this claim is not procedurally defaulted because information about Sampson's brain

89

damage was not known at trial or during direct appeal due to trial counsel's ineffective investigation. Because the viability of this claim depends on this threshold issue, and because this claim does not appear to require any independent fact-finding if the court receives evidence on the brain damage issue to resolve other claims, the court will not address this constitutional question until the procedural default issue is decided. Decision on the request to summarily dismiss this claim will be deferred.

VI. CONCLUSION AND ORDER

In view of the foregoing, some but not all of Sampson's claims are subject to summary dismissal. However, as explained in the October 20, 2011 Memorandum and Order concerning Claim IV, Sampson has proven that he was denied his Sixth Amendment right to an impartial jury and, therefore, he is entitled to a new trial to determine whether the death penalty is justified in his case. As discussed in a separate October 20, 2011 Memorandum and Procedural Order, it appears that a new sentencing trial will render moot some but not all of Sampson's claims that otherwise survive summary dismissal. As explained in that Order, the court is not now issuing an order finally resolving any of Sampson's claims. Rather, it is deferring doing so until the parties have an opportunity to confer and advise the court on the most appropriate form of an order to implement its decisions and state their positions on how this case should proceed.

UNITED STATES DISTRICT JUDGE